**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

_____

TEXAS MEDICAL ASSOCIATION, et al.,    )
    )
               *Plaintiffs*,    )
    )
v.    )
    )
UNITED STATES DEPARTMENT OF    )
HEALTH AND HUMAN SERVICES, et al.,    )
    ) Case No.: 6:22-cv-00372-JDK
               *Defendants*.    )
    ) Lead Consolidated Case
    )
    )
    )
    )
    )

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**
**AND MEMORANDUM IN SUPPORT THEREOF**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF THE ISSUE ........................................................................................... 2

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................................ 2

      A.   The No Surprises Act .............................................................................. 2

      B.   The IDR Process ..................................................................................... 5

      C.   The July Interim Final Rule ....................................................................... 6

      D.   The September Interim Final Rule ............................................................. 7

      E.   This Court's Decision in *TMA I* ................................................................ 8

      F.   The Final Rule ......................................................................................... 9

LEGAL STANDARDS ...................................................................................................... 14

ARGUMENT .................................................................................................................... 15

  I.   The Final Rule Exceeds The Departments' Statutory Authority Under The NSA And Is Not In Accordance With Law. ....................................................................... 16

      A.   The NSA leaves no room for the Departments to promulgate rules restricting arbitrators' discretion to weigh the statutory factors. ................................ 16

      B.   The Final Rule conflicts with the NSA's unambiguous terms. ................. 18

      C.   The Final Rule is not a permissible interpretation of the Act................... 24

  II.   The Final Rule Is Arbitrary And Capricious.................................................... 26

  III.   The Challenged Provisions Should Be Vacated And Remanded With Instructions To The Departments To Stop Privileging The QPA In The IDR Process.................................... 29

CONCLUSION................................................................................................................. 30

CERTIFICATE OF SERVICE ......................................................................................... 32

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Corn Growers Ass'n v. EPA*,
291 F.3d 1 (D.C. Cir. 2002) ...................................................................22

*Chamber of Commerce v. Dep't of Lab.*,
885 F.3d 360 (5th Cir. 2018) ....................................................25, 28, 29

*Chem. Mfrs. Ass'n v. EPA*,
870 F.2d 177 (5th Cir. 1989) .................................................................28

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ...............................................................................14

*Cigar Ass'n of Am. v. FDA*,
964 F.3d 56 (D.C. Cir. 2020) .................................................................27

*DIRECTV, Inc. v. Budden*,
420 F.3d 521 (5th Cir. 2005) .................................................................23

*Dish Network Corp. v. NLRB*,
953 F.3d 370 (5th Cir. 2020) .................................................................15

*Earth Island Inst. v. Hogarth*,
494 F.3d 757 (9th Cir. 2007) .................................................................30

*FCC v. Prometheus Radio Project*,
141 S. Ct. 1150 (2021).............................................................................15

*Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*,
314 U.S. 95 (1941)..................................................................................23

*Fiber Glass Sys., Inc. v. NLRB*,
807 F.2d 461 (5th Cir. 1987) .................................................................30

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
141 S. Ct. 1017 (2021).............................................................................29

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*,
968 F.3d 454 (5th Cir. 2020) .................................................................14

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
140 S. Ct. 2367 (2020).....................................................................19, 23

*Loc. Joint Exec. Bd. of Las Vegas v. NLRB*,
   657 F.3d 865 (9th Cir. 2011) ........................................................................30

*Matter of Bell Petrol. Servs., Inc.*,
   3 F.3d 889 (5th Cir. 1993) ...........................................................................28

*McQuiggin v. Perkins*,
   569 U.S. 383 (2013).......................................................................................18

*Mexichem Fluor, Inc. v. EPA*,
   866 F.3d 451 (D.C. Cir. 2017).......................................................................25

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983).................................................................................15, 28

*Music Choice v. Copyright Royalty Bd.*,
   970 F.3d 418 (D.C. Cir. 2020).......................................................................29

*Nat'l Pork Producers Council v. EPA*,
   635 F.3d 738 (5th Cir. 2011) ..................................................................17, 21

*New York v. Reilly*,
   969 F.2d 1147 (D.C. Cir. 1992).....................................................................18

*Ramirez v. ICE*,
   471 F. Supp. 3d 88 (D.D.C. 2020) ..........................................................18, 19

*Rotkiske v. Klemm*,
   140 S. Ct. 355 (2019).....................................................................................19

*Russello v. United States*,
   464 U.S. 16 (1983).........................................................................................17

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943).........................................................................................15

*Sierra Club v. EPA*,
   346 F.3d 955 (9th Cir. 2003) ........................................................................30

*Sw. Elec. Power Co. v. EPA*,
   920 F.3d 999 (5th Cir. 2019) ....................................................15, 25, 26, 27

*Tex. Med. Ass'n v. Dep't of Health & Hum. Servs.*,
   No. 6:21-CV-425-JDK, 2022 WL 542879 (E.D. Tex. Feb. 23, 2022) ........... *passim*

*Texas v. Biden*,
   20 F.4th 928 (5th Cir. 2021), *rev'd and remanded on other grounds*, 142 S.
   Ct. 2528 (2022) .............................................................................................30

iii

*Texas v. EPA*,
  389 F. Supp. 3d 497 (S.D. Tex. 2019) ...................................................................................14

*Texas v. United States*,
  497 F.3d 491 (5th Cir. 2007) ......................................................................................24, 25, 26

*Tice-Harouff v. Johnson*,
  No. 6:22-cv-201, 2022 WL 3350375 (E.D. Tex. Aug. 12, 2022) (Kernodle, J.)....................27

*United States v. Mead Corp.*,
  533 U.S. 218 (2001) .............................................................................................................14

*United States v. Mecham*,
  950 F.3d 257 (5th Cir. 2020) .................................................................................................20

*United Steel v. Mine Safety & Health Admin.*,
  925 F.3d 1279 (D.C. Cir. 2019) ............................................................................................29

*Wages & White Lion Invs., LLC v. FDA*,
  16 F.4th 1130 (5th Cir. 2021) ...............................................................................................15

**Statutes**

5 U.S.C. § 706(2) .......................................................................................................................14

26 U.S.C. § 9816(c) ......................................................................................................................2

29 U.S.C. § 1185e(c) .....................................................................................................................2

42 U.S.C. § 300gg-111 ...................................................................................................... *passim*

**Other Authorities**

45 C.F.R. § 149.140 ..................................................................................................................6, 7

45 C.F.R. § 149.510 ........................................................................................................... *passim*

86 Fed. Reg. 36,872 (July 13, 2021) ............................................................................................6

86 Fed. Reg. 55,980 (Oct. 7, 2021) ..........................................................................................7, 8

87 Fed. Reg. 52,618 (Aug. 26, 2022) ................................................................................. *passim*

Fed. R. Civ. P. 56(a) ...................................................................................................................14

H.R. 2328, 116th Cong. (2020) ....................................................................................................4

H.R. 3630, 116th Cong. (2019) ....................................................................................................4

H.R. 5800, 116th Cong. (2020) ................................................................................4

S. 1895, 116th Cong. (2019) ...................................................................................4

Dep'ts, *FAQs about Affordable Care Act and Consolidated Appropriations Act,
    2021 Implementation Part 55* (Aug. 19, 2022),
    https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-
    activities/resource-center/faqs/aca-part-55.pdf ..............................................7, 13

House Committees on Ways and Means, Energy and Commerce, and Education
    and Labor, *Protecting Patients from Surprise Medical Bills* (Dec. 21, 2020),
    https://gop-waysandmeans.house.gov/protecting-patients-from-surprise-
    medical-bills/ ...........................................................................................................5

House Ways and Means Committee, *Neal Opening Statement at Markup of
    Surprise Medical Billing, Hospice, and Health Care Investment Transparency
    Legislation* (Feb. 12, 2020), https://waysandmeans.house.gov/media-
    center/press-releases/neal-opening-statement-markup-surprise-medical-
    billing-hospice-and ..................................................................................................4

Plaintiffs Texas Medical Association ("TMA"), Dr. Adam Corley, and Tyler Regional Hospital, LLC, respectfully move for summary judgment on Counts I and II of their complaint.[1]

## INTRODUCTION

Earlier this year, in *Texas Medical Association v. Department of Health & Human Services* ("*TMA I*"), No. 6:21-cv-425-JDK, 2022 WL 542879 (E.D. Tex. Feb. 23, 2022), this Court invalidated an interim final rule issued by defendants (collectively, "the Departments") requiring arbitrators to presume that the so-called "qualifying payment amount" or "QPA" is the appropriate reimbursement rate for out-of-network healthcare services under the federal independent dispute resolution ("IDR") process established by the No Surprises Act ("NSA"). The Court held that "the Act unambiguously establishes the framework for deciding payment disputes," and that the Departments' QPA presumption "conflict[ed] with the statutory text" and "impermissibly altered the Act's requirements" by placing a "thumb on the scale for the QPA." *Id.* at *7–8.

In response to this Court's ruling, the Departments have now issued a final IDR rule ("Final Rule") that replaces their earlier QPA presumption with a new set of requirements that, although not described by the Departments as a "presumption," have the same effect. Under these new rules, arbitrators must always consider the QPA first and may not give *any* weight to the other circumstances Congress required them to consider unless a variety of extrastatutory criteria imposed by the Departments are met. Like the invalidated QPA presumption, these new rules unlawfully elevate the QPA over the other statutory factors, making the QPA the *de facto* benchmark rate. And, like the invalidated QPA presumption, they add material new terms that unlawfully circumscribe

---

[1] Attached hereto as Exhibits A–D and incorporated herein by reference are plaintiffs' declarations in support of this motion.

the discretion Congress granted arbitrators to choose how to weigh all the relevant facts and cir-

cumstances in determining which party's offer to select as the appropriate out-of-network rate.

Unless set aside, these provisions of the Final Rule will unfairly skew IDR results in insur-

ers' favor, granting them a windfall they were unable to obtain in the legislative process. At the

same time, they will undermine healthcare providers' ability to obtain adequate reimbursement for

their services, to the detriment of both providers and the patients they serve. Accordingly, for the

reasons discussed below, the Court should vacate the challenged provisions and, this time, remand

with instructions to the Departments to cease seeking to privilege the QPA in the IDR process.

## STATEMENT OF THE ISSUE

The issue presented is whether the challenged provisions of the Final Rule that place a

thumb on the scale for the QPA in the IDR process must be set aside because they exceed the

Departments' statutory authority, conflict with the statute, and are arbitrary and capricious.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    The No Surprises Act

The NSA creates a comprehensive framework designed to address surprise medical billing,

as well as supplemental requirements imposed on healthcare providers and plans and issuers (col-

lectively, "insurers") to enhance beneficiary transparency regarding the costs they can expect to

incur for healthcare items and services. The NSA made parallel amendments to the Public Health

Service ("PHS") Act, enforced by the Department of Health and Human Services ("HHS"); the

Employee Retirement Income Security Act ("ERISA"), enforced by the Department of Labor; and

the Internal Revenue Code ("IRC"), enforced by the Department of the Treasury.[2]

---

[2] The relevant statutory and regulatory provisions at issue in this case generally appear in triplicate
and are identical in all material respects. The NSA's IDR provisions are codified at 42 U.S.C.
§ 300gg-111(c) (PHS Act), 29 U.S.C. § 1185e(c) (ERISA), and 26 U.S.C. § 9816(c) (IRC). For
ease of reference, this brief cites the PHS Act provisions and implementing regulations.

2

The NSA provides that for emergency services furnished by an out-of-network healthcare provider and non-emergency services furnished by an out-of-network physician (or other healthcare personnel) at an in-network facility, insurers may not impose a patient cost-sharing requirement greater than the cost-sharing that would apply had the items or services been furnished by an in-network provider. 42 U.S.C. § 300gg-111(a)(1)(C)(ii), (b)(1)(A). Patient cost-sharing is calculated using a "recognized amount." *Id.* § 300gg-111(a)(1)(C)(iii), (b)(1)(B). The "recognized amount" is (1) an amount determined by an applicable All-Payer Model Agreement; (2) if there is none, the amount determined by a "specified State law," which is a state law that provides a method for determining the total amount payable by the patient; or (3) otherwise, the QPA for that item or service. *Id.* § 300gg-111(a)(3)(H). For each item or service, the QPA is statutorily defined as generally being the median of the contracted rates recognized by the insurer in 2019 for the same or similar item or service furnished by a healthcare provider in the same or similar specialty and in the same geographic region, with annual inflation adjustments. *Id.* § 300gg-111(a)(3)(E).

In addition to limiting patient cost-sharing, the NSA also limits the amount that out-of-network healthcare providers can bill to patients. For covered services, the NSA prohibits out-of-network healthcare providers from billing a patient for any amount that exceeds the statutorily calculated patient cost-sharing amount, unless an exception applies. Instead, the statute obligates insurers to reimburse out-of-network healthcare providers at the "out-of-network rate" as defined in statute, less any cost-sharing from the patient. *Id.* § 300gg-111(a)(1)(C)(iv)(II), (b)(1)(D).

The "out-of-network rate" is determined through a process similar to that for determining patient cost-sharing, but with one significant difference. As with patient cost-sharing, healthcare provider reimbursement is governed by any applicable All-Payer Model Agreement or, if there is

none, then by any applicable specified state law providing a method for determining out-of-net-work reimbursement. *Id.* § 300gg-111(a)(3)(K). But unlike with patient-cost sharing, if there is no applicable All-Payer Model Agreement or specified state law, Congress declined to set healthcare provider reimbursement at the QPA or otherwise provide a benchmark or mathematical formula. Instead, the NSA authorizes insurers to make an initial payment in an amount of their choosing, and then channels reimbursement disputes through a carefully designed process of open negotiation, followed, if necessary, by binding arbitration before a certified IDR entity.

The IDR process Congress established in the NSA was the product of extensive congressional deliberation and compromise. During the legislative process, insurers lobbied Congress to use the QPA as a benchmark rate not just for patient cost-sharing, but also for healthcare provider reimbursement. Multiple proposed bills would have set out-of-network reimbursement at the QPA or made the QPA the default payment amount subject to potential adjustment through an arbitration process only in exceptional circumstances. *See*, *e.g.*,  H.R. 3630, 116th Cong. (2019); S. 1895, 116th Cong. (2019); H.R. 2328, 116th Cong. (2020); H.R. 5800, 116th Cong. (2020).

Congress, however, ultimately rejected these approaches in favor of an IDR process in which "both the provider's offer and the plan's offer receive equal weight"; the arbitrator "considers, but isn't bound by, the plan's median in-network rate"; and "the provider is not left in a position to disprove the adequacy of such a rate." *Neal Opening Statement at Markup of Surprise Medical Billing, Hospice, and Health Care Investment Transparency Legislation* (Feb. 12, 2020) (statement of House Ways and Means Committee Chairman explaining the bipartisan compromise that Congress "worked together for many months to craft" to create an IDR process that would

consider information from both sides without "giving too much weight to … a benchmark rate");[3] *see also* House Committees on Ways and Means, Energy and Commerce, and Education and Labor, *Protecting Patients from Surprise Medical Bills* (Dec. 21, 2020) ("This text includes NO benchmarking or rate-setting" and requires arbitrators to "equally consider many factors").[4]

> ### B.    The IDR Process

The NSA "describe[s] the [IDR] process in meticulous detail." *TMA I*, 2022 WL 542879, at *8. As relevant here, the statute directs each party to submit (1) an offer for a payment amount, (2) any information requested by the arbitrator relating to the offer, and (3) any additional information relating to the offer the party wishes the arbitrator to consider, including information relating to a list of specifically enumerated statutory factors. 42 U.S.C. § 300gg-111(c)(5)(B), (C)(ii).

Subparagraph (C), entitled "Considerations in determination," spells out in specific detail the factors arbitrators must consider. *Id.* § 300gg-111(c)(5)(C). In particular, Congress mandated that arbitrators "shall consider" (1) the QPA for comparable items or services furnished in the same geographic area, *id.* § 300gg-111(c)(5)(C)(i)(I); (2) "information on any circumstance described in clause (ii)," *id.* § 300gg-111(c)(5)(C)(i)(II); (3) any information the arbitrator requests, *id.*; and (4) any additional information submitted by either party relating to its offer, *id.*

The aforementioned "clause (ii)," entitled "[a]dditional circumstances," sets forth five factors arbitrators must consider: (1) the level of training, experience, and quality and outcomes measurements of the healthcare provider that furnished the item or service, *id.* § 300gg-111(c)(5)(C)(ii)(I); (2) the market share of the healthcare provider or payor in the geographic region where the item or service was provided, *id.* § 300gg-111(c)(5)(C)(ii)(II); (3) the acuity of the

---

[3]   https://waysandmeans.house.gov/media-center/press-releases/neal-opening-statement-markup-surprise-medical-billing-hospice-and

[4] https://gop-waysandmeans.house.gov/protecting-patients-from-surprise-medical-bills/

individual receiving the item or service or the complexity of furnishing such item or service to such individual, *id.* § 300gg-111(c)(5)(C)(ii)(III); (4) the teaching status, case mix, and scope of services of the facility that furnished the item or service, *id.* § 300gg-111(c)(5)(C)(ii)(IV); and (5) demonstrations of good faith efforts (or lack of good faith efforts) made by the healthcare provider or payor to enter into network agreements, and, if applicable, contracted rates between the healthcare provider and payor during the previous four plan years, *id.* § 300gg-111(c)(5)(C)(ii)(V).

In subparagraph (D), Congress further specified three factors that arbitrators "shall not consider": (1) usual and customary charges, (2) the amount the healthcare provider would have billed had the NSA's provisions regarding balance billing not applied, and (3) the amount that would have been paid by a public payor, including under Medicare, Medicaid, the Children's Health Insurance Program, TRICARE, or 38 U.S.C. § 1701 *et seq*. *Id.* § 300gg-111(c)(5)(D).

After "taking into account the considerations specified" in the statute, the arbitrator must "select one of the offers submitted … to be the amount of payment" for the item or service at issue. *Id.* § 300gg-111(c)(5)(A)(i). If the parties agree to a payment amount before a decision issues, that payment amount controls. *Id.* § 300gg-111(c)(2)(B). If not, the arbitrator's decision is binding absent a fraudulent claim or evidence of factual misrepresentation. *Id.* § 300gg-111(c)(5)(E)(i).

### C.    The July Interim Final Rule

On July 1, 2021, the Departments issued an interim final rule implementing certain of the NSA's surprise medical billing requirements. *See* 86 Fed. Reg. 36,872 (July 13, 2021) ("July IFR"). Among other provisions, the July IFR sets forth a methodology for how insurers are to calculate QPAs. *See* 45 C.F.R. § 149.140. In calculating QPAs, insurers must resolve a number of issues that require subjective judgment, such as whether providers are in the "same or similar specialty," *id.* § 149.140(a)(12), what is the relevant "insurance market," *id.* § 149.140(a)(8), and what is the relevant "geographic region," *id.* § 149.140(a)(7).

The July IFR requires insurers to disclose only very limited information about how they calculated QPAs. *Id.* § 149.140(d). The information insurers use to calculate QPAs lies solely within their control, and the required disclosures provide almost no insight into how the insurer calculated a given QPA or whether the insurer's calculation complies with the applicable rules. Although the Departments can audit insurers' QPA calculations, *see* 42 U.S.C. § 300gg-111(a)(2), HHS has stated that it plans to conduct no more than nine audits annually, 86 Fed. Reg. at 36,935.

There is already evidence of widespread insurer noncompliance with the Departments' QPA-calculation rules. For example, the Departments recently acknowledged that they "have been informed" that insurers have not been consistently complying with how the Departments intended them to determine whether providers are in the "same or similar specialty." Dep'ts, *FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55* at 16–17 (Aug. 19, 2022) ("August FAQs").[5] The Departments also stated that they "have been informed" that some insurers "enter $0 in their fee schedule" for certain items and services and instructed insurers that "$0 does not represent a contracted rate" and thus "plans and issuers should not include $0 amounts in calculating median contracted rates." *Id.* at 17 n.29.

### D.     The September Interim Final Rule

On September 30, 2021, the Departments released a second interim final rule—at issue in *TMA I*—implementing additional provisions of the NSA. 86 Fed. Reg. 55,980 (Oct. 7, 2021). The September rule required arbitrators to employ a "rebuttable presumption" that the offer closest to the QPA represented the appropriate reimbursement amount. *Id.* at 56,056. Specifically, the rule directed arbitrators to "select the offer closest to the [QPA]" unless they "determine[d] that credi-

---

[5]          https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/faqs/aca-part-55.pdf.

ble information submitted by either party … clearly demonstrate[d] that the [QPA] [was] materially different from the appropriate out-of-network rate." *Id.* at 56,104. If the arbitrator did select the offer farther from the QPA, it was required to provide in its written decision "a detailed explanation" justifying its decision to reject the offer closer to the QPA, including a description of the "basis upon which the certified IDR entity determined that the credible information demonstrated that the QPA [was] materially different from the appropriate out-of-network rate." *Id.* at 56,000.

The Departments identified no statutory text creating these requirements. Instead, they asserted that the statute was "best interpret[ed]" to impose the QPA presumption because, *e.g.*, "[t]he statutory text lists the QPA as the first factor," *id.* at 55,996, and information on the other statutory factors would often "already be reflected in the QPA," *id.* at 55,997. The Departments also cited various "policy considerations" for "[a]nchoring" the payment amount to the QPA, which they believed would "increase the predictability of IDR outcomes" and "encourage parties to reach an agreement outside of the Federal IDR process to avoid the administrative costs." *Id.* at 55,996.

### E.      This Court's Decision in *TMA I*

In *TMA I*, this Court vacated the September rule's provisions imposing the QPA presumption. 2022 WL 542879, at *1, *15. Those rules, the Court held, unlawfully added decisionmaking requirements not found in the NSA and imposed extrastatutory limits on arbitrators' discretion.

The Court decided first that the "Departments' interpretation of the statute" was "owed no" deference because the NSA already "sp[eaks] clearly on the issue relevant here" by "unambiguously establish[ing] the framework for deciding payment disputes." *Id.* at *7–8. In mandating that arbitrators "shall consider" statutory factors, 42 U.S.C. § 300gg-111(c)(5)(C)(i), the Court explained, the NSA "plainly requires arbitrators to consider all the specified information in determining which offer to select." *TMA I,* 2022 WL 542879, at *7. And the NSA does not "instruc[t]

8

arbitrators to weigh any one factor or circumstance more heavily than the others" or "suggest anywhere that the other factors or information is less important than the QPA." *Id.* at *8.

The Court held that the Departments had "impermissibly altered" these clear statutory requirements by "treating the QPA as the default payment amount and imposing on any party attempting to show otherwise a heightened burden of proof that appears nowhere in the statute." *Id.* at *8–9 (cleaned up). The Court rejected as "unpersuasive" the Departments' defense that the "overall statutory scheme supports" elevating the QPA over the other factors. *Id.* at *8 (cleaned up). Rather than "restrict[ing] arbitrators' discretion and limit[ing] how they could consider the other factors," the Court reasoned, the NSA "'clearly sets forth a list of considerations and does not dictate a procedure' or a 'procedural order for [those] considerations.'" *Id.* (quoting *Mo.-Kan.-Tex. R.R. Co. v. United States*, 632 F.2d 392, 412 (5th Cir. 1980)). The Court thus concluded that the Departments' "thumb on the scale" for the QPA "'rewr[ote]' clear statutory terms'" and was unlawful. *Id.* at *8–9 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014)).

The Court further held that the Departments had violated the APA's notice-and-comment requirement in issuing the September rule and that this failure "provide[d] a second and independent basis" to invalidate the challenged provisions of the rule. *Id.* at *14.

In light of these infirmities, and after rejecting the Departments' requests for remand without vacatur or vacatur as applied only to plaintiffs, the Court vacated the provisions of the rule creating the presumption in favor of the QPA. *Id.* at *14–15.[6]

### F.     The Final Rule

On August 19, 2022, the Departments released the Final Rule at issue here. It was published in the Federal Register on August 26, 2022, becomes effective on October 25, 2022, 87 Fed. Reg.

---

[6] The Court also rejected challenges to plaintiffs' standing. *TMA I*, 2022 WL 542879, at *4–6.

52,618, and applies to items and services provided or furnished on or after that date, *id*. at 52,632. As relevant here, the Final Rule "remove[s] from the regulations the language vacated" in *TMA I*, *id.* at 52,625, but replaces those provisions with new requirements arbitrators must follow in considering the statutory factors, selecting an offer, and issuing their decisions.[7]

The Final Rule requires arbitrators to start by "consider[ing] the [QPA] for the applicable year for the same or similar item or service." 45 C.F.R. § 149.510(c)(4)(iii)(A). Only after the arbitrator has looked to the QPA, may the arbitrator "*then* consider information submitted by a party" concerning the other statutory circumstances. *Id*. § 149.510(c)(4)(iii)(B) (emphasis added). Although the statute does not prescribe a procedural order for considering the factors, the Departments determined that requiring arbitrators to begin with the QPA was "reasonable" because it is listed first and "must be a quantitative figure," whereas "the information received related to the additional circumstances … will often be qualitative and open to subjective evaluation." 87 Fed. Reg. at 52,627. The Departments failed to mention that other statutory circumstances may also include quantitative figures such as the "contracted rates between the provider or facility … and the plan or issuer … during the previous 4 plan years," 42 U.S.C. § 300gg-111(c)(5)(C)(ii)(V), or other information relating to the offer such as contracted rates or historical allowed amounts agreed upon with other plans or issuers in the same geographic area for the same or similar item or service.

---

[7] The Final Rule also imposes an additional QPA-disclosure requirement on insurers. Under the Rule, when a QPA is calculated "based on a downcoded service code or modifier"—that is, one "alter[ed]" by an insurer to a new code "associated with a lower [QPA] than the service code or modifier billed by the provider"—the insurer must disclose the following information: (1) a statement that the code was downcoded; (2) an explanation of why the claim was downcoded, including a description of which codes were altered; and (3) the amount that the QPA would have been if the insurer had not downcoded. 87 Fed. Reg. at 52,652.

In addition to permitting arbitrators to consider any other information only after having first considered the QPA, the Final Rule also imposes a number of other extrastatutory criteria that must be satisfied before arbitrators may give weight to any information other than the QPA:

> In weighing the considerations described in paragraphs (c)(4)(iii)(B) through (D) of this section [*i.e.*, all the information submitted to the arbitrator except the QPA], the certified IDR entity should evaluate whether the information is credible and relates to the offer submitted by either party for the payment amount for the qualified IDR item or service that is the subject of the payment determination. The certified IDR entity should not give weight to information to the extent it is not credible, it does not relate to either party's offer for the payment amount for the qualified IDR item or service, or it is already accounted for by the qualifying payment amount under paragraph (c)(4)(iii)(A) of this section or other credible information under paragraphs (c)(4)(iii)(B) through (D) of this section.

45 C.F.R. § 149.510(c)(4)(iii)(E).

The Final Rule thus forbids arbitrators to give weight to any information other than the QPA unless three requirements are met. *First*, before giving weight to any other information, the arbitrator must determine that it is "credible," *i.e.*, "that upon critical analysis [it] is worthy of belief and is trustworthy." *Id.* § 149.510(a)(2)(v). The Departments exempted the QPA from this requirement on the ground that the July IFR's requirements provided sufficient assurance of credibility, even though the Departments recognized that the QPA would be credible only "to the extent [it] is calculated in a manner consistent with the detailed rules issued under the [July IFR], and is communicated in a way that satisfies the applicable disclosure requirements." 87 Fed. Reg. at 52,627. Although the Departments required arbitrators to verify the credibility of all other information, they emphasized that it is not the arbitrator's "responsibility" to "monitor the accuracy of the plan or issuer's QPA calculation methodology." *Id.* at 52,627 n.31. The Departments did not grapple with the reality that the QPA will generally be an unaudited number calculated by the insurer and that neither the Departments, providers, nor arbitrators will have visibility into whether

the QPA was calculated consistent with the July IFR's "detailed rules." Nowhere, for example, did the Departments acknowledge, as they had in the August FAQs, that insurers were failing to comply with certain of the Departments' requirements for calculating QPAs. *See supra*, at 7.

*Second*, arbitrators must evaluate all information—again, except the QPA—to determine whether it "relates to the offer[s] submitted." 45 C.F.R. § 149.510(c)(4)(iii)(E). Arbitrators may not "give weight to" any other information—including information on the "additional circumstances" that Congress mandated arbitrators "shall consider" in every case, 42 U.S.C. § 300gg-111(c)(5)(C)(ii)—if it "does not relate to either party's offer." 45 C.F.R. § 149.510(c)(4)(iii)(E). Although the statute makes clear that the "additional circumstances" listed in subsection (C)(ii) *always* relate to the party's offer, 42 U.S.C. § 300gg-111(c)(5)(B)(ii), the Final Rule prohibits arbitrators from giving weight to any of these factors if the information does not meet the Departments' "related to" test. Thus, for example, although the statute expressly requires arbitrators to consider the provider's level of training and experience, *id.* § 300gg-111(c)(5)(C)(ii)(III), the Final Rule prohibits arbitrators from giving weight to this factor unless "the provider's level of training and experience was necessary for providing" the service at issue or "the training or experience made an impact on the care that was provided," 45 C.F.R. § 149.510(c)(4)(iv)(B).

*Third*, arbitrators may not "give weight to" any information other than the QPA to the extent the information is "already accounted for by the [QPA]." *Id.* § 149.510(c)(4)(iii)(E). Thus, for example, although the statute expressly requires arbitrators in every case to consider patient acuity and the complexity of furnishing the item or service at issue, 42 U.S.C. § 300gg-111(c)(5)(C)(ii)(III), the Final Rule prohibits arbitrators from giving any weight to these factors if "the additional information on the acuity of the patient and complexity of the service is already accounted for in the calculation of the [QPA]," 45 C.F.R. § 149.510(c)(4)(iv)(C)(2). Relatedly, if

12

the arbitrator does give weight to any information other than the QPA, it has an additional explanatory burden: its "written decision must include an explanation of why" it "concluded that this information was not already reflected" in the QPA. *Id.* § 149.510(c)(4)(vi)(B).

The Departments asserted that these requirements are warranted because "in many cases, the additional factors for the certified IDR entity to consider other than the QPA will already be reflected in the QPA," and "giving additional weight to information that is already incorporated into the calculation of the QPA would be redundant, possibly resulting in the selection of an offer that does not best represent the value of the qualified IDR item or service and potentially over time contributing to higher health care costs." 87 Fed. Reg. at 52,629. The Departments did not explain how arbitrators or healthcare providers would be able to determine whether the QPA already accounts for another piece of information submitted by the parties, given that the QPA is a figure calculated in secret by the insurer and is transparent to the insurer alone, and the arbitrator is prohibited from requiring the insurer to show that it calculated the relevant QPA consistent with the Departments' methodology. *See* 87 Fed. Reg. at 52,627 n.31; *see also* August FAQs at 16 ("[P]lans and issuers are not obligated to demonstrate that a QPA was calculated in accordance with the requirements of … 45 CFR 149.140(c) unless required to do so by an applicable regulator.").

Thus, under the Final Rule, the QPA "will be relevant to a payment determination" and must be considered first "in all cases." 87 Fed. Reg. at 52,627. But information on the other factors Congress required arbitrators to consider must be disregarded unless it satisfies extrastatutory criteria imposed by the Departments. And not only must the QPA be considered first, it is the lens through which all other information must be viewed. According to the Departments, the QPA "will

aid certified IDR entities in their consideration of each of the other statutory factors, as these enti-

ties will then be in a position to evaluate whether the 'additional' factors present information that

may not have already been captured in the calculation of the QPA." *Id.* at 52,628.

## LEGAL STANDARDS

Summary judgment is proper "if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"In the context of a challenge under the APA, '[s]ummary judgment is the proper mechanism for

deciding, as a matter of law, whether an agency action is supported by the administrative record

and consistent with the APA standard of review.'" *Texas v. EPA*, 389 F. Supp. 3d 497, 503 (S.D.

Tex. 2019) (quoting *Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 41 (D.D.C. 2008)); *see,

e.g.*, *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 459–60 (5th Cir. 2020).

Under the APA, courts will "hold unlawful and set aside" agency action that is "arbitrary, capri-

cious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or

"in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C).

In assessing an agency's statutory interpretation, courts must first determine whether Con-

gress authorized the agency "to speak with the force of law" with regard to the issue at hand.

*United States v. Mead Corp.*, 533 U.S. 218, 229 (2001). If so, then courts evaluate the agency's

interpretation under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S.

837 (1984). Under *Chevron*, courts "must give effect to the unambiguously expressed intent of

Congress," *id.* at 842–43, deferring to the agency's interpretation only if "the statute is 'truly am-

biguous' on the question" at hand and the agency's interpretation is a "permissible construction,"

*Gulf Fishermens Ass'n*, 968 F.3d at 460. Here, as discussed below, the challenged provisions are

not entitled to *Chevron* deference, both because the statute unambiguously precludes the Depart-

ments' rules and because the rules are not a permissible construction of the NSA.

14

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Although this standard is deferential and a court must not "substitute" its own "policy judgment for that of the agency," *id.*, arbitrary-and-capricious review "is not toothless," *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). "In fact, … it has serious bite." *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021). Agency action must be set aside if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Further, a court cannot uphold a rule based on grounds not given by the agency in the rule. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943); *Dish Network Corp. v. NLRB*, 953 F.3d 370, 379–80 (5th Cir. 2020).

## ARGUMENT

The challenged provisions of the Final Rule exceed the Departments' statutory authority and conflict with the NSA for three reasons. *First*, the NSA's detailed and comprehensive instructions leave no room for the Departments to promulgate rules restricting arbitrators' discretion to weigh the statutory factors as they see fit in light of all the facts and circumstances of a given case. *Second*, even if they did, the challenged provisions conflict with the statute's unambiguous terms and thus fail at *Chevron* step one. And *third*, the challenged provisions also fail at *Chevron* step two because, in making the QPA the *de facto* benchmark for out-of-network reimbursement, they do not permissibly interpret or implement the IDR process Congress created in the NSA. Separately, the Final Rule is arbitrary and capricious because, in multiple respects, it flunks the APA's fundamental requirements of reasoned decisionmaking. Accordingly, the challenged provisions of the Final Rule should be vacated and—given the Departments' repeated attempts to elevate the

15

QPA in violation of the statute and this Court's decision in *TMA I*—remanded with instructions to the Departments to cease seeking to privilege the QPA in the IDR process.

## I. The Final Rule Exceeds The Departments' Statutory Authority Under The NSA And Is Not In Accordance With Law.

### A. The NSA leaves no room for the Departments to promulgate rules restricting arbitrators' discretion to weigh the statutory factors.

The challenged provisions must be set aside, first, because the NSA's directions to arbitrators regarding the determination of the payment amount are complete and leave no room for the Departments to impose restrictions on arbitrators' discretion to weigh the statutory factors. In authorizing the Departments to promulgate rules implementing the IDR process, Congress provided that, under those rules, arbitrators would "determin[e]" the payment amount "in accordance with the succeeding provisions of this subsection." 42 U.S.C. § 300gg-111(c)(2)(A). In those "succeeding provisions," Congress itself provided all the guidance it deemed necessary with respect to arbitrators' decisional process and the selection of the offer to be applied as the out-of-network rate. And, as this Court has already held, those provisions are "unambiguous." *TMI I*, 2022 WL 542879, at *7. The Departments may not alter or add to them, under the guise of "interpretation" or otherwise. *See id.* at *9 (holding that the Departments violated the statute by "add[ing] key words not in the statute" and "impermissibly 'rewrit[ing] statutory language by ascribing additional, material terms'" (quoting *Texaco Inc. v. Duhe*, 274 F.3d 911, 920 (5th Cir. 2001)).

Several factors reinforce this conclusion. *First*, "Congress described the arbitration process in meticulous detail." *Id.* at *8. In a section entitled "Considerations in determination," Congress painstakingly enumerated the facts and circumstances arbitrators must consider "[i]n determining which offer is the payment to be applied." 42 U.S.C. § 300gg-111(c)(5)(C)(i). Congress then directed arbitrators to "select one of the offers submitted" after "taking into account th[ose] considerations." *Id.* § 300gg-111(c)(5)(A)(i). And Congress further specified factors that arbitrators may

16

*not* consider "[i]n determining which offer is the payment to be applied." *Id.* § 300gg-111(c)(5)(D). Especially in a statute this detailed and prescriptive, if Congress had wanted to provide additional instructions to arbitrators regarding the weighing of the factors or "to restrict arbitrators' discretion and limit how they could consider the other [non-QPA] factors, it would have said so." *TMA I*, 2022 WL 542879, at \*7; *see also Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 753 (5th Cir. 2011) (holding that agency lacked authority "to create from whole cloth" new provisions supplementing a comprehensive statutory scheme).

*Second*, in numerous other provisions of the statute addressing the IDR process, Congress expressly left gaps for the Departments to fill.[8] In marked contrast, Congress did not assign the Departments any role in dictating how arbitrators should weigh the statutory factors or determine which party's offer to select. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another … it is generally presumed that Congress acts intentionally."). Congress instead directed arbitrators to

---

[8] *See* 42 U.S.C. § 300gg-111(c)(1)(B) (the notification initiating the IDR process must contain "such information as specified by the Secretary" and the process begins upon submission of the notification or "such other date specified by the Secretary"); *id.* § 300gg-111(c)(3)(A) ("[T]he Secretary shall specify criteria under which multiple qualified IDR dispute items and services are permitted to be considered jointly as part of a single determination…."); *id.* § 300gg-111(c)(3)(A)(iv) (batched items and services must be furnished during a 30-day period "or an alternative period as determined by the Secretary"); *id.* § 300gg-111(c)(3)(B) ("the Secretary shall provide" for the treatment of bundled payments); *id.* § 300gg-111(c)(4)(A) ("[t]he Secretary … shall establish a process to certify" IDR entities); *id.* § 300gg-111(c)(4)(A)(vii) (the IDR entity must meet specified requirements and "such other requirements as determined appropriate by the Secretary"); *id.* § 300gg-111(c)(4)(F) ("[t]he Secretary shall … provide for a method" for selecting a certified IDR entity); *id.* § 300gg-111(c)(7)(C) (to be certified, IDR entities must "submit to the Secretary such information as the Secretary determines necessary to carry out the provisions of this subsection"); *id.* § 300gg-111(c)(7)(D) ("[t]he Secretary shall ensure the public reporting" does not disclose privileged or confidential information); *id.* § 300gg-111(c)(8)(A) (fees for participating in the IDR process shall be paid "at such time and in such manner as specified by the Secretary"); *id.* § 300gg-111(c)(8)(B) (the amount of the fee is to be "an amount established by the Secretary"); *id.* § 300gg-111(c)(9) ("[t]he Secretary may modify" deadlines or timing requirements "in cases of extenuating circumstances, as specified by the Secretary").

decide cases "in accordance with the succeeding provisions of this subsection," 42 U.S.C. § 300gg-111(c)(2)(A), and "pursuant to this paragraph," *id.* § 300gg-111(c)(5)(C)(i), without any hint that implementing regulations on the weighing of the factors were needed. They are not needed: "The remaining provisions of [the Departments' rules] and the Act itself provide a sufficient framework for providers and insurers to resolve payment disputes." *TMA I*, 2022 WL 542879, at *14.

*Third*, Congress enacted the NSA against a backdrop of longstanding case law holding that when a statute sets forth a list of factors for a decision maker to consider without dictating how they are to be weighed, the weighing of the factors is left to the decision maker's sound discretion. *See, e.g.*, *New York v. Reilly*, 969 F.2d 1147, 1150 (D.C. Cir. 1992) ("Because Congress did not assign the specific weight the Administrator should accord each of these factors, the Administrator is free to exercise his discretion in this area."); *Ramirez v. ICE*, 471 F. Supp. 3d 88, 176 (D.D.C. 2020) ("[I]f Congress did not mandate any particular structure or weight for an agency's consideration of a variety of factors, then the agency is left with discretion to decide how to account for the consideration factors, and how much weight to give each factor." (cleaned up)). "Congress legislates against the backdrop of existing law." *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.2 (2013). And existing law makes clear that when Congress directed arbitrators to "tak[e] into account," 42 U.S.C. § 300gg-111(c)(5)(A)(i), and "consider" the statutory factors, *id.* § 300gg-111(c)(5)(C), without assigning weights or prescribing a decisional structure, it authorized arbitrators to exercise their discretion in weighing the statutory factors. By robbing arbitrators of the discretion Congress granted them, the Departments' rules violate the statute.

## B.    The Final Rule conflicts with the NSA's unambiguous terms.

Even if the Departments have some authority to adopt rules restricting arbitrators' discretion, the challenged provisions are unlawful because they "rewrite clear statutory terms to suit" the Departments' "own sense of how the statute should operate." *TMA I*, 2022 WL 542879, at *8

(quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014)). Under the new requirements, arbitrators must consider the QPA first and cannot give any weight to the other circumstances Congress required them to consider unless they determine that a variety of extrastatutory criteria are met. These aspects of the Final Rule unlawfully transform the IDR process Congress created by dictating decisionmaking procedures for arbitrators that Congress chose not to adopt, by constraining arbitrators' ability to consider information that Congress mandated they take into account, and, ultimately, by placing an administrative thumb on the scale for the QPA.

To start, the Departments cannot require arbitrators to consider the QPA first or otherwise command them to make the QPA the starting point of the analysis. *See* 45 C.F.R. § 149.510(c)(4)(iii)(A)–(B) (requiring arbitrators to "consider the [QPA]" and "*then* consider information submitted by a party" concerning the other statutory circumstances (emphasis added)). The NSA "'clearly sets forth a list of considerations and does not dictate a procedure' or a 'procedural order'" for evaluating them. *TMA I*, 2022 WL 542879, at \*7–8 (quoting *Mo.-Kan.-Tex. R.R. Co. v. United States*, 632 F.2d 392, 412 (5th Cir. 1980)). Indeed, Congress knew how to prescribe the exact decisionmaking procedure the Final Rule requires—looking to one statutory factor and *then* to another. *See Ramirez*, 471 F. Supp. 3d at 176 (discussing 8 U.S.C. § 1232(c)(2)(B), which instructs the agency to "consider placement ... *after* taking into account" other factors). But Congress "chose not to do so." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2380 (2020); *see also Rotkiske v. Klemm*, 140 S. Ct. 355, 360–61 (2019) ("Atextual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision."). By adding a material "limitation not found in the statute," the Departments unlawfully "alter[ed]" the NSA's clear terms. *Little Sisters*, 140 S. Ct. at 2381; *see also TMA I*, 2022 WL 542879, at \*8.

That the QPA is the "first-listed statutory factor" does not license this requirement. 87 Fed. Reg. at 52,628. The Departments still "cite no authority holding that a statutory factor" must be considered first or given "more weight simply because it is the first in a list." *TMA I*, 2022 WL 542879, at *8. An interpretive canon requiring statutory factors to be considered in the listed order would be not only unprecedented, but nonsensical. Under the Departments' logic, by placing the provider's level of training and experience first among the "additional circumstances" arbitrators must consider, Congress implicitly told arbitrators to start there and *then* move in order through the other circumstances. And because prior contracted rates between the provider and the insurer are listed last, arbitrators would have to consider that information last. The statute, of course, requires none of this. If Congress had wanted to assign priority to factors based on their order or to prescribe a procedural order for their consideration, it would have said so.

The obvious intent and effect of the Departments' QPA-first rule is to elevate the QPA and subordinate the other factors, even though the statutory structure places the other factors on par with the QPA. *See* 42 U.S.C. § 300gg-111(c)(5)(C)(i)(I) (QPA), (II) (other information); *see also* 87 Fed. Reg. at 52,628 (stating that looking to the QPA first "will aid [arbitrators] in their consideration of each of the other statutory factors"). By making the QPA the reference point and the lens through which all other information must be viewed, the Final Rule aims to influence how arbitrators view other information before them and to increase the likelihood that the arbitrator will select the offer closer to the QPA. *Cf. United States v. Mecham*, 950 F.3d 257, 268 (5th Cir. 2020) (recognizing that a sentencing guidelines range may have an "anchoring effect" on the ultimate sentence imposed). But the statute "nowhere states that the QPA is the primary or most important factor." *TMA I*, 2022 WL 542879, at *8 (internal quotation marks omitted).

Also unlawful are the Final Rule's provisions ordering arbitrators not to give any weight to information other than the QPA unless that information satisfies a variety of extrastatutory criteria. *See* 45 C.F.R. § 149.510(c)(4)(iii)(E). The other statutory factors are not mere "'permissible additional factors' that may be considered only 'when appropriate.'" *TMA I*, 2022 WL 542879, at *8 (emphasis omitted) (quoting 86 Fed. Reg. at 56,080). To the contrary, Congress mandated that arbitrators "shall consider" this other information—no ifs, ands, or buts. *See id.* at *7 ("The Act plainly requires arbitrators to consider *all* the specified information in determining which offer to select." (emphasis added)). The Departments cannot rewrite Congress's instructions to add "heightened burden[s]" on these other statutory factors or to otherwise "restrict arbitrators' discretion and limit how they [can] consider the other factors." *See id.* at *8.

The Departments therefore lack authority to adopt their rule forbidding arbitrators to give weight to information, including information relating to the "additional circumstances," to the extent the information is "already accounted for" in the QPA. 45 C.F.R. § 149.510(c)(4)(iii)(E). Congress did not prohibit arbitrators from attaching repeated or extra significance to a piece of information just because it bears on more than one statutory factor. Nor did Congress permit an arbitrator to disregard information on the statutory factors because the arbitrator believes that information was an input into the QPA calculation. The Departments invented these limitations from "whole cloth." *Nat'l Pork Producers Council*, 635 F.3d at 753.

Worse, the Departments' instruction to arbitrators to ignore information if it is accounted for in the QPA directly conflicts with Congress's own instructions. The statute tells arbitrators to consider the "additional circumstances" and other information submitted by the parties relating to their offers *in addition* to the QPA. 42 U.S.C. § 300gg-111(c)(5)(C)(i)(II). Congress mandated this knowing full well that those circumstances may encompass the same or similar information as the

QPA, which is defined elsewhere in the same statute. *See id.* § 300gg-111(a)(3)(E)(i). Demanding a showing that information was not accounted for in the QPA before it may be given weight thus squarely conflicts with the statutory text and "impos[es] a heightened burden on the remaining statutory factors" that Congress itself chose not to impose. *TMA I*, 2022 WL 542879, at *8.

This burden is amplified by the accompanying explanation requirement, which disincentivizes arbitrators from giving weight to any information other than the QPA. Under the Final Rule, if an arbitrator does give weight to any other information, it must explain why it "concluded that th[e] information was not already reflected" in the QPA. 45 C.F.R. § 149.510(c)(4)(iv)(B). Given that the QPA is calculated unilaterally by the insurer and that neither providers nor arbitrators have meaningful visibility into the figure, this is no easy task. The obvious effect of this explanation requirement and of the Departments' restriction on considering information other than the QPA is to privilege the QPA over the remaining factors Congress decided arbitrators must consider.

The Departments' lopsided credibility test is another impermissible thumb on the scale in favor of the QPA. The Final Rule requires arbitrators to evaluate the credibility of any information presented to them—*except* the QPA—and forbids them to "give weight to information to the extent it is not credible." 45 C.F.R. § 149.510(c)(4)(iii)(E). However, while an evenhanded credibility requirement would not be cause for concern (surely arbitrators will not give weight to information they deem noncredible), nothing in the statute indicates that arbitrators should look at the QPA through rose-colored glasses while viewing all other information critically. Instructing arbitrators to "treat one of the … statutory factors" in a "different fashion" than the others by exempting it from an otherwise applicable threshold test "distorts the judgment Congress directed" arbitrators to "make [in] each" dispute. *Am. Corn Growers Ass'n v. EPA*, 291 F.3d 1, 6 (D.C. Cir. 2002).

The Departments also plainly lack authority to order arbitrators to ignore information on the "additional circumstances" if the information does not "relate to" a party's offer. 45 C.F.R. § 149.510(c)(4)(iii)(E). The NSA mandates, without qualification, that arbitrators "shall consider" "information on any circumstance described in clause (ii)"—that is, the "additional circumstances." 42 U.S.C. § 300gg-111(c)(5)(C)(i). By instructing arbitrators to weigh "information on" those "additional circumstances" only to the extent that information "relates to" a party's offer, the Final Rule blatantly "introduce[s] a limitation" into the statute's unqualified mandate that information on those circumstances must be considered. *Little Sisters*, 140 S. Ct. at 2381.

Indeed, the statute makes unambiguously clear that information on the "additional circumstances" *always* relates to a party's offer. Congress authorized parties to submit "any information relating to" their offers, "*including* information relating to any circumstance described in subparagraph (C)(ii)"—that is, the "additional circumstances." 42 U.S.C. § 300gg-111(c)(5)(B)(ii) (emphasis added). The word "including" signals that the items that follow are an "illustrative application of the general" category described before it. *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941); *see also DIRECTV, Inc. v. Budden*, 420 F.3d 521, 527 (5th Cir. 2005) (defining "includes" to mean "made up of, at least in part; contain"). So Congress deemed "information relating to any" of the "additional circumstances" to be an "illustrative application" of "information relating to [an] offer submitted by either party." 42 U.S.C. § 300gg-111(c)(5)(B)(ii). The Departments' requirement that arbitrators ignore some subset of the information on the "additional circumstances" as purportedly unrelated to a party's offer directly conflicts with Congress's judgment as reflected in the plain statutory text.

23

In all but name, the Final Rule imposes an unlawful presumption that the offer closest to the QPA is the appropriate payment amount. Like the presumption invalidated in *TMA I*, the Departments' new requirements clearly and impermissibly communicate that the QPA is the most important statutory factor and should be given outsized weight. And they mandate that *only* the QPA be given weight, unless the other information before the arbitrator meets "a heightened burden of proof that appears nowhere in the statute." *TMA I*, 2022 WL 542879, at *8. But because Congress did not make the QPA the "most important factor" or "impose … a presumption that the offer closest to the QPA should be chosen," the Departments may not add these features into the statute by administrative decree. *Id.* at 8 (internal quotation marks omitted).

### C.      The Final Rule is not a permissible interpretation of the Act.

Even if the challenged provisions were not expressly foreclosed by the statute, they are unlawful because they do not reasonably construe the NSA and "do not reasonably effectuate Congress's intent." *Texas v. United States*, 497 F.3d 491, 506, 509 (5th Cir. 2007) (invalidating agency action that "constitute[d] an unreasonable interpretation of Congress's intent").

As just discussed, although Congress intended for the QPA to be just one input alongside others and nowhere signaled that the QPA should be granted special treatment, the Departments have created a *de facto* presumption in favor of the QPA. To reiterate, the Departments have ensured that the QPA, because it must always be considered first, will color how arbitrators view all of the other information before them. When the arbitrator does turn to information on the other statutory factors, it cannot consider that information as it sees fit. Instead, the arbitrator must begin by evaluating whether the information satisfies threshold tests concocted by the Departments. And even if the arbitrator deems information to be "credible" and "relevant to" a party's offer, the arbitrator is still forbidden from giving that information any weight unless it determines that the

24

information is not already accounted for by the QPA, a figure into which arbitrators lack full insight. If the information does clear this difficult obstacle, the arbitrator must explain why in writing. This administratively engineered thumb on the scale for the QPA does not permissibly implement the NSA's text and structure. *See Sw. Elec.*, 920 F.3d at 1029 (setting aside regulation "based on an impermissible interpretation" of governing statute).

Nor do the challenged provisions "represen[t] a reasonable accommodation" of the "policies that were committed to the agenc[ies'] care by the statute." *Texas*, 497 F.3d at 506 (quoting *Chevron*, 467 U.S. at 845). Congress carefully contemplated the role the QPA should play in determining healthcare provider reimbursement. Legislators assessed various approaches, including making the QPA the out-of-network reimbursement rate in all cases or making the QPA the default payment amount. *See supra*, at 4–5 . But after extensive deliberation, Congress rejected these options in favor of an IDR process that "includes NO benchmarking or rate-setting" and requires arbitrators to "equally consider many factors." House Committees on Ways and Means, Energy and Commerce, and Education and Labor, *supra*. It is plainly unreasonable for the Departments now to impose requirements that make the QPA the *de facto* benchmark or primary factor in the IDR process. *See Chamber of Commerce v. Dep't of Lab.*, 885 F.3d 360, 385 (5th Cir. 2018) (finding rule "unreasonable" because it "outflank[ed]" congressional efforts to regulate in a different manner); *Mexichem Fluor, Inc. v. EPA*, 866 F.3d 451, 459 (D.C. Cir. 2017) (holding rule unlawful where Congress "contemplated giving" the agency authority it claimed but "ultimately declined").

In short, instead of respecting Congress's decision to balance the interests of healthcare providers and insurers as appropriate in light of all relevant facts in each case, the purpose and effect of the Departments' new requirements is to push arbitrators to select the offer closest to the QPA in most cases. The Final Rule thus unmistakably skews IDR results in favor of insurers,

whose offers will almost always be closer to the QPA because it is a figure over which insurers "hold ultimate power." *TMA I*, 2022 WL 542879, at *2. The Departments may not lawfully rig the IDR process in this way. *See Texas*, 497 F.3d at 506 (invalidating as unreasonable rule that "stacked" administrative procedure "against the objective interest-balancing Congress intended and create[d] the strong impression of a biased mediation process").

## II.   The Final Rule Is Arbitrary And Capricious.

The challenged provisions of the Final Rule conflict with the statute and should be set aside on that ground alone. They are also independently unlawful because they are not the product of the reasoned decisionmaking the APA requires. The Departments ignored significant problems with each of the provisions and otherwise failed to reasonably explain their new requirements.[9]

*First*, the Departments' attempt to justify their requirement to consider the QPA first is plainly deficient. They observed that the QPA "is the first-listed statutory factor," 87 Fed. Reg. at 52,628, but, as discussed, no interpretive canon holds that when Congress lists a statutory factor first, that factor should be treated differently or considered before other factors. The Departments also noted that the QPA is a "quantitative figure, like the offers that will be submitted in a payment determination," and argued that the QPA "will be unlike the information received related to the additional circumstances, which will often be qualitative and open to subjective evaluation." *Id.* at 52,627. But the Departments nowhere explained why the other quantitative figures that may be submitted by the parties, such as prior contracted rates between the provider and the insurer or other relevant data points submitted under subsection (C)(5)(B)(ii), are inferior to or more "subjective" than the QPA. Moreover, the Departments offered no reason why quantitative information

---

[9] Because of the substantial overlap between *Chevron* step two and the APA's arbitrary-and-capricious standard, *see Sw. Elec.*, 920 F.3d at 1028–29, the points in this section are also relevant to whether the Final Rule permissibly implements the NSA, and further confirm that it does not.

26

is better than qualitative information. And there is little reason to think it should be in a scheme that grants arbitrators discretion to weigh various types of information in light of all the circumstances in each case and select one of the parties' competing offers. The Departments' QPA-first requirement is arbitrary because it is unfounded and illogical. *See Sw. Elec.*, 920 F.3d at 1014.

   *Second*, the Departments ignored the fundamental unworkability of their prohibition on "double counting" information that is already included in the QPA and the associated requirement that the arbitrator explain in writing why it concluded that information was not already reflected in the QPA. The QPA remains a black box into which healthcare providers and arbitrators have no meaningful insight or input. It is a figure calculated in secret by the insurer based on the insurer's information and about which the insurer must disclose only limited information. Without a complete picture of how the QPA was calculated, providers offering additional information that they believe supports their offers cannot reasonably be expected to show that this information was not already accounted for in the QPA. Nor can arbitrators be expected to determine on their own whether the QPA accounts for a particular piece of information. The Departments acknowledged none of these obvious problems, although "it is difficult to imagine a more important aspect of the problem" than a policy's impracticability. *Cigar Ass'n of Am. v. FDA*, 964 F.3d 56, 62 (D.C. Cir. 2020). By providing no explanation of how their no-double-counting rule is supposed to work— or could possibly work—the Departments acted arbitrarily and capriciously. *See Tice-Harouff v. Johnson*, No. 6:22-cv-201-JDK, 2022 WL 3350375, at *11 (E.D. Tex. Aug. 12, 2022) (Kernodle, J.) ("[A]lthough an agency's experience and expertise presumably enable the agency to provide the required explanation, they do not substitute for the explanation." (cleaned up)).

*Third*, the Departments supplied no logical reason why arbitrators should be required to treat the QPA as credible while viewing all other information critically. The Departments themselves recognized that the QPA would "meet the credibility requirement" only if it is "calculated … consistent with the detailed rules issued under the [July IFR]" and "communicated in a way that satisfies the applicable disclosure requirements." 87 Fed. Reg. at 52,627. But there has been little auditing or monitoring of the accuracy of QPA calculations, and in most cases the QPA will be an unaudited figure unilaterally calculated by the insurer. The Departments themselves have elsewhere acknowledged that insurers have failed to comply with certain aspects of the Departments' rules for calculating QPAs. *See supra*, at 7. The Departments' assertion that the QPA "will mee[t]" the credibility standard is therefore entirely unsupported and hence arbitrary and capricious. *See*, *e.g.*, *Matter of Bell Petrol. Servs., Inc.*, 3 F.3d 889, 905–06 (5th Cir. 1993).

The Departments grappled with none of these concerns about the credibility of QPA calculations. Nor did they consider an obvious alternative: permitting arbitrators to take these credibility concerns into account in deciding how much weight to give the QPA. The Departments noted that "it is the Departments' (or applicable state authorities') responsibility, not the certified IDR entity's, to monitor the accuracy" of the QPA. 87 Fed. Reg. at 52,627 n.31. But while Congress charged the Departments with auditing some subset of insurers' QPA calculations, it does not follow that insurers' calculations will always be correct or that arbitrators must invariably treat them as such, while scrutinizing all other information more closely. *See Chamber of Commerce*, 885 F.3d at 382 ("Illogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action."). Thus, the Departments failed to consider important aspects of the problem, address obvious alternatives, or articulate satisfactory explanations for their decision. *See State Farm*, 463 U.S. at 43; *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 264 (5th Cir. 1989).

*Fourth*, the Departments' "related to" requirement is arbitrary. Nowhere did the Departments explain how information that Congress mandated be considered could fail to be "related to" a party's offer or the arbitrator's task. Even taken on its own terms, the Department's requirement is unreasonable. For example, the Departments would prohibit arbitrators from giving weight to the "additional circumstance" of the provider's level of training and experience, 42 U.S.C. § 300gg-111(c)(5)(C)(ii)(III), unless the provider shows that his or her "level of training and experience was necessary for providing" the service at issue "or that the training or experience made an impact on the care that was provided." 87 Fed. Reg. at 52,653. But relatedness does not imply necessity or causation. *See, e.g.*, *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021) (concluding that relatedness demands some connection but not a causal one). The Departments offered no explanation at all for their unusual definition, and "an agency's ipse dixit cannot substitute for reasoned decisionmaking." *Music Choice v. Copyright Royalty Bd.*, 970 F.3d 418, 429 (D.C. Cir. 2020); *see also Chamber of Commerce*, 885 F.3d at 382 (finding rule unlawful in part because it rested on the agency's unsupported and illogical "fiat").

## III.   The Challenged Provisions Should Be Vacated And Remanded With Instructions To The Departments To Stop Privileging The QPA In The IDR Process.

As in *TMA I*, "vacatur of the challenged portions of the [Final] Rule is the appropriate remedy." *TMA I*, 2022 WL 542879, at *14; *see United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action.").

The "seriousness of the deficiency weighs heavily in favor of vacatur." *TMA I*, 2022 WL 542879, at *14. Because the Final Rule "conflicts with the unambiguous terms of the Act in several key respects," the Departments cannot "rehabilitate or justify the challenged" provisions on remand. *Id*. Nor is it likely that the Departments will be able to correct their deficient reasoning. After *TMA I*, the Departments knew about many of the potential problems with the Final Rule, but

they ignored or failed to adequately address them. This Court should not give the Departments a third chance. *See Texas v. Biden*, 20 F.4th 928, 1000 (5th Cir. 2021), *rev'd and remanded on other grounds*, 142 S. Ct. 2528 (2022) (vacating action where agency "was on notice about the problems with its decision … [a]nd it still failed to correct them"). Nor will vacatur be "unduly disruptive." *TMA I*, 2022 WL 542879, at *14. As before, the Final Rule's surviving provisions and the statute "itself provide a sufficient framework" for resolving disputes. *Id.*

The Court should also remand to the Departments with specific instructions. *See Sierra Club v. EPA*, 346 F.3d 955, 963 (9th Cir. 2003) ("[B]oth Supreme Court and …. Circuit precedent acknowledge the propriety of remanding with instructions in exceptional cases."). That additional step is appropriate where, as here, an agency has failed to comply with a previous court order or has otherwise repeatedly failed to respect the governing law. *See, e.g.*, *Fiber Glass Sys., Inc. v. NLRB*, 807 F.2d 461, 463 (5th Cir. 1987); *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 769–70 (9th Cir. 2007). Because of the Departments' "stubborn refusal to follow [this Court's mandate] or statutory provisions," *Loc. Joint Exec. Bd. of Las Vegas v. NLRB*, 657 F.3d 865, 873 (9th Cir. 2011), the proper remedy is to remand to the Departments with specific instructions to comply with the law. Specifically, the Court should instruct the Departments that in any future rules, guidance, or other actions concerning the IDR process, the Departments may not (i) instruct arbitrators to place any greater weight on the QPA than on the other statutory factors, (ii) condition arbitrators' consideration or weighing of the other factors upon any additional findings relating to the QPA, or (iii) impose on arbitrators any administrative burdens that are conditioned upon arbitrators' relying on factors other than the QPA or selecting the offer farther from the QPA.

## CONCLUSION

For the foregoing reasons, the Court should vacate the challenged provisions of the Final Rule, *see* Compl., Prayer for Relief ¶ B, and remand with the instructions laid out above.

Dated:  October 12, 2022

Respectfully submitted,

/s/ *Eric D. McArthur*

Eric D. McArthur (*pro hac vice*) (Lead Attorney)
emcarthur@sidley.com
Brenna E. Jenny (*pro hac vice*)
bjenny@sidley.com
Madeleine Joseph† (*pro hac vice*)
mjoseph@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Tel: (202) 736-8018
Fax: (202) 736-8711

Jaime L.M. Jones (*pro hac vice*)
jaime.jones@sidley.com
Joseph R. LoCascio (*pro hac vice*)
joseph.locascio@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Tel: (312) 853-0751
Fax: (312) 853-7036

Penny P. Reid
Texas Bar No. 15402570
preid@sidley.com
Kelsey M. Taylor
Texas Bar No. 24098507
ktaylor@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Ave., Suite 2000
Dallas, Texas 75201
Tel: (214) 981-3413
Fax: (214) 981-3400

†Admitted only in Massachusetts; pending approval of application for admission to the D.C. Bar, practicing law in the District of Columbia under the supervision of principals of the firm who are members in good standing of the D.C. Bar.

31

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served on all counsel of record in accordance with the Federal Rules of Civil Procedure and this Court's CM/ECF filing system on October 12, 2022.

/s/ *Eric D. McArthur*
Eric D. McArthur