# EXHIBIT A

Case 6:22-cv-00372-JDK   Document 41-1   Filed 10/12/22   Page 1 of 7 PageID #: 172

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| TEXAS MEDICAL ASSOCIATION, et al., | ) |
| *Plaintiffs*, | ) |
| v. | ) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | ) Case No.: 6:22-cv-00372-JDK |
| *Defendants*. | ) Lead Consolidated Case |

**DECLARATION OF DR. CHRISTOPHER RYAN COOK**

I, Dr. Christopher Ryan Cook, solemnly declare under penalty of perjury and to the best of my knowledge, information, and belief as follows:

1. I am over 18 years of age and with capacity, and I provide this declaration based on my personal knowledge.

2. I am a board-certified anesthesiologist, subspecialty fellowship-trained in regional anesthesia, and a member of the Texas Medical Association. I have been in private practice for 12 years, with the last four years in independent practice in Dallas–Fort Worth. I have cared for and delivered both general anesthetics and regional blocks for orthopedic trauma patients at a Level I Trauma Center, orthopedic oncology patients, patients for cardiac electrophysiology procedures, chronic pain patients for interventional pain procedures to minimize outpatient opioid usage, and morbidly obese patients for robotic bariatric services. A number of these cases

required complex airway management, rapid blood transfusion, and invasive intravascular access. In addition, regional anesthesia was often necessary to avoid general anesthesia, minimize opioid use, and decrease the risk of opioid addiction. The surgeries in which I furnish anesthesia services are often lengthy procedures that can stretch late into the night.

3. I own 100% of Anesthesia and Acute Pain Experts Plano PLLC. My compensation model is based on billing and collecting, minus overhead expenses for anesthesia services rendered. This compensation varies based on a number of factors, including volume of cases, payor mixture (e.g., private health insurance versus Medicare), billing company expenses, malpractice premiums, corporate taxation, benefit expenses (including health insurance), accounting, transportation expenses, attorneys' fees, and medical school debt payments.

4. All of the services that I provide out-of-network are subject to the No Surprises Act's ("NSA") balance billing prohibition for patients with health insurance covered by the NSA, including Texas patients with coverage through an ERISA plan. Some of the out-of-network services that I provide qualify as "emergency services" covered under the NSA. Other out-of-network services that I provide are non-emergency medical services for which I am out-of-network, while the facility in which I am providing the services is in-network for my patient. Under the NSA, patients cannot consent to being balance-billed for either emergency services or "ancillary services," such as the anesthesiology services that I furnish.

5. I prefer to be in-network with health insurers where possible, but insurance companies do not always offer opportunities to be in-network or negotiate network agreements with me in good faith.

6. I routinely see commercially-insured patients in my practice, the large majority of whom have coverage that is subject to the NSA's balance billing prohibition, and some of these

2

patients are out-of-network. Accordingly, since the NSA went into effect on January 1, 2021, I have furnished out-of-network services that are subject to reimbursement through the NSA's IDR process, and I will continue to do so.

7. Where claims for my services are subject to reimbursement through the NSA's IDR process, I, working with my medical practice's administrative staff and our third-party billing company, have attempted to engage in open negotiation with out-of-network insurers for a reasonable reimbursement rate, using the process set forth in the NSA's implementing regulations.

8. My experience with Open Negotiation under the NSA has been incredibly frustrating. When insurers make an initial payment to me for services, they often do not include the qualifying payment amount ("QPA") as they are required to do, and they also do not clearly identify whether a claim is subject to a state surprise medical billing law or the NSA, even though they could easily do so by using an appropriate and clear remittance advice remark code. Their failure to convey this information makes it very difficult to determine when a claim is even subject to the NSA's IDR process, including Open Negotiation. Working with my administrative staff and third-party billing company, I do my best to understand which claims are eligible for Open Negotiation. Where I have participated in Open Negotiation, the process has been overwhelming, time-consuming, and not a true negotiation, as insurers have automatically rejected all of my offers and presented me with nothing more than "take it or leave it" offers generally tethered to the relevant QPA. Insurers are offering me $0–$30/unit for out-of-network anesthesia services subject to the NSA, which represents 0–34% of the 50th percentile allowed payment based on independent non-conflicted databases for my geographic area. These payments are a substantial reduction from 2019, 2020, and 2021.

9. In my experience, the Open Negotiation process has rarely resulted in an out-of-network insurer offering me a reasonable reimbursement rate that is consistent with the reimbursement rates insurers were willing to pay before the NSA went into effect. Instead, insurers have just pushed down their reimbursement offers to the relevant QPA.

10. Furthermore, the NSA's IDR process is so complex and time-consuming that my third-party billing company has informed me that they will not submit claims through IDR on my behalf, as part of their services. As a result, so far this year I have ended up simply accepting inadequate reimbursement rate offers made by insurers during Open Negotiation. This is in contrast to the Texas State IDR process, which is straightforward and user-friendly, and which my billing company can easily utilize.

11. For one claim for out-of-network services I furnished, the Open Negotiation period expires on October 12, 2022, and I plan to submit that claim into the IDR process within the next four business days, consistent with the NSA's implementing regulations governing the IDR process. Further, I am going to begin submitting other selected claims to the IDR process following the close of the Open Negotiation period, and I will continue to use the NSA's IDR process in the future to seek a reasonable reimbursement rate for at least some of the services I furnish to out-of-network patients.

12. I expect that the bids I will submit to the NSA's IDR process, including the bid I will submit within the next week, will always be higher than the QPA, because the QPA is much lower than a reasonable reimbursement rate for my services. I expect that the bids submitted by insurers as part of the NSA's IDR process will always be lower and closer to the relevant QPA than my bids, because up through the Open Negotiation period of the NSA's dispute resolution process, insurers have only ever offered me reimbursement rates at or around the relevant QPA.

13. Indeed, QPAs will often be well below the true median contracted rate as paid out in the market where I work, Dallas–Fort Worth. The Departments, in fact, recently acknowledged[1] that QPAs can materially differ from relevant median market rates, as a result of insurers inappropriately including "Ghost Contract" rates from physicians in different specialties, or even $0 rates listed in fee schedules. In addition, QPAs often do not accurately reflect the costs I incur in providing medical services, including because of geographic disparities in input costs, differences in provider training, and differences in patient and case complexity.

14. Indeed, the QPA values that are actually provided by health plans in Open Negotiation are egregiously low when compared to historical single case contract agreements that the same insurers entered into with my medical practice in 2019, 2020, and 2021. For example, one insurer has reduced payment by 78% per unit this year when compared to 2019 and reduced my unit rate by 49% from 2020 to 2021 following the passage and effective date of the NSA. QPAs are also dramatically lower when compared to an independent non-conflicted database, with QPAs ranging from 0–34% of the 50th percentile allowed payment within the relevant geographic area.

15. Because the Final Rule privileges the QPA during the IDR process, it incentivizes insurers to offer nothing more than the QPA during Open Negotiation, and furthermore to execute terminations, non-renewals, and renewals at 50% or less of their previous rates, as it will be significantly cheaper for insurers to reimburse providers under the NSA's out-of-network reimbursement rules than it will be to contract and offer reasonable network rates. I anticipate my practice will be insolvent within three months, without major governmental intervention

---

[1] DEP'TS, *FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55* at FAQ 14 (Aug. 19, 2022), *available at* https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/faqs/aca-part-55.pdf.

through congressional action or rulemaking. I have begun exploring other options including locum tenens work to continue to provide for my family. I anticipate most large groups and academic practices will face a termination from one of the largest health plans by the second quarter of 2023 because of the leverage the QPA has given insurers, which are seeking to tether all out-of-network reimbursement to the QPA. Ultimately, Texas patients will suffer from lack of access to care as physicians leave the state for states with more equitable qualifying state processes or leave the profession by retirement, career or specialty change, or sadly suicide. In addition, prospective medical students will begin to choose other professions with greater stability and compensation in comparison to the tremendous personal sacrifice and medical school debt currently taken on by today's physicians. Ultimately, it is the poorest and most vulnerable Texans who will suffer the most from access to care problems.

16. Privileging the QPA will make it more difficult for my bid to be chosen, in comparison with a process in which the IDR entities can freely consider all statutory factors without favoring any particular factor. Privileging the QPA will pressure me to lower my bids towards the QPA, which is often much lower than a reasonable reimbursement rate. Driving out-of-network reimbursement rates to the QPA will result in the systematic reduction of out-of-network reimbursements for me, compared to an IDR process that does not privilege the QPA.

17. Lower reimbursement rates for my services will decrease my compensation.

18. In this way, privileging the QPA directly harms my financial interests.

Pursuant to the requirements of 28 U.S.C. section 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on:
10.10.2022

DocuSigned by:
*[signature]*
125B6B23611E4C7...

Dr. Christopher Ryan Cook