# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| TEXAS MEDICAL ASSOCIATION, et al., | ) |
| *Plaintiffs*, | ) |
| v. | ) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | ) Case No.: 6:22-cv-00372-JDK |
| *Defendants*. | ) Lead Consolidated Case |

## DECLARATION OF DR. STEVEN FORD

I, Dr. Steven Ford, solemnly declare under penalty of perjury and to the best of my knowledge, information, and belief as follows:

1. I am over 18 years of age and with capacity, and I provide this declaration based on my personal knowledge.

2. I am a neuro-anesthesiologist, a resident of Dallas, Texas, and a member of the Texas Medical Association. As a neuro-anesthesiologist, I perform the anesthesia for neurosurgical operations, whether brain or spine, that commonly require special anesthesia techniques to facilitate intraoperative neuro-monitoring, which is unique to these types of operations, and often requires invasive monitoring to maintain hemodynamic stability and manage blood loss. None of these caregiving services are ever provided as telemedicine or from a laptop at home; they all require in-person, intensive one-on-one interactions between the neuro-

1

anesthesiologist and patient, which begin at the time the patient leaves the preoperative area, continue through the completion of the operation, and remain ongoing while the patient is transferred to a post-anesthesia care unit or intensive care unit after the operation.

3. I work at Optima Anesthesia PLLC, a small practice of four physicians who provide M.D.-only anesthesia services. All physicians are board-certified; two of the physicians have had additional formal fellowship training; and I have additional board certification in critical care medicine. Two of us, including me, were on faculty at large medical schools in the U.S. in the past at the Assistant Professor or Associate Professor level. I received my anesthesia and critical care training from Stanford University.

4. I am one of the three owners of this small medical practice. After all expenses are paid—including but not limited to credentialing expenses, scheduling expenses, revenue cycle management expenses, malpractice premiums, cross coverage expenses, profit-sharing expenses, legal expenses, banking fees, accounting expenses, hospital privilege expenses, state franchise taxes, arbitration fees, and mediation fees—the remaining revenue is distributed to the three separate professional associations of the three owners. Each professional association has many additional expenses, including but not limited to continuing medical education expenses, health insurance premium expenses, transportation expenses, legal expenses, banking expenses, accounting expenses, and retirement plan expenses.

5. All of the caregiving that I and other physicians furnish through Optima Anesthesia PLLC, if provided out-of-network, is subject to the No Surprises Act's ("NSA") balance billing prohibition for patients with health insurance covered through an ERISA plan. Out-of-network non-ERISA patients are generally subject to SB 1264, which is the State of Texas' version of the NSA and which is implemented by the Texas Department of Insurance.

2

Some of the out-of-network services that I provide qualify as "emergency services" covered under the NSA. Other out-of-network services that I provide are non-emergency medical services for which I am out-of-network, but the facility in which I am providing the services is in-network for my patient. Under the NSA, patients cannot consent to being balance-billed for either emergency services or "ancillary services," such as the anesthesiology services that I furnish.

      6.      I prefer to be in-network with health insurers where possible, but insurance companies do not always offer opportunities to be in-network or to negotiate network agreements with me in good faith.

      7.      Optima Anesthesia PLLC furnishes caregiving services to approximately 40 to 50 patients per week and provides out-of-network services to approximately 50% of those patients. About 80% of those out-of-network patients are patients covered by ERISA plans, and as such, those patients are now covered by the NSA's rules for out-of-network reimbursement. Accordingly, since January 1, 2022, when the NSA went into effect, I and other members of Optima Anesthesia PLLC have provided out-of-network anesthesia services that are subject to reimbursement through the NSA's IDR process, and we will continue to do so.

      8.      Where claims for my services are subject to reimbursement through the NSA's IDR process, I, working with my medical practice's administrative staff, have attempted to engage in the Open Negotiation process with out-of-network insurers in order to obtain a reasonable reimbursement rate, using the process set forth in the NSA's implementing regulations. This is a huge expense in time and money for my practice. During Open Negotiation, insurers currently do not negotiate in good faith. In fact, they do not negotiate at all, despite my good faith efforts to do so. My claims for anesthesia services just sit for 31 days

with no negotiation and no change in payment beyond the initial payment offered by the insurer. Furthermore, when insurers send an initial payment to me for my services, they commonly do not identify the QPA for my services (as they are required by regulation to do), much less provide information about how the QPA was calculated. Yet even with this opacity around how insurers calculate QPAs, there is growing evidence, including from third parties such as Avalere Health[1] and even from the government itself,[2] that QPAs are not reasonable proxies for an average negotiated rate for my services. According to the Departments,[3] QPAs can materially differ from relevant median market rates, as a result of insurers inappropriately including rates from physicians in different specialties, or even $0 rates listed in fee schedules. Indeed, these insurer-calculated QPAs are significantly lower than the reimbursement rates insurers were offering just last year for my services, before the NSA went into effect.

9.  QPAs will often be well below the true median contracted rate as paid out in the market where I work. The insurer-calculated QPAs by law are supposed to be 2019 in-network median rates adjusted to 2022 inflation. However, I have seen QPAs that are 20% to 50% of the 2019 median in-network rates available in a third-party database, with no inflation adjustment.

10. Furthermore, QPAs often do not accurately reflect the costs I incur in providing medical services, including because of geographic disparities in input costs, differences in provider training, and differences in patient and case complexity.

---

[1] https://www.acr.org/-/media/ACR/Files/Advocacy/2022-8-15-Avalere-QPA-Whitepaper_Final.pdf.
[2] DEP'TS, *FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55* at FAQ 14 (Aug. 19, 2022), *available at* https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/faqs/aca-part-55.pdf.
[3] *Id.*

4

11. In my experience, the Open Negotiation process has rarely resulted in an out-of-network insurer offering me a reasonable reimbursement rate that is consistent with the reimbursement rates insurers were willing to pay before the NSA went into effect. As a result, since January 1, 2021, I have worked with my administrative staff to submit claims for medical services I provided to the NSA's IDR process. I will continue to use the NSA's IDR process to seek a reasonable reimbursement rate for services I furnish to out-of-network patients.

12. To my knowledge, the bids I have submitted to the NSA's IDR process have always been higher than the relevant QPA, which is much lower than a reasonable reimbursement rate for my services.

13. I expect that the bids submitted by insurers as part of the NSA's IDR process will always be lower and closer to the relevant QPA than my bids. Indeed, in my experience, each insurer's bid is always the QPA, and in every IDR dispute I have lost, the insurer's offer is the QPA. As such, privileging the QPA will pressure me to lower my bids towards the QPA, which is often much lower than a reasonable reimbursement rate. Driving out-of-network reimbursement rates to the QPA will result in the systematic reduction of out-of-network reimbursement for me, compared to an IDR process that does not privilege the QPA.

14. Because the Final Rule privileges the QPA during the IDR process, it incentivizes insurers to offer nothing more than the QPA during Open Negotiation, and furthermore to execute terminations, non-renewals, and renewals at 50% or less of their previous rates, as it will be significantly cheaper for insurers to reimburse providers under the NSA's out-of-network reimbursement rules than it will be to contract and offer reasonable network rates. Many practices will become insolvent. The ultimate results will be less competition, more

consolidation, fewer independent physician practices, decreased quality of care, and diminished access to care for Texas patients.

15. The IDR process has harmed my practice tremendously. I have physicians leaving my small independent practice to work for consolidated hospital corporations and even leaving the state of Texas due to the financial harm. We are currently 10 months into the NSA IDR process with less than 5% of disputes with payment determinations. Yet I have paid thousands of dollars in administrative fees to the federal government and certified IDR entities for disputes that remain unresolved, well past statutory and regulatory deadlines. Lower reimbursement rates have led to an increase in the anesthesia care team model, in which anesthesiologists supervise the provision of anesthesia by certified registered nurse anesthetists but do not directly provide anesthesia, a model that has been shown to increase patient mortality and morbidity, undermining the quality of anesthesia care for Texas residents. *See Association of Anesthesiologist Staffing Ratio With Surgical Patient Morbidity and Mortality*, JAMA SURGERY (2022). At the same time, insurers have announced record profits over the past year.

16. Privileging the QPA will make it more difficult for my bid to be chosen in IDR, in comparison with a process in which the IDR entities can freely consider all statutory factors without favoring any particular factor.

17. As such, requiring IDR entities to privilege the QPA will lower reimbursement rates for my services, such that my compensation will decrease.

18. In this way, privileging the QPA directly harms my financial interests.

Pursuant to the requirements of 28 U.S.C. section 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on:
10/10/2022

Dr. Steven Ford

6