# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| TEXAS MEDICAL ASSOCIATION, et al., | ) |
| *Plaintiffs*, | ) |
| v. | ) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | ) |
| *Defendants*. | ) Case No.: 6:22-cv-00372-JDK <br> ) Lead Consolidated Case |

## DECLARATION OF TYLER REGIONAL HOSPITAL, LLC

I, Glen Christensen, solemnly declare under penalty of perjury and to the best of my knowledge, information, and belief as follows:

1. I am the Chief Financial Officer for Tyler Regional Hospital, LLC (the "Hospital"). My responsibilities include negotiating with insurers to enter into network agreements and negotiating reimbursement for medical services furnished to out-of-network patients.

2. This declaration is based on my personal knowledge and is made with the authority of the Hospital.

3. The Hospital provides medical care to thousands of patients each year, with the mission of ensuring that East Texas residents receive world-class medical care. In addition to offering comprehensive, innovative, cutting-age care for all patients, the Hospital provides a

1

variety of services focused exclusively on the least fortunate in the Tyler community. These services include: (1) a primary healthcare program providing free primary care visits, diabetes visits, mammograms, and blood pressure visits; (2) the Healthy Texas Women program, which offers free reproductive health services like HIV screening, screening and treatment for postpartum depression, breast and cervical cancer screenings, and pelvic exams; and (3) the Family Planning Program, which offers free pregnancy testing, cholesterol, diabetes, and high blood pressure screening, and prenatal benefits.

4. The Hospital also provides out-of-network services, including emergency services, that are covered by the No Surprises Act's ("NSA") balance billing prohibition and the independent dispute resolution ("IDR") process for determining reimbursement rates for certain out-of-network services.

5. The Hospital furnishes emergency services through its emergency department. When the Hospital furnishes emergency services to a patient with insurance that covers emergency services, the Hospital submits a claim on a UB-04 form through a third-party billing service to the patient's insurance company. The claim for services (known as a facility fee) is submitted in the Hospital's name, and the Hospital receives payment from the insurance company. This same process applies regardless of whether the Hospital is in-network or out-of-network.

6. The Hospital has furnished emergency services covered by the NSA's IDR process to patients since the NSA went into effect. However, the Hospital has not yet submitted claims for services covered by the NSA into the NSA's Open Negotiation process. The Hospital has not consistently been able to identify, within the period to initiate Open Negotiation, when claims are covered by the NSA's IDR process, as a result of a failure by insurers to clearly

convey this information when making an initial payment. Nonetheless, the Hospital will almost certainly submit a claim through Open Negotiation later this year, and for at least some of those claims, the Hospital will almost certainly choose to enter into the NSA's IDR process.

7. I expect that the bids submitted by insurers as part of the NSA's IDR process will almost always be lower and closer to the relevant QPA than the Hospital's bids. As such, the Hospital will feel pressure to lower its bids towards the QPA. Driving out-of-network reimbursement rates to the QPA will result in the systematic reduction of out-of-network reimbursement for the Hospital, compared to an IDR process that does not privilege the QPA.

8. Based on industry knowledge, I also expect that the QPAs associated with the Hospital's services will be below a reasonable reimbursement rate. QPAs often do not accurately reflect the costs the Hospital incurs in providing emergency medical services, including because of geographic disparities, differences in provider training, and differences in patient and case complexity. The Departments also recently acknowledged[1] that QPAs can materially differ from relevant median market rates, as a result of insurers inappropriately including rates from physicians in different specialties, or even $0 rates listed in fee schedules.

9. Because the Final Rule privileges the QPA during the IDR process, the Hospital's reimbursement for services covered by the NSA's IDR process will decline.

10. Privileging the QPA will make it more difficult for the Hospital's bid to be chosen in the IDR process, in comparison with a process in which the IDR entities can freely consider all statutory factors without favoring any particular factor.

---

[1] DEP'TS, *FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55* at FAQ 14 (Aug. 19, 2022), *available at* https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/faqs/aca-part-55.pdf.

3

11. Requiring IDR entities to privilege the QPA will lower reimbursement rates for the Hospital's care, such that the Hospital's revenues will decrease.

12. In this way, privileging the QPA directly harms the Hospital's financial interests.

Pursuant to the requirements of 28 U.S.C. section 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on: _____

DocuSigned by: *[signature]* 10/11/2022

Glen Christensen

4