**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

_____

| | | |
|---|---|---|
| TEXAS MEDICAL ASSOCIATION, et al., | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | Case No.: 6:22-cv-00372-JDK |
| v. | ) | |
| | ) | Lead Consolidated Case |
| UNITED STATES DEPARTMENT OF | ) | |
| HEALTH AND HUMAN SERVICES, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**LIFENET'S MOTION FOR SUMMARY JUDGMENT AND
MEMORANDUM IN SUPPORT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................ 1

STATEMENT OF THE ISSUE ....................................................................... 2

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................... 2

    I.     The No Surprises Act ...................................................................... 2

    II.    The Final Rule, Enacting the New QPA Presumption, Also Affects Air Ambulance Providers ................................................................... 4

    III.   QPAs Are Being Calculated Using "Ghost Rates" Agreed to By Providers that Do Not Even Operate Air Ambulances ........................ 6

    IV.   Facts Relating to LifeNet's Standing ............................................... 8

LEGAL STANDARDS .................................................................................. 8

ARGUMENT .................................................................................................. 9

    I.     LifeNet Incorporates TMA's Merits Arguments ............................ 9

    II.    The New QPA Presumption Is Arbitrary and Capricious Because the Departments Do Not Account for "Ghost Rates" ............................. 9

    III.   LifeNet Has Standing ................................................................... 10

         A.    Legal Standard .......................................................... 11

         B.    LifeNet Is An Object of the New QPA Presumption............. 11

         C.    The New QPA Presumption Causes Procedural Injury to LifeNet.......... 12

         D.    The New QPA Presumption Causes Economic Harm to LifeNet ........... 13

         E.    The New QPA Presumption Causes Immediate Reputational Harm to LifeNet ........................................................... 14

CONCLUSION............................................................................................. 16

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Petroleum Inst. v. Johnson*,
  541 F. Supp. 2d 165 (D.D.C. 2008) ...................................................................................11

*Ass'n of Data Processing Serv. Organizations, Inc. v. Camp*,
  397 U.S. 150 (1970) .........................................................................................................15

*Matter of Bell Petrol. Servs., Inc.*,
  3 F.3d 889 (5th Cir. 1993) ................................................................................................10

*Chamber of Commerce v. Dep't of Lab.*,
  885 F.3d 360 (5th Cir. 2018) ..............................................................................................9

*Chem. Mfrs. Ass'n v. EPA*,
  870 F.2d 177 (5th Cir. 1989) ............................................................................................10

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ....................................................................................................14, 15

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.*,
  779 F.3d 258 (5th Cir. 2015) ............................................................................................11

*Cranor v. 5 Star Nutrition, L.L.C.*,
  998 F.3d 686 (5th Cir. 2021) ..............................................................................11, 15, 16

*Duarte v. City of Lewisville*,
  759 F.3d 514 (5th Cir. 2014) ............................................................................................11

*LifeNet v. HHS, et al.*,
  6:22-cv-00373, ECF 4 (filed Sep. 26, 2022) ......................................................................4

*LifeNet, Inc. v. United States Dep't of Health & Hum. Servs.*,
  No. 6:22-CV-162-JDK, 2022 WL 2959715 (E.D. Tex. July 26, 2022) .......................... *passim*

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .........................................................................................................12

*Meland v. Weber*,
  2 F.4th 838 (9th Cir. 2021) ...............................................................................................11

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*,
  656 F.3d 580 (7th Cir. 2011) ............................................................................................11

*Robins v. Spokeo, Inc.*,
   867 F.3d 1108 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 931 (2018)..................................15

*Shields v. Dick*,
   No. 3:20-CV-00018, 2020 WL 5522991 (S.D. Tex. July 9, 2020) ..........................11

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016)............................................................................................11

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014)................................................................................................15

*Texas v. EEOC*,
   933 F.3d 433 (5th Cir. 2019) ................................................................................12

**Statutes**

26 U.S.C. § 9816(c) ......................................................................................................2

29 U.S.C. § 1185e(c) ....................................................................................................2

42 U.S.C. § 300gg-111 ...........................................................................................2, 3, 15

42 U.S.C. § 300gg-112 ...........................................................................................2, 3

**Other Authorities**

D. Gordon, *New Healthcare Price Transparency Rule Took Effect July 1* ....................7

Restatement (First) of Torts § 624 (1938) ..................................................................16

Restatement (Second) of Torts §§ 623A-629 (1977)..................................................16

**Federal Regulations**

45 C.F.R. § 147.211(b)(1)(iii)........................................................................................7

45 C.F.R. § 149.140(d) ..............................................................................................10

45 C.F.R § 149.510 ...............................................................................................4, 6, 9

45 C.F.R § 149.520 ...............................................................................................4, 6, 12

86 Fed. Reg. 36,872 ...............................................................................................6, 15

87 Fed. Reg. 52,618 ...........................................................................................9, 10, 13

Plaintiff LifeNet, Inc., respectfully moves for summary judgment on Count I of its complaint. Attached hereto as Exhibits E, F, and G, and incorporated herein by reference, are LifeNet's declarations in support of this motion.

## INTRODUCTION

LifeNet joins in full the separate motion for summary judgment filed by the Texas Medical Association ("TMA"). ECF 41 (the "TMA Br."). LifeNet makes three additional arguments:

*First*, there are no material statutory or regulatory differences, relevant to this case, between the Independent Dispute Resolution ("IDR") process for air ambulance providers and the IDR process for non-air ambulance providers.  Nor are there any material differences between how the New QPA Presumption is applied to air ambulance providers, and how it is applied to non-air-ambulance providers. Therefore, all of TMA's arguments are equally applicable to air ambulance providers like LifeNet. *See LifeNet, Inc. v. United States Dep't of Health & Hum. Servs.*, No. 6:22-CV-162-JDK, 2022 WL 2959715, at *8 (E.D. Tex. July 26, 2022) ("*LifeNet I*") ("[F]or all the reasons stated in *TMA,* the Court holds that the Rule conflicts with the Act and must be set aside under the APA.").

*Second*, the Departments' New QPA Presumption is arbitrary and capricious because QPA calculations are afflicted by "ghost rates"—that is, contracted rates agreed to by providers who do not even provide the at-issue service. To take just one local example: Aetna of Texas's recently published data contains hundreds of contracted rates, for air ambulance transport services, which were agreed to by social workers, optometrists, and psychologists. *See* Ex. E. Such "ghost rates" are not a reliable measure of the market prices for these services because a provider with no air ambulance has no economic incentive to negotiate for an appropriate air-ambulance rate. The Departments knew about this problem but did not address it. Nor did the Departments attempt to

1

explain why the arbitrator should be forbidden from questioning the credibility of QPAs that are based on "ghost rates."

*Third*, LifeNet has standing to challenge the New QPA Presumption.

## STATEMENT OF THE ISSUE

LifeNet respectfully incorporates TMA's statement of the issue.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

LifeNet respectfully incorporates TMA's statement of undisputed material facts.   In addition, LifeNet adds the following undisputed material facts relating to air ambulances.

## I.    The No Surprises Act

In the No Surprises Act, Congress enacted a separate and much shorter statutory provision that governs air ambulance IDRs: 42 U.S.C. § 300gg-*112*.[1] That separate provision incorporates, by reference, nearly every part of the statutory provision that governs non-air ambulance IDRs: 42 U.S.C. § 300gg-*111*. The only difference between these two provisions, relevant to this case, is the list of non-QPA statutory factors that the IDR entity "shall consider." The chart below compares these factors for both kinds of IDRs:

| "Considerations in determination" for *non-air ambulance* IDRs.  42 U.S.C. § 300gg-111(c)(5). | "Considerations in determination" for *air ambulance* IDRs.  42 U.S.C. § 300gg-112(b)(5)(C). |
|---|---|
| "[T]he  qualifying  payment  amounts [QPAs] . . . for the applicable year for items or services that are comparable to the qualified IDR item or service and that are furnished in | *Substantially the same.* |

---

[1] The relevant statutory and regulatory provisions at issue in this case generally appear in triplicate and are identical in all material respects. For ease of reference, this brief—like TMA's brief—cites the PHS Act provisions in 42 U.S.C., and the PHS implementing regulations in 45 C.F.R., which are enforced by the Department of Health and Human Services ("HHS").  The NSA made parallel amendments to the Employee Retirement Income Security Act ("ERISA"), enforced by the Department of Labor; and the Internal Revenue Code ("IRC"), enforced by the Department of the Treasury. The relevant provisions are also codified at 29 U.S.C. § 1185e(c) (ERISA), and 26 U.S.C. § 9816(c) (IRC).

| "Considerations in determination" for *non-air ambulance* IDRs. 42 U.S.C. § 300gg-111(c)(5). | "Considerations in determination" for *air ambulance* IDRs. 42 U.S.C. § 300gg-112(b)(5)(C). |
|---|---|
| the same geographic region . . . as such qualified IDR item or service." | |
| "Demonstrations of good faith efforts (or lack of good faith efforts) made by the nonparticipating provider or nonparticipating facility or the plan or issuer to enter into network agreements and, if applicable, contracted rates between the provider or facility, as applicable, and the plan or issuer, as applicable, during the previous 4 plan years." | *Substantially the same.* |
| Any information the IDR entity requests from the parties. | *Same.* |
| Any additional information submitted by a party relating to an offer. | *Same.* |
| "The acuity of the individual receiving such item or service or the complexity of furnishing such item or service to such individual." | *Substantially the same.* |
| "The level of training, experience, and quality and outcomes measurements of the provider or facility that furnished such item or service . . . ." | "The training, experience, and quality of the medical personnel that furnished such services."<br><br>"The quality and outcomes measurements of the provider that furnished such services." |
| "The market share held by the nonparticipating provider or facility or that of the plan or issuer in the geographic region in which the item or service was provided." | The "[a]mbulance vehicle type, including the clinical capability level of such vehicle." |
| "The teaching status, case mix, and scope of services of the nonparticipating facility that furnished such item or service." | The "[p]opulation density of the pick up location (such as urban, suburban, rural, or frontier)." |

Because the statutory provisions are otherwise identical in all relevant respects, each of the statutory arguments made by TMA's brief applies with full force to air ambulance providers and to air ambulance IDRs. All the Court need do is transpose TMA's citations to Section 300gg-111(c) to the same subparagraph of Section 300gg-112(b). *Compare, e.g.*, 42 U.S.C. § 300gg-

111(c)(5)(C) ("the certified IDR entity . . . shall consider . . . information on any circumstance described in clause (ii)"), *with* 42 U.S.C. § 300gg-112(b)(5)(C) (same).

## II.  The Final Rule, Enacting the New QPA Presumption, Also Affects Air Ambulance Providers

On August 26, 2022, two months after this Court's *LifeNet I* decision, the Departments published a Final Rule in the Federal Register entitled *Requirements Related to Surprise Billing*, 87 Fed. Reg. 52,618 (August 26, 2022). The Final Rule replaces those provisions of the October IFR that were vacated by *TMA I* and *LifeNet I.* Exhibit A to LifeNet's current complaint is a redline comparison showing the changes to the relevant regulatory provisions. *LifeNet v. HHS, et al.*, 6:22-cv-00373, ECF 4 (filed Sep. 26, 2022).

In place of the provisions vacated by this Court, the Final Rule enacts a New QPA Presumption. The New QPA Presumption is to be codified in four parts of 45 C.F.R § 149.510 (which governs all *non*-air ambulance IDRs) and in one part of 45 C.F.R. § 149.520 (which governs air ambulance IDRs, and which adopts nearly all of Section 149.510 by reference). This brief, like TMA's brief, cites the New QPA Presumption's provisions according to these as-yet-to-be-implemented codifications in the Code of Federal Regulations.

The New QPA Presumption affects air ambulance providers in the same way as it affects non-air ambulance providers. Indeed, all of the regulatory citations are exactly the same, except for 45 C.F.R. § 149.520(b)(3), which differs solely because it contains the additional statutory factors that "shall" be considered in an air ambulance IDR. *See supra*, at 3 (chart comparing the statutory factors). The following chart quotes each part of the New QPA Presumption in the order it appears in Sections 149.510 and 149.520:

| Regulatory Text (bold language contains the New QPA Presumption) | Citation | Reason Why This Language Creates a New QPA Presumption |
|---|---|---|
| (iii) Considerations in determination. In determining which offer to select:<br><br>(A) The certified IDR entity must consider the qualifying payment amount(s) for the applicable year for the same or similar item or service.<br><br>(B) The certified IDR entity must **then** consider information submitted by a party that relates to the following circumstances . . . . | 45 C.F.R. § 149.510(c)(4) (iii)(A)-(B). | This requires the IDR entity *first* to consider the QPA, and only *then* to consider the other statutory factors. |
| (E) **In weighing the considerations described in paragraphs (c)(4)(iii)(B) through (D) of this section [i.e., all of the statutory factors *other than* the QPA],** the certified IDR Entity should evaluate whether the information is credible **and relates to the offer submitted by either party for the payment amount for the** qualified IDR item or service that is the subject of the payment determination. **The certified IDR Entity should not give weight to information to the extent it is not credible, it does not relate to either party's offer for the payment amount for the qualified IDR item or service, or it is already accounted for by the qualifying payment amount under paragraph (c)(4)(iii)(A) of this section or other credible information under paragraphs (c)(4)(iii)(B) through (D) of this section.** | 45 C.F.R. § 149.510(c)(4) (iii)(E)<br><br>45 C.F.R. § 149.520(b)(3) (near-identical text, applicable to air ambulance IDRs) | This requires the IDR entity to "not give weight" to any statutory factor, besides the QPA, unless the IDR entity first determines that (i) the factor "relates to the offer" and (ii) is not "already accounted for by" the QPA.<br><br>The IDR entity is required to make a "credibility" determination as to information relating to the other factors, but is *forbidden* to question the "credibility" of the QPA. |
| (iv) **Examples. The rules of paragraph (c)(4)(iii) of this section are illustrated by the following examples: …** | 45 C.F.R. § 149.510(c)(4) (iv) | These five examples each restate the language of 45 C.F.R. § 149.510(c)(4)(iii)(E). |

5

| Regulatory Text (bold language contains the New QPA Presumption) | Citation | Reason Why This Language Creates a New QPA Presumption |
|---|---|---|
| (vi) Written decision.<br><br>. . . (B) The certified IDR Entity's written decision must include an explanation of their determination, including what information the certified IDR Entity determined demonstrated that the offer selected as the out-of-network rate is the offer that best represents the value of the qualified IDR item or service, including the weight given to the qualifying payment amount and any additional credible information under paragraph (c)(4)(iii)(B) through (D) of this section. **If the certified IDR Entity relies on information described under paragraph (c)(4)(iii)(B) through (D) of this section in selecting an offer, the written decision must include an explanation of why the certified IDR Entity concluded that this information was not already reflected in the qualifying payment amount** | 45 C.F.R. § 149.510(c)(4)(vi) | This requires the IDR Entity to do extra work if it "relies on" any of the statutory factors other than the QPA. Specifically, the IDR Entity must somehow explain, in writing, "why" it "concluded that this information was not already reflected in" the QPA. |

## III.   QPAs Are Being Calculated Using "Ghost Rates" Agreed to By Providers that Do Not Even Operate Air Ambulances

In addition to the arguments made in TMA's brief, the New QPA Presumption is also arbitrary and capricious because the Departments do not grapple with the problem of QPAs calculated using "ghost rates," that is, rates agreed to by providers that *do not even provide the service at issue.* A provider who does not own or operate an air ambulance will have no incentive to negotiate for a fair price for this service. Including "ghost rates" in the QPA therefore defeats the supposed purpose of the QPA, which the Departments claim is to "reflect[] market rates under typical contract negotiations." July IFR, 86 Fed. Reg. 36,872, at 36,889 (July 13, 2021).

6

The Transparency in Coverage Act required payors to disclose their current in-network rates, for a variety of services, on July 1, 2022.[2] LifeNet's counsel has retained the expert analysis firm of Dobson DaVanzo to analyze this data. Their analysis of one Texas payor—Aetna of Texas—demonstrates that many of that payor's contracted rates, for air ambulance services, were agreed to by providers that do not typically operate air ambulances. *See* Ex. E (DaVanzo Decl.). For example, the data shows contracted rates, for air ambulance transport, which were agreed to by social workers, optometrists, and psychologists. *Id.*

The Dobson DaVanzo analysis is confirmed by another independent analysis firm, Avalere Health. According to Avalere Health, insurers' QPAs are routinely based on contracts with providers who "rarely or never provide" the service in question. Ex. F (Smyser Decl.), Ex. 3.[3]

The "ghost rate" problem was pointed out to the Departments by at least two commenters. The Association of Air Medical Services (AAMS) commented, on the October IFR, as follows:

> [The Original QPA Presumption is] an unreliable approach because it does not account for critical differences in an entity's structure and contracting practices. For example, a hospital may enter into an agreement with a payer based on a broad range of services, including rates for air ambulance services. *In some instances, a hospital may agree to rates for air ambulance services without actually offering the services. Such rates may be far below market, and may be included in the contract without any negotiation because the hospital will never seek payment.*

---

[2] *See* Transparency in Coverage Act Final Rules, 45 C.F.R. § 147.211(b)(1)(iii); *see also* FAQs About Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 49 (Aug. 20, 2021), *available at* https://perma.cc/B7L7-QEKM; *see generally* D. Gordon, *New Healthcare Price Transparency Rule Took Effect July 1, But It May Not Help Much Yet*, Forbes.com, July 3, 2022, *available at* https://perma.cc/3YHP-TQQQ.

[3] This report is also publicly available online. Avalere Health, *PCP Contracting Practices and Qualified Payment Amount Calculation Under the No Surprises Act*, 1 (August 2, 2022) https://perma.cc/6NJN-ZULQ. Avalere Health concludes that the number of non-specialist providers whose rates are included in the QPA, even though those providers do not actually provide the service at issue, is vastly greater than the number of specialist providers who actually supply the vast majority of these specialty services. *See id.* at 5–6 (noting that primary care physicians massively outnumber "anesthesiologists, emergency physicians, and radiologists," and discussing the reasons why this imbalance means that the QPA is not a credible measure of the market rates for these specialty services).

. . . . It is not rational for the Departments to treat independent rates negotiated at arm's length the same as below-market, ghost rates that are passively accepted by hospitals because they will never be charged to payers.

Ex. F (Smyser Decl.), Ex. 1, at 4 (AAMS Ltr to Hon. Xavier Becerra, et al. (Dec. 6, 2021)

(emphasis added)).

Similarly, MedNax—a national medical group comprised of neonatal care providers—

commented in response to the October IFR that:

> [W]e urge the Departments to fix the Qualifying Payment Amount (QPA) methodology, which is currently based on in-network contracts alone and a myriad of physicians, *regardless of whether a physician ever bills for services under a CPT code. This issue of "ghost contracting" frequently occurs in the subspecialty of neonatology.* Rather, the QPA should be determined based on a weighted methodology of CPT codes actually used that will allow the IDR entity to have better understanding of prior contracted rates, good-faith negotiations, specialists' medical experience, acuity of patients seen and market share.

Ex. F (Smyser Decl.), Ex. 2, at 1 (MedNax Ltr to Hon. Xavier Becerra, et al. (Nov. 19, 2021)

(emphasis added)).

As TMA's brief points out, the Departments' regulations require no meaningful disclosure

of what the insurer did to calculate the QPA. TMA Br., at 7 (citing 45 C.F.R. § 149.140(d)). There

is no way that a provider or arbitrator can tell, based on the meager disclosures required by the

Departments, whether the insurer has calculated its QPA based on "ghost rates."

## IV.  Facts Relating to LifeNet's Standing

This Court previously determined that LifeNet had standing to challenge the Original QPA

Presumption enacted in the October IFR. *See LifeNet I*, 2022 WL 2959715, at *6-*8. LifeNet

resubmits, here, substantially the same evidence that LifeNet submitted in its previous action. *See*

Ex. G (Gaines Decl.).

## LEGAL STANDARDS

LifeNet incorporates by reference the legal standards set forth in TMA's brief.

**ARGUMENT**

I.     **LifeNet Incorporates TMA's Merits Arguments**

LifeNet incorporates by reference the merits argument set forth in TMA's brief. TMA's arguments apply in full to air ambulance providers once TMA's citations to Section 300gg-111(c) are transposed to the corresponding subparagraphs of Section 300gg-112(b).

II.    **The New QPA Presumption Is Arbitrary and Capricious Because the Departments Do Not Account for "Ghost Rates"**

The New QPA Presumption exempts the QPA from the threshold requirement of credibility. As to all the non-QPA factors, the arbitrator must  first determine that the evidence is "credible," *i.e.*, "that upon critical analysis [it] is worthy of belief and is trustworthy." 45 C.F.R. § 149.510(a)(2)(v). But although the Departments required arbitrators to verify the credibility of all this non-QPA information, the Departments forbade the arbitrators from questioning the credibility of the QPA. Instead, the Departments emphasized that it is not the arbitrator's "responsibility" to "monitor the accuracy of the plan or issuer's QPA calculation methodology." *Id.* at 52,627 n.31. The Departments simply declared, by agency fiat, that "the QPA will meet the credibility requirement." 87 Fed. Reg. at 52,627. Although Congress charged the Departments with auditing some subset of insurers' QPA calculations, it does not follow that arbitrators must always treat the QPA amount as credible information, while scrutinizing all other information more closely. *See Chamber of Commerce v. Dep't of Lab.*, 885 F.3d 360, 385 (5th Cir. 2018) ("Illogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action.").

The presumption of QPA credibility is also arbitrary and capricious because the Departments did not grapple with the serious problem of ghost rates—that is, rates agreed to by providers that do not even provide the service at issue. *See supra*, at 6-8 (describing the mounting

9

evidence of the ghost rate problem, and quoting from two commenters who pointed out this problem to the Departments). The Departments gave no logical reason why arbitrators should be required to treat QPAs as credible, while viewing all other information critically, given that the QPAs may be based on ghost rates. This is an additional reason why the Departments' fiat that the QPA "will mee[t]" the credibility requirement is unsupported and hence arbitrary and capricious. *See*, *e.g.*, *Matter of Bell Petrol. Servs., Inc.*, 3 F.3d 889, 905–06 (5th Cir. 1993).[4] Nor did the Departments consider an obvious alternative: permitting arbitrators to take the ghost rate problem into account in deciding how much weight to give the QPA.

In short: by simply ignoring the ghost rate problem in their rulemaking, the Departments acted arbitrarily and capriciously because they failed to consider important aspects of the problem, address obvious alternatives, or articulate satisfactory explanations for their decision. *See Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 264 (5th Cir. 1989).

## III.    LifeNet Has Standing

LifeNet has standing to challenge the New QPA Presumption, for all of the reasons that this Court previously found that LifeNet had standing to challenge the Old QPA Presumption.  *See See LifeNet I*, 2022 WL 2959715, at \*6-\*8. Specifically: (i) LifeNet is an object of the challenged regulation; (ii) the challenged regulation will cause financial harm to LifeNet; (iii) the challenged regulation deprives LifeNet of procedural rights; and (iv) the challenged regulation causes

---

[4] The full quote is as follows: "to the extent the QPA is calculated in a manner that is consistent with the detailed rules issued under the July 2021 interim final rules, and is communicated in a way that satisfies the applicable disclosure requirements, the QPA will meet the credibility requirement . . . ." 87 Fed. Reg. at 52,627.  The effect of this language is to remove any discussion of ghost rates from the arbitrator's determination. The July IFR can be read to allow insurers to include ghost rates" in their QPAs. And nothing in the July IFR's disclosure requirements obligates the insurers to tell providers or arbitrators that they have done so. *See* 45 C.F.R. § 149.140(d) (meager disclosures, required by the Departments, convey almost no meaningful information about how the QPA was calculated or the contracted rates on which it is based).

immediate reputational harm by devaluing LifeNet's services in the critically important market for commercial out-of-network payor reimbursements.

### A.      Legal Standard

Standing requires that the plaintiff "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The standing requirement is not demanding: "A single unsolicited automated call has been found to confer Article III standing." *Shields v. Dick*, No. 3:20-CV-00018, 2020 WL 5522991, at *4 (S.D. Tex. July 9, 2020); *see also Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 688 (5th Cir. 2021) (a single "unwanted text" message).

### B.      LifeNet Is An Object of the New QPA Presumption

First, LifeNet is an object of the New QPA Presumption. When "a plaintiff is an object of a regulation there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up)); *Duarte v. City of Lewisville*, 759 F.3d 514, 518 (5th Cir. 2014); *Am. Petroleum Inst. v. Johnson*, 541 F. Supp. 2d 165, 176 (D.D.C. 2008) ("[S]tanding is usually self-evident when the plaintiff is a regulated party.").[5]

---

[5] *See also, e.g.*, *Meland v. Weber*, 2 F.4th 838, 845 (9th Cir. 2021) (shareholder had Article III standing to challenge state law mandating female representation on corporation's board of directors because shareholder was also "one of the objects" of the law); *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 656 F.3d 580, 585–86 (7th Cir. 2011) (individual truckers had standing because they were "objects" of rule requiring on-board recording devices, even though the rule directly regulated only the truckers' employers, the "motor carrier" companies).

LifeNet is a "nonparticipating provider" of air ambulance services, and therefore LifeNet's compensation for its out-of-network transports, for commercially insured patients, is governed by the NSA and its implementing regulations. *See* Ex. G (Gaines Decl.) ¶¶ 2-4.

LifeNet remains an "object of the regulation" even though non-party Air Methods Corporation has contracted to pay LifeNet for LifeNet's air ambulance services. *Id.* ¶ 5 (Gaines Decl.); *see also id.* Ex. 1 (contract between LifeNet and Air Methods). During the IDR process, the arbitrator will consider LifeNet's training, experience, and quality and outcome measurements, and the arbitrator will then place a value on LifeNet's services. *See* 45 C.F.R. § 149.520(b)(2) (arbitrator "shall" consider the "training, experience, and quality of the medical personnel that furnished the air ambulance services"); *see also LifeNet I*, 2022 WL 2959715, at *7 ("It is LifeNet—not Air Methods—whose training, experience, and quality and outcome measurements are to be considered by the arbitrator. LifeNet is therefore a 'nonparticipating provider' under the Act and has standing to challenge the Rule as an object of it." (citations omitted)). !

### C.    The New QPA Presumption Causes Procedural Injury to LifeNet

Second, the New QPA Presumption imposes a procedural injury on LifeNet. A plaintiff can show a cognizable injury-in-fact if he or she has "been deprived of 'a procedural right to protect [his] concrete interests.'" *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019); *see also Lujan*, 504 U.S. at 573 n.8. The plaintiff "need not prove that following proper procedure will necessarily create different outcomes," but rather "must merely show a reasonable claim of minimal impact." *TMA*, 2022 WL 542879, at *4 (cleaned up).

Just like the Original QPA Presumption, the New QPA Presumption "deprives" LifeNet "of the arbitration process established by the Act. Rather than having an arbitrator consider all statutory factors as provided by the Act, the Rule puts a substantial 'thumb on the scale' in favor of the QPA." *LifeNet I*, 2022 WL 2959715, at *7 (citations omitted).

### D.      The New QPA Presumption Causes Economic Harm to LifeNet

Third, the New QPA Presumption causes economic harm to LifeNet because it "will drive out-of-network reimbursement rates to the QPA as a de facto benchmark." Ex. G (Gaines Decl.), ¶ 16. "[I]n many and perhaps all cases" the offer made by Air Methods, for LifeNet's services, will "be above the QPA." *Id.* ¶ 11.

The New QPA Presumption, like the Old QPA Presumption, will have the effect of systemically disfavoring selection of the offers submitted by Air Methods for LifeNet's services, thus resulting in lower out-of-network rates being awarded for LifeNet's services. The Departments concede that this effect—lowering the rates of compensation for providers—is one of the intended effects of the New QPA Presumption. *See* Final Rule, 87 Fed. Reg. at 52,629 (identifying New QPA Presumption as helping to avoid "higher health care costs").

Lower payment determinations, by the arbitrators, will inevitably cause financial harm to LifeNet even though LifeNet's current contract with Air Methods guarantees fixed payments (for now). That contract will expire in less than one year. *See* Ex. G (Gaines Decl.), Ex. 1 (contract), § 2.4 (permitting either party to terminate the contract "without cause" after the "two-year anniversary of the Commencement Date," i.e., on October 1, 2023). Moreover, Air Methods also has the option of terminating the contract earlier, if the fixed payments to LifeNet become "financially inviable." *Id*. § 2.3 (providing for termination without cause if a "financially inviable situation that is beyond the reasonable expectations of either Party" arises). By depressing the value of the compensation Air Methods receives from insurers in the IDR process, the New QPA Presumption creates a "significant risk" of just such a "financially unviable" situation that would cause this contract to be terminated by Air Methods before October 1, 2023. Ex. G (Gaines Decl.) ¶ 12; *see also LifeNet I*, 2022 WL 2959715, at *7 (E.D. Tex. July 26, 2022) (crediting same). !

Lower reimbursement rates will inevitably harm LifeNet directly whenever its current contract with Air Methods ends. If LifeNet wishes to extend its relationship with Air Methods, it will need to agree to rates that reflect the value of its services under the New QPA Presumption. *See LifeNet I*, 2022 WL 2959715, at *7 (E.D. Tex. July 26, 2022) ("An unviable situation, moreover, would almost certainly result in LifeNet's having to renegotiate its contract for a lower payment amount—or losing the contract altogether.").

### E.   The New QPA Presumption Causes Immediate Reputational Harm to LifeNet

Contract aside, LifeNet is also injured immediately by the lower valuations that the New QPA Presumption causes IDR entities to give to LifeNet's services. LifeNet, like any other for-profit business, must routinely answer the following question: "how much are LifeNet's services worth?" The answer to that question critically depends on the important market of commercial insurers' reimbursements for emergency transports. *See* Ex. G (Gaines Decl.), ¶ 17 (this is a "critically important market").

This question—what are LifeNet's services worth?—will be asked if LifeNet seeks to borrow money or makes capital investments. *See Clinton v. City of New York*, 524 U.S. 417, 431 (1998) (a liability that is contingent upon government's later waiver decision is nevertheless an Article III injury, today, because "a substantial contingent liability immediately and directly affects the borrowing power, financial strength, and fiscal planning of the potential obligor"). This question will also be asked when LifeNet's current contract with Air Methods ends next year. Indeed, this is the first question that Air Methods or any other potential business partner will ask, during negotiations over the terms of a new contract: "how much are LifeNet's services worth?"

The answer to the question "how much are LifeNet's services worth?" now depends in large part on the results of IDRs, because those results are now the *only* commercial marketplace

14

for LifeNet's services to commercially insured out-of-network patients. LifeNet can no longer bill such patients directly, for anything other than the patient's "cost sharing" (e.g., co-pay) amount. *See* 42 U.S.C. § 300gg-135. And there are no other state-law processes available to LifeNet, to obtain compensation from commercial insurers, because all such state laws are preempted by the Airline Deregulation Act. *See* July IFR, 86 Fed. Reg. at 36,885 & n.37. In short, the NSA's IDR process is the only game in town. Every IDR determination, by placing a dollar value on LifeNet's services, is a relevant piece of data in answering the question of what LifeNet's services are worth.

The results of the IDRs decided today will have a continuing impact on the answer to that question. And because the results of today's IDRs will be significantly lower, as a result of the New QPA Presumption, today's results will harm LifeNet when LifeNet is called upon to answer that question. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (substantial risk of future harm conferred standing); *Clinton*, 524 U.S. at 431 (contingent risk of future harm conferred standing); *Ass'n of Data Processing Serv. Organizations, Inc. v. Camp,* 397 U.S. 150, 152 (1970) (plaintiff had standing to challenge agency ruling because that ruling "might entail some future loss of profits" to plaintiff).

To be sure, the immediate harm to LifeNet, from a low dollar valuation in the IDR process, is intangible for now. But a harm does not need to be "tangible" to provide Article III standing. *Cranor*, 998 F.3d at 689-90. In *Cranor*, the Fifth Circuit held that the "nuisance" caused by receiving a "single unwelcome text message" was sufficiently "concrete" to constitute an injury-in-fact. *Id.* Similarly, the inaccurate reporting of credit information—e.g., age and marital status—has been held to be a sufficiently "concrete" injury to confer standing, even absent any reputational harm or monetary loss. *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1115 (9th Cir. 2017) (on remand from Supreme Court), *cert. denied*, 138 S. Ct. 931 (2018).

Moreover, lower dollar valuations, for LifeNet's services, are analogous to injuries recognized at common law. *See Cranor*, 998 F.3d at 691 (finding Article III standing, in part, because a claim based on a "single unwelcome text message" bore a close relationship to a claim for "public nuisance" as recognized at common law). This inquiry "is focused on types of harms protected at common law, not the precise point at which those harms become actionable" under common law. *Id.* at 693 (emphasis added) (quoting *Krakauer v. Dish Network*, L.L.C., 925 F.3d 643, 654 (4th Cir. 2019)). Lower-than-appropriate dollar valuations of LifeNet's services bear a close relationship to the kinds of injuries recognized at common law for untrue and disparaging statements about another's "chattels or intangible things." Restatement (First) of Torts § 624 (1938); *see also* Restatement (Second) of Torts §§ 623A-629 (1977).

## CONCLUSION

The New QPA Presumption should be vacated, and this matter should be remanded to the Departments with specific instructions that any additional regulations or guidance to arbitrators on the weighing of the statutory factors may not privilege the QPA over the other factors.

Dated: October 12, 2022                                  Respectfully submitted,

                                        By:      */s/ Stephen Shackelford, Jr.*
                                                Stephen Shackelford, Jr. (EDTX Bar No.
                                                24062998)
                                                Steven M. Shepard (*pro hac vice*)
                                                SUSMAN GODFREY LLP
                                                1301 Ave. of the Americas, Fl. 32
                                                New York, NY  10019
                                                sshackelford@susmangodfrey.com
                                                sshepard@susmangodfrey.com
                                                212-336-8340
                                                *Counsel to Plaintiff LifeNet, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2022, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Eastern District of Texas, using the electronic filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

By:  */s/ Stephen Shackelford, Jr.*
Stephen Shackelford, Jr.