# EXHIBIT G

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

| | |
|---|---|
| TEXAS MEDICAL ASSOCIATION, et al., | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) Case No.: 6:22-cv-00372-JDK |
| v. | ) |
| | ) Lead Consolidated Case |
| UNITED STATES DEPARTMENT OF | ) |
| HEALTH AND HUMAN SERVICES, et al., | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

## DECLARATION OF JAMES L. GAINES

1. My name is James L. Gaines. I am over the age of eighteen. I am employed by LifeNet, Inc. ("LifeNet"). My job title is General Counsel. I have personal knowledge of the matters contained herein.

**I.    LifeNet's Operations**

2. LifeNet provides air ambulance services in Texas, Arkansas, Louisiana, and Oklahoma. LifeNet's headquarters are in Texarkana, Texas.

3. Many of the emergency air ambulance services that LifeNet provides are subject to the No Surprises Act's (NSA's) balance-billing prohibition and to that Act's Independent Dispute Resolution (IDR) process.

4. As of the date of this Declaration, LifeNet has performed dozens of emergency air transports, in 2022, for which the right to reimbursement may be governed by the No Surprises Act and its implementing regulations.

**II.     LifeNet's Contractual Arrangement With Air Methods Corporation**

5.      LifeNet is compensated for its emergency air transport services by Air Methods Corporation ("Air Methods") pursuant to a contract between the two companies. That contract also provides that Air Methods has responsibility for pursuing the collection of bills for LifeNet's services.

6.      LifeNet's contract with Air Methods Corporation was executed on August 24, 2021, more than a month before IFR Part II, containing the QPA Presumption, was published.

7.      Section 2.3 of the contract is entitled "Termination for Decline in Revenue." It reads, in full: In the event that the revenue producing flight volume or payor mix for one or more Base Sites drops to a financially unviable situation that is beyond the reasonable expectations of either Party, then either Party may terminate all or part of this Agreement (including the closure of one or more Base Sites) upon at least 180 days prior written notice to the other Party.  AMC [Air Methods Corporation] and LifeNet will meet to discuss potential adjustments to the Clinical Crew services prior to either Party exercising its rights under this Section 2.3."

**III.    LifeNet's Contract Should Be Sealed Because It Contains Commercially Sensitive Information**

8.      Attached as Exhibit 1 is a true and accurate copy of LifeNet's contract with Air Methods Corporation ("AMC"), executed on August 24, 2021, together with the subsequent amendments thereto. The only redactions are of specific pricing and other financial information, which are highly commercially sensitive.

9.      The unredacted portions of the document are also commercially sensitive and for that reason LifeNet respectfully requests that the Court permit them to be filed under seal. The commercially sensitive information, contained in the unredacted portions, includes: the specific details and structure of LifeNet's and AMC's compensation arrangement; the specific details and

2

structure of LifeNet's and AMC's cooperation; the specific details of LifeNet's and AMC's operations and personnel; and details of the locations served by the parties' services. If these details were to be made public, then that would cause competitive injury to LifeNet. For these reasons, LifeNet and AMC agreed to a confidentiality clause preventing either party from disclosing the agreement. *See* Ex. 1, Aug. 24, 2021 Contract, § 27.0, p. 19.

**IV.     LifeNet Will Be Harmed by Reimbursement for Its Services at the Level of the QPA**

10. I expect that open negotiation with insurance companies and health plans, over out-of-network air ambulance services provided by LifeNet, will not always successfully resolve disagreements over an appropriate reimbursement rate. In these circumstances, a certified IDR entity will then determine the reimbursement rate, according to processes set forth in the NSA and the Departments' regulations.

11. I believe that the offers submitted to the IDR entity, for air ambulance services provided by LifeNet, will in many and perhaps all cases be above the QPA. That is because, among other reasons, LifeNet has for years attempted to become an "in network" provider for many ERISA health plans, but those plans have refused to agree to pay reasonable rates for LifeNet's services. The QPA is supposedly calculated based on the same in-network rates that LifeNet reviewed during contract negotiations, and rejected as being too low. Therefore, based on LifeNet's experience in the market, I expect that the QPAs will in many cases be significantly below the amounts that LifeNet has been paid for its out-of-network emergency transports prior to the enactment of the No Surprises Act.

12. There is a significant risk that reimbursement rates at the level of the QPA will create a "financially unviable situation that [was] beyond the reasonable expectations" of Air Methods and that will therefore risk the early termination of the contract. Ex. 1, Aug. 24, 2021 Contract, § 2.3.

### V.      LifeNet Is Harmed by the New QPA Presumption

13. I believe that the offers submitted to the IDR entity by *payors*, for the air ambulance services provided by LifeNet, will in many if not all cases will be close to the QPA. Indeed, health insurance companies have indicated they plan to submit bids equal to the QPA. *See, e.g.*, Br. of America's Health Insurance Plans, *Texas Medical Association, et al. v. U.S. Dep't Health & Hum. Serv'cs, et al.*, 21-cv-00425, Dkt. 75, at 3 (insurers' brief, describing the Departments' "QPA-centric" approach to the IDR process and praising it for making out-of-network rates "more predictable," because "most cases can be resolved by reference to the QPA alone").

14. I am familiar with the regulatory provisions enacted in the Departments' Final Rule, entitled *Requirements Related to Surprise Billing*, 87 Fed. Reg. 52,618 (August 26, 2022), which LifeNet's Motion for Summary Judgment refers to as the New QPA Presumption:

| Regulatory Text (bold language contains the New QPA Presumption) | Citation | Reason Why This Language Creates a New QPA Presumption |
|---|---|---|
| (iii) Considerations in determination. In determining which offer to select:<br><br>(A) The certified IDR entity must consider the qualifying payment amount(s) for the applicable year for the same or similar item or service.<br><br>(B) The certified IDR entity must **then** consider information submitted by a party that relates to the following circumstances . . . . | 45 C.F.R. § 149.510(c)(4)(iii)(A)-(B). | This requires the IDR entity *first* to consider the QPA, and only *then* to consider the other statutory factors. |
| (E) **In weighing the considerations described in paragraphs (c)(4)(iii)(B) through (D) of this section [i.e., all of the statutory factors *other than* the QPA], the certified IDR Entity should evaluate whether the information is credible and relates to the offer submitted by either party for the payment amount for the** qualified IDR | 45 C.F.R. § 149.510(c)(4)(iii)(E)<br><br>45 C.F.R. § 149.520(b)(3) (near-identical | This requires the IDR entity to "not give weight" to any statutory factor, besides the QPA, unless the IDR entity first determines that |

4

| Regulatory Text (bold language contains the New QPA Presumption) | Citation | Reason Why This Language Creates a New QPA Presumption |
|---|---|---|
| item or service that is the subject of the payment determination. **The certified IDR Entity should not give weight to information to the extent it is not credible, it does not relate to either party's offer for the payment amount for the qualified IDR item or service, or it is already accounted for by the qualifying payment amount under paragraph (c)(4)(iii)(A) of this section or other credible information under paragraphs (c)(4)(iii)(B) through (D) of this section.** | text, applicable to air ambulance IDRs) | (i) the factor "relates to the offer" and (ii) is not "already accounted for by" the QPA.<br><br>The IDR entity is required to make a "credibility" determination as to information relating to the other factors, but is *forbidden* to question the "credibility" of the QPA. |
| **(iv) Examples. The rules of paragraph (c)(4)(iii) of this section are illustrated by the following examples: …** | 45 C.F.R. § 149.510(c)(4)(iv) | These five examples each restate the language of 45 C.F.R. § 149.510(c)(4)(iii)(E). |
| (vi) Written decision.<br><br>. . . (B) The certified IDR Entity's written decision must include an explanation of their determination, including what information the certified IDR Entity determined demonstrated that the offer selected as the out-of-network rate is the offer that best represents the value of the qualified IDR item or service, including the weight given to the qualifying payment amount and any additional credible information under paragraph (c)(4)(iii)(B) through (D) of this section. **If the certified IDR Entity relies on information described under paragraph (c)(4)(iii)(B) through (D) of this section in selecting an offer, the written decision must include an explanation of why the** | 45 C.F.R. § 149.510(c)(4)(vi) | This requires the IDR Entity to do extra work if it "relies on" any of the statutory factors other than the QPA. Specifically, the IDR Entity must somehow explain, in writing, "why" it "concluded that this information was not already reflected in" the QPA. |

5

| Regulatory Text (bold language contains the New QPA Presumption) | Citation | Reason Why This Language Creates a New QPA Presumption |
|---|---|---|
| **certified IDR Entity concluded that this information was not already reflected in the qualifying payment amount** | | |

15.  The New QPA Presumption will make it more difficult for Air Method's offers (of an appropriate amount of reimbursement for LifeNet's services) to win the IDR proceeding, compared to a process in which the IDR entity was free to consider all the statutory factors without the New QPA Presumption. Thus, the New QPA Presumption will thus result in lower IDR determinations of reimbursement rates for the services provided by LifeNet.

16.  The application of the New QPA Presumption in IDR proceedings will drive out-of-network reimbursement rates to the QPA as a benchmark.

17.  The lower reimbursement rates, determined by IDRs applying the New QPA Presumption, will immediately cause an injury to LifeNet because these lower rates will constitute a lower dollar valuation for LifeNet's services. These determinations will instantly devalue LifeNet's services in a critically important market, namely, the market of reimbursement paid by commercial payors. This lower reimbursement rate will cause the value of LifeNet's services, in this market, to correspondingly decrease.

18.  For the foregoing reasons, the New QPA Presumption directly harms LifeNet's procedural, financial, and reputational interests.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on October 11, 2022.

Signature: _/s/_

      James L. Gaines, Esq.

# EXHIBIT 1
# to the Gaines Declaration

# FILED UNDER SEAL