# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

TEXAS MEDICAL ASSOCIATION,　　　　)
*et al.*,　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　*Plaintiffs*,　　　　　　　)
　　　　　　　　　　　　　　　　　)　　Civil Action No. 6:22-cv-00372-JDK
　　　　v.　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
UNITED STATES DEPARTMENT OF　　　)
HEALTH AND HUMAN SERVICES, *et al.*, )
　　　　　　　　　　　　　　　　　)
　　　　　*Defendants*.　　　　　　　)
　　　　　　　　　　　　　　　　　)

## AMICUS CURIAE BRIEF BY PHYSICIANS ADVOCACY INSTITUTE, 14 STATE MEDICAL ASSOCIATIONS, AND 16 MEDICAL SPECIALTY SOCIETIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to the Court's briefing order of October 4, 2022 (docket #7), Physicians Advocacy Institute ("PAI"), 14 state medical associations[1], American Association of Neurological Surgeons, Congress of Neurological Surgeons, and 14 other medical specialty societies[2] hereby submit this friend-of-the-court brief in support of plaintiffs' motion for summary judgment (docket #41).

---

[1] The 14 amici state medical associations include: 1) California Medical Association, 2) Connecticut State Medical Society, 3) Medical Association of Georgia, 4) Kentucky Medical Association, 5) Massachusetts Medical Society, 6) Michigan State Medical Society; 7) Nebraska Medical Association, 8) Medical Society of New Jersey, 9) Medical Society of the State of New York, 10) North Carolina Medical Society, 11) Oregon Medical Association, 12) South Carolina Medical Association, 13) Tennessee Medical Association, and 14) Washington State Medical Association.

[2] The 16 amici specialty medical societies include: 1) Texas Association of Neurological Surgeons, 2) Texas College of Emergency Physicians, 3) Texas Orthopaedic Association, 4) Texas Radiology Society, 5) Texas Society for Gastroenterology and Endoscopy, 6) American Association of Neurological Surgeons, 7) Congress of Neurological Surgeons, 8) American Academy of Otolaryngology-Head and Neck Surgery, 9) American Association of Orthopaedic Surgeons, 10) American College of Hyperbaric Medicine, 11) American College of Surgeons, 12) American Osteopathic Association, 13) American Society of Plastic Surgeons, 14) Colorado Society of Anesthesiologists, 15) Illinois Society of Anesthesiologists, and 16) North American Spine Society.

## TABLE OF  CONTENTS

INTRODUCTION ................................................................................................................ 1

INTERESTS OF THE PHYSICIAN AMICI .................................................................... 2

DISCUSSION ...................................................................................................................... 3

I.   This Court Vacated the Portions of the October 7, 2021, Interim Final Rule that
     Imposed a Rebuttable Presumption in Favor of the QPA. ......................................... 3

II.  The Final Rule Should Be Vacated for All the Reasons Set Forth in Plaintiffs'
     Motion for Summary Judgment, Which Detail Why the QPA Continues to Be
     Improperly Elevated Over all Other Factors. .............................................................. 4

III. Anchoring Bias Is Subtler Yet Stronger than the Use of an Express Rebuttable
     Presumption to Elevate the QPA. ............................................................................... 7

     A.   Anchoring Bias is a Well-Documented Cognitive Phenomenon that Can
          Yield Predictable Results. ............................................................................... 7

     B.   Anchoring Bias Will Poison IDRs Conducted Pursuant to the Final Rule to
          Favor the QPA................................................................................................... 9

IV.  As Did the IFR, the Final Rule Will Embolden Health Insurer Overreach and
     Dominance in Contract Negotiations to the Detriment of Patient Access to High
     Quality Care................................................................................................................ 11

     A.   Provider Networks will Deteriorate as Physician Practices and Other Health
          Care Providers Face Widespread Under-Compensation. .............................. 12

     B.   Access to Safety Net Providers and Critically Needed Specialists will be
          Jeopardized in Certain Communities. ........................................................... 13

     C.   The Final Rule will Spur Further Consolidation that Will Undermine Market
          Competition, Raise Costs, and Limit Patient Access. ................................... 15

CONCLUSION.............................................................................................................. 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.,*
968 F.3d 454 (5th Cir. 2020) .....................................................4

*Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.,*
-- F.Supp.3d --, 2022 WL 542879 (E.D. Tex. 2022) ......................3, 5, 6

**Statutes**

42 U.S.C. § 300gg-111 ..........................................................6, 12

**Regulations**

45 C.F.R. § 149.140 .............................................................9, 12

45 C.F.R. § 149.510 ...........................................................5, 6, 10

86 Fed. Reg. 55 ....................................................................3

86 Fed. Reg. 56 ....................................................................3

87 Fed. Reg. 52 ..................................................................4, 9

87 Fed. Reg. 52618 ..............................................................1, 4

87 Fed. Reg. 52627 .................................................................5

87 Fed. Reg. 52628 .................................................................5

87 Fed. Reg. 52629 .................................................................5

87 Fed. Reg. 52632 .............................................................6, 10

87 Fed. Reg. 52652 .................................................................5

87 Fed. Reg. 52653 .................................................................6

**Other Authorities**

Ass'n of Amer. Medical Colleges (by HIS Markit Ltd.), "The Complexities of
Physician Supply and Demand: Projections from 2019 to 2034" (June 2021).......................14

Avalere Health, "COVID-19's Impact on Acquisitions of Physician Practices and Physician Employment 2019-2021, PHYSICIANS ADVOCACY INST. (April 2022) ................................................................................................................15

Critcher, Clayton R.; Gilovich, Thomas. (October 30, 2007). "Incidental environmental anchors Journal of Behavioral Decision Making. 21(3). ..................................8

Disli, Mustafa; Inghelbrecht, Koen; Schoors, Koen; Stieperaere, Hannes. (February 12, 2021). "Stock Price Anchoring."  SSRN .........................................8

Erin Lindsey Duffy, "Influence of Out-of-Network Payment Standards on Insurer-Provider Bargaining, California's Experience" AMERICAN J. OF MANAGED CARE (Aug. 23, 2019) ............................................................................................13

Karyn Schwartz et al., "What We Know About Provider Consolidation" Kaiser Family Found. (Sept. 2, 2020) ............................................................................15

Krystia Reed, Valerie P. Hans & Valerie F. Reyna, "Accounting for Awards: An Examination of Juror Reasoning behind Pain and Suffering Damage Award Decisions," 96 DENVER L. REV. 841 (2019). ..............................................................8

Mussweiler, Thomas; Strack, Fritz (1999). "Hypothesis-Consistent Testing and Semantic Priming in the Anchoring Paradigm: A Selective Accessibility Model."  Journal of Personality and Social Psychology. 73 (3): 437-446...................8

Northcraft, Gregory B.; Neale, Margaret A. (February 1987.)  "Experts, amateurs and real estate: An anchoring-and-adjustment perspective on property pricing decisions."  Organizational Behavior and Human Decision Processes ....................9

Sherif, Muzafer; Taub, Daniel; Hovland, Carl I. (1958). "Assimilation and contrast effects of anchoring stimuli on judgments." Journal of Experimental Psychology. 55 (2): 150-155 ...............................................................................7

Tversky, Amos; Kahneman, Daniel (September 1974). "Judgment under Uncertainty: Heuristics and Biases." Science. 185 (4157): 1124-31....................7, 8

# INTRODUCTION

Earlier this year, this Court invalidated parts of an interim final rule promulgated by the defendants (collectively, the "Departments") that effectively made the Qualifying Payment Amount ("QPA") the default level of payment to out-of-network providers for disputed payments for services covered by the No Surprises Act ("NSA"). The amici parties again support the plaintiffs' instant challenge of a renewed attempt by the Departments to once again elevate the QPA in the independent dispute resolution ("IDR") process established by the NSA.

The Departments' final administrative rule, Requirements Related to Surprise Billing, 87 Fed. Reg. 52618 (August 26, 2022) (the "Final Rule"), disclaims any intent to impose a presumption in favor of the QPA. However, the Final Rule continues to require the QPA to be considered first, before the other factors, and places significant limitations on the weight an arbiter may give to evidence of the other statutorily prescribed factors. The Final Rule thus subtly relies on "anchoring bias" to favor the QPA, which, in effect, functions as the very rebuttable presumption that this Court previously rejected.

Cognitive science researchers have well-documented that persons who are asked to make a value judgment are heavily influenced, if not predisposed to a certain result, when the form or format of the question they face creates an "anchor" over a specific value. The Final Rule "anchors" the QPA in the IDR process to all but ensure that arbiters will choose the QPA.

Precisely because of this reliance on anchoring bias, the Departments' attempt to elevate the QPA in the Final Rule is more pernicious than the rebuttable presumption employed in the IFR. Elevation of the QPA creates a *de facto* out-of-network rate that governs the relationship between health insurers and providers. Such an outcome directly contradicts the law and

Congress' intent to create a fair and open IDR process, which would have disastrous effects in the marketplace for health care services and, ultimately, on patient care.

Congressional leaders lauded the bipartisan passage of the No Surprises Act ("NSA") as a "free-market solution that takes patients out of the middle and fairly resolves disputes between plans and providers," while emphasizing that the NSA's "text includes NO benchmarking or rate-setting." (emphasis in original) The Departments' Final Rule, however, impermissibly violates Congress' intent and the clear statutory provisions governing the IDR process.

## INTERESTS OF THE PHYSICIAN AMICI

The Physicians Advocacy Institute ("PAI") is a not-for-profit organization formed pursuant to a federal district court settlement order in multidistrict class action litigation brought by physicians and state medical associations based on systemic unfair payment practices by the nation's largest for-profit insurers. Consistent with the terms of that court order, PAI's mission is to advance fair and transparent payment policies and contractual practices by payors, in order to sustain the practice of medicine for the benefit of patients. PAI champions policies to allow physicians to sustain independent medical practices, which are a cornerstone for delivering care in our health care system, particularly in underserved and rural areas. For the past decade, physicians have grappled with increasingly complex payment policies by government and private payors. PAI develops free educational resources, tools, and market information to support practices as they navigate these programs and the administrative burdens and costs. PAI's research shows how challenging it has been for independent practices to survive.

Amici 16 medical specialty societies are also nonprofit organizations that promote research, education, and the highest level of quality care in specific medical specialties. Collectively, these specialty societies have almost 360,000 members throughout the United

States or the world, with board specializations or equivalent recognition of the greatest degree of training and excellence in a field of medicine. For decades these organizations have advanced their specialty fields through education, outreach, and advocacy, including advocacy before federal and state courts and legislatures to ensure fair reimbursement that bolsters sustainable specialty practices in all modes and settings for the benefit of patients. More detail about each specialty society is provided in the Appendix hereto.

Amici 14 state medical associations are each nonprofit associations for physicians at every stage of their careers — medical students, interns, residents, and practicing or retired physicians. They collectively are comprised of nearly 195,000 members across America practicing medicine in every mode and setting imaginable. The state associations work toward advancing the science and art of medicine by, *inter alia*, helping physicians sustain viable medical practices and challenging unfair payor practices and policies to protect patient access to medical care. More detail about each state association is provided in the Appendix hereto.

## DISCUSSION

**I.    This Court Vacated the Portions of the October 7, 2021, Interim Final Rule that Imposed a Rebuttable Presumption in Favor of the QPA.**

The previous lawsuit brought by TMA successfully challenged an earlier rule issued by the Departments implementing the IDR process. *See* Requirements Related to Surprise Billing: Part II, 86 Fed. Reg. 55,980 (Oct. 7, 2021) ( "IFR"). The IFR imposed a "rebuttable presumption" that the offer submitted in an IDR proceeding that is closest to the QPA is the appropriate out-of-network rate. 86 Fed. Reg. at 56,056-61. In an order dated February 23, 2022, this Court held that the QPA rebuttable presumption was an "unlawful" attempt to "rewrite[] clear statutory terms." *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, -- F.Supp.3d --, 2022 WL 542879, at *8 (E.D. Tex. 2022) (the "*TMA I*" ruling). This Court further

determined that the Departments failed to comply with the notice-and-comment requirement of the Administrative Procedure Act. *Id*. at *9-*14. On these two separate and independent bases, the Court vacated the portions of the IFR that established the QPA rebuttable presumption.

Crucial to this Court's ruling in *TMA I* was its close reading of the statutory factors that all arbiters must consider. This Court rejected the Departments' argument that the QPA was "entitled to more weight simply because it is the first in [the] list." *Id*. at *8. As this Court observed, "[a] statute's 'lack of text' is sometimes 'more telling' than the text itself" — and in this instance, the NSA "nowhere states that the QPA is the 'primary' or 'most important' factor." *Id*. (citing *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 460 (5th Cir. 2020)). This Court further rejected the idea that Congress had dictated a "procedural order" for considering the statutory factors. *Id*. It also rejected any rationale for de-prioritizing the factors other than the QPA. "If Congress had wanted to restrict arbitrators' discretion and limit how they could consider the other factors, it would have said so—especially here, where Congress described the arbitration process in meticulous detail." *Id*.

The Departments responded to this Court's ruling in *TMA I* by promulgating the Final Rule. However, the Final Rule continues to violate the NSA's statutory language for the same reasons explained by this Court in *TMA I*.

## II.     The Final Rule Should Be Vacated for All the Reasons Set Forth in Plaintiffs' Motion for Summary Judgment, Which Detail Why the QPA Continues to Be Improperly Elevated Over all Other Factors.

The Final Rule disclaims any intent to establish a presumption in favor of the QPA. *See* 87 Fed. Reg. at 52, 631. It nonetheless elevates the QPA in ways that directly violate this Court's earlier ruling. This is particularly true given the important phenomenon known as "anchoring bias," which is discussed in section III, *infra*.

The Final Rule first requires that arbiters "must consider the QPA for the applicable year for the same or similar item or service" before considering any other factor. *Id*. at 52628; 45 C.F.R. § 149.510(c)(4)(iii)(A).[3] Only after the QPA is considered may the arbiter "then . . . consider all additional information submitted by a party." 87 Fed. Reg. at 52628 (emphasis added); *accord* 45 C.F.R. § 149.510(c)(4)(iii)(B) ("The certified IDR entity must then consider information submitted by a party that relates to" the other factors) (emphasis added). As this Court previously recognized, the statutory text of the NSA does not prescribe any "procedural order" for the factors considered by the arbiter, much less a bifurcated order that isolates and elevates the QPA over all other relevant factors. *TMA I*, 2022 WL 542879 at *8.

The Final Rule additionally imposes three separate, extra-statutory hurdles to the consideration of evidence of the other factors. The first hurdle is that evidence of the other factors — but not the QPA — may not be given weight unless the arbiter finds them to be "credible." 87 Fed. Reg. at 52652. The QPA, by contrast, is automatically deemed "credible." *Id*. at 52627 n.31 (it is not the arbiter's "responsibility" to "monitor the accuracy" of the insurer's QPA calculation). As this Court previously observed, the QPA is an "insurer-determined number" over which insurers have the "ultimate say." *TMA I*, 2022 WL 542879 at *2.

The second newly imposed obstacle to the consideration of evidence directed to factors other than the QPA is that such evidence must "relate[] to the offer[s] submitted." 87 Fed. Reg. at 52652; 45 C.F.R. §149.510(c)(4)(iii)(E). For instance, unless an arbiter determines that evidence of the provider's level of training and experience was "necessary" to provide a particular service or "made an impact on the care that was provided," it cannot be considered. 87

---

[3] All cites are to the version of the regulation made effective on October 25, 2022, pursuant to the Final Rule.

Fed. Reg. at 52629; 45 C.F.R. §149.510(c)(4)(iv) (text of examples). The final new obstacle is that evidence of other factors may not be considered to the extent the arbiter determines that such evidence "is already accounted for" in the calculation of the QPA. 87 Fed. Reg. at 52653; 45 C.F.R. §149.510(c)(4)(iii)(E). These new hurdles are found nowhere in the statute. They thus violate the NSA's plain command that arbiters "shall consider" evidence of other factors, such as the provider's level of training and experience. 42 U.S.C. § 300gg-111(c)(5)(C)(i),(ii)(I)-(V).

On top of all this, there is personal pressure on arbiters to tilt toward the QPA. The Final Rule requires that all arbiters issue a written decision. However, a greater burden is imposed if an arbiter does not select the QPA in resolving a dispute. In such cases, the arbiter's "written decision must include an explanation of why the certified IDR entity concluded that this information was not already reflected in the QPA." 87 Fed. Reg. 52632; 45 C.F.R. §149.510(c)(4)(vi)(B). The path of least resistance, therefore, is for the arbiter to select the QPA and avoid having to present detailed justification for a decision that does not center on the QPA. Together, all these requirements in the Final Rule subtly incentivize arbiters to select the QPA.

Plaintiffs' motion for summary judgment in this case establishes that in issuing the challenged portions of the Final Rule, the Departments have exceeded the powers granted to them under the NSA and have violated the Administrative Procedure Act. It is particularly important, however, to understand precisely why all these unlawful requirements imposed on the IDR amount to "a substantial thumb on the scale in favor of the QPA" (to use the Court's phrase), even though they do not purport to be an explicit rebuttable presumption. *TMA I*, 2022 WL 542879. The cognitive science concept of anchoring bias explains why this is so.

III.   **Anchoring Bias Is Subtler Yet Stronger than the Use of an Express Rebuttable Presumption to Elevate the QPA.**

A.   **Anchoring Bias is a Well-Documented Cognitive Phenomenon that Can Yield Predictable Results.**

"Anchoring bias" is the cognitive function whereby people who are tasked with exercising judgment to determine or estimate a numerical value can be heavily influenced, if not pre-conditioned, to a specific result based on the presence of an "anchor" value – a number that is subtly weighted based on how it is presented, e.g., first in a list of options.[4] The concept of anchoring has been known to cognitive scientists for over fifty years.[5] It has been explored in <u>hundreds</u> of published, peer-reviewed academic papers. A widely cited 1974 paper by Tversky and Kahneman described anchoring bias as when "people make estimates by starting from an initial value [i.e., the anchor] that is adjusted to yield the final answer," but the adjustments do not stray too far from the initial value.[6] Researchers have found that anchoring bias persists even when the anchoring information is arbitrary or even entirely random.[7]

In an experiment cited by Tversky and Kahneman, people were asked to estimate the percentage of African countries in the United Nations. Researchers "sp[un] a wheel of fortune in the subjects' presence," which resulted in a number between 0 and 100. The researchers found that "these arbitrary numbers had a marked effect" on the estimates given. "For example, the median estimates of the percentage of African countries in the United Nations were 25 and 45 for

---

[4] Tversky, Amos; Kahneman, Daniel (September 1974). "Judgment under Uncertainty: Heuristics and Biases." Science. 185 (4157): 1124–31, available online <u>here</u>.

[5] Sherif, Muzafer; Taub, Daniel; Hovland, Carl I. (1958). "Assimilation and contrast effects of anchoring stimuli on judgments." Journal of Experimental Psychology. 55 (2): 150–155, available online <u>here</u>.

[6] Tversky and Kahneman, fn. 4, *supra*, at 1128.

[7] *Id*.

groups that received 10 and 65, respectively, as starting points."[8] In another study, "estimates of an athlete's performance were influenced by the number on his jersey."[9] Thus, the order in which choices or cues are presented significantly influences the decisionmaker.

The framing of the question also matters. One study asked participants whether Mahatma Gandhi died before or after age 9, or, in the alternative, before or after age 140.[10] While both '9' and '140' are implausible anchors, the respondents in the first group gave an average age of 50, while those in the second group gave an average age of 67.[11]

Anchoring bias has been replicated in a wide range of contexts. Relevant here, the effect is readily apparent in real-world scenarios relating to monetary price or valuation. For instance, the effects of anchoring bias have been found in a study of mock juries that were given either a "low anchor" ($50,000) or a "high anchor" ($1.5 million) and then asked to determine an award to compensate a personal injury plaintiff.[12] The study found that the anchor influenced damage awards, even without the mock jurors knowing it. Another study found that stock investors valued publicly traded companies that had higher stock prices more highly — even though there is not necessarily any correlation between the two.[13] Even having expertise in the area of evaluation is not enough to avoid anchoring bias. For instance, researchers conducted studies that

---

[8] *Id*.

[9] Critcher, Clayton R.; Gilovich, Thomas. (October 30, 2007). "Incidental environmental anchors." Journal of Behavioral Decision Making. 21(3). Abstract available here.

[10] Mussweiler, Thomas; Strack, Fritz (1999). "Hypothesis-Consistent Testing and Semantic Priming in the Anchoring Paradigm: A Selective Accessibility Model." Journal of Personality and Social Psychology. 73 (3): 437–446. Abstract available here and article available here.

[11] *Id*. at 442.

[12] Krystia Reed, Valerie P. Hans & Valerie F. Reyna, "Accounting for Awards: An Examination of Juror Reasoning behind Pain and Suffering Damage Award Decisions," 96 DENVER L. REV. 841, 849 n.50 and 865-66 (2019).

[13] Disli, Mustafa; Inghelbrecht, Koen; Schoors, Koen; Stieperaere, Hannes. (February 12, 2021). "Stock Price Anchoring."  SSRN. Available online here.

asked students and professional real estate agents to tour and then appraise the value of real estate properties.[14] The test subjects were provided with various listing prices before being asked to give their appraisal. The study found that both subject populations were "significantly biased" by the listing prices even though the agents — who ostensibly had more expertise in real estate — "flatly denied" it.[15]

The Final Rule presents a classic example of anchoring bias when it asks arbiters to consider the QPA first and in isolation from any other factors in choosing between the QPA and a competing offer presented by a provider. Research on anchoring bias instruct that arbiters will be heavily influenced by the QPA at a subconscious level.

### B. Anchoring Bias Will Poison IDRs Conducted Pursuant to the Final Rule to Favor the QPA.

Given the QPA's outsize influence in IDR, it is problematic that insurers have unilateral and unquestioned control over setting the QPA. Providers have limited insight into how the QPA was calculated.[16] Neither is the arbiter. *See* Final Rule, 87 Fed. Reg. at 52,627 n.31 ("[I]t is the Departments' . . . responsibility, not the [arbiter]'s, to monitor the accuracy of the . . . QPA") Unless an arbiter is free to weigh the evidence of all the factors (as well as any additional evidence requested by the arbiter) as it sees fit, the entire IDR process becomes biased in favor of the payors who alone determine the QPA. Such government-sponsored rate-setting is directly contrary to the plain language of the NSA and the intent of Congress in enacting that law.

---

[14] Northcraft, Gregory B.; Neale, Margaret A. (February 1987.) "Experts, amateurs and real estate: An anchoring-and-adjustment perspective on property pricing decisions." Organizational Behavior and Human Decision Processes. Available online here.

[15] *Id*. at 95.

[16] *See* 45 C.F.R. § 149.140(d)(2) (requiring insurers to disclose only whether the relevant QPA was calculated using not contracted rates, but rather using an "eligible database" of health care charges and payments or an "underlying fee schedule rates or a derived amount").

Viewed in this light, the processes and procedures set forth in the Final Rule will necessarily result in a flawed process in which arbiters pick the QPA virtually all the time. After all, the Rule requires arbiters to first start with the QPA and only the QPA. By forcing arbiters to anchor solely to the QPA and then make adjustments only after the fact, the Final Rule all but ensures that the arbiter will pick the offer closest to the QPA.  After all, one of the new requirements imposed by the Final Rule is that arbiters may not give any weight to evidence of other factors that is "already accounted for" in the QPA.

The fact that the IDR is structured as a "baseball arbitration" in which the arbiter must pick one offer or the other only heightens the effect of the anchoring bias in favor of the QPA. As plaintiffs' evidence on summary judgment establishes, providers and facilities will almost always pick an offer that is significantly higher than the QPA. Payors, in contrast, will tend to pick an offer set right at the QPA. Thus, the arbiter's decision-making process will frequently begin already anchored to one of the two offers, e.g., the QPA itself.

The icing on the cake to elevate the QPA is the Departments' new written decision requirement. While the Departments insist that a written decision is required in all cases, the fact remains that the arbiter must only provide additional written justification if it bases its decision on evidence of any of the factors other than the QPA. 87 Fed. Reg. 52632; 45 C.F.R. §149.510(c)(4)(vi)(B). Given what the Departments themselves admit is a tremendous backlog of IDRs, it is highly unlikely that an arbiter will do the extra work necessary to write a more comprehensive written decision when it can be avoided. The QPA will therefore become what Congress never intended it to be: a *de facto* regulation of the prices that providers and facilities may be paid for eligible items and services.

IV.     **As Did the IFR, the Final Rule Will Embolden Health Insurer Overreach and Dominance in Contract Negotiations to the Detriment of Patient Access to High Quality Care.**

During legislative deliberations over the NSA, Congress listened to patient and provider organizations' warnings that relying too heavily on insurer-determined rate-setting in resolving out-of-network payment disputes would diminish and disrupt patients' access to affordable, quality health care, especially in rural and underserved urban areas that already struggle with accessibility. Congressional members from both chambers drew on such concerns when they criticized the imbalanced IDR process in the IFR that created an explicit rebuttable presumption in favor of the QPA:

> This approach is contrary to statute and could incentivize insurance companies to set artificially low payment rates, which would narrow provider networks and jeopardize patient access to care – the exact opposite of the goal of the law. It could also have a broad impact on reimbursement for in-network services, which could exacerbate existing health disparities and patient access issues in rural and urban underserved communities.[17]

More than half the Senate also wrote to the Departments to object to an approach that elevated the QPA, noting "[i]n no way does the [NSA] privilege any one rate in the IDR process, but rather establishes an open and robust dispute resolution process in which each factor is given equal weighting."[18] The Senators were "very concerned" that an elevated QPA would implement "a benchmark payment . . . policy which Congress debated and ultimately rejected because of concerns it created around rural access and narrow networks." *Id.* These same concerns apply with equal force to the Final Rule because, like the IFR, the Final Rule continues to artificially favor the QPA as a *de facto* benchmark for reimbursement rates.

---

[17] Letter from Congressional members to Defendants (dated Nov. 5, 2021), available online here.

[18] *See* Senate Republicans' Ltr. to Departments (dated Dec. 28, 2021), available online here.

A.      **Provider Networks will Deteriorate as Physician Practices and Other Health Care Providers Face Widespread Under-Compensation.**

Elevating the QPA, as the Departments have in the Final Rule, will, in effect, set the ceiling for all out-of-network payments at the insurer-established in-network median rate. This all but ensures that physicians and other health care providers will be routinely under-compensated across the board — for both out-of-network and in-network services, as payors leverage the NSA to drive down contracted rates. The QPA is an insurer-determined figure that generally represents the insurers' historic contract rates adjusted only for inflation. *See* 42 U.S.C. § 300gg-111(a)(3)(E)(i). These contract rates are discounts off the fair market rates that providers would receive in exchange for the benefits of being in an insurer's network. Such discounted rates are not appropriate measures for resolving out-of-network disputes because they give insurers the windfall of a discounted rate while depriving providers of the benefits of network participation.

Health insurers have, and will continue, to use an elevated QPA for leverage in contract negotiations with providers. Their rationale is obvious and almost unassailable — if providers do not accept a contract rate that the insurer deems appropriate, the insurer could walk away and rely on the provider's services on an out-of-network basis. If the provider refuses to accept the insurer's reimbursement on a particular claim, the insurer could ultimately claim its average contract rate because arbiters in the IDR process under the Final Rule would likely determine that the insurer's QPA applies to the claim in dispute.[19]

---

[19] Citing the rebuttable presumption favoring the QPA in the IFR, North Carolina's largest commercial health insurer claimed in a letter to a contracted physician practice that "this new federal law allows a significant change to [our] contracting approach," and the insurer now is "able to seek to contract at a rate more in line with what we consider to be a reasonable, market rate." *See* BlueCross BlueShield of North Carolina letter to Contracted Provider (Nov. 5, 2021), available online here. Such deference to the QPA, according to the insurer, "provide[s] enough clarity to warrant a significant reduction in your contracted rate." *Id.* The insurer thereupon made a demand that the physicians immediately accept a 15%

Inadequate compensation to providers threatens the long-term sustainability of physician practices, particularly small, independent practices that serve rural communities and underserved, dense urban neighborhoods. This will allow insurers to shrink already narrow provider networks, thus deteriorating the accessibility and quality of health insurance coverage for beneficiaries. More services will only be available on an out-of-network basis in many areas of the country, and the services that are accessible by in-network providers will be subject to longer wait times and more administrative hurdles.

When medically necessary in-network care is no longer available or illusory, patients will be forced to seek services out-of-network, resort to emergency rooms for their care, or forego medical care altogether — outcomes that run entirely contrary to the goals of the NSA. Patients also may incur much higher out-of-pocket costs, which makes receiving some health care cost-prohibitive for those with high-deductible plans.

### B. Access to Safety Net Providers and Critically Needed Specialists will be Jeopardized in Certain Communities.

Safety net providers such as emergency department physicians and hospital-based specialists are particularly vulnerable to the market impacts that will result from the Departments' Final Rule. Insurers see providers in these specialties as fungible.  This means that these providers will become the first to be shed from provider networks due to low-ball rate negotiation tactics or outright ouster by insurers.[20] Specialty physicians are already in short

---

rate reduction or face near immediate termination from its provider network. Many amici have received reports from their members of similarly sharp negotiating tactics, albeit perhaps not as blatant.

[20] California's experience with its surprise billing law substantiates these concerns. A RAND Study found that "[p]hysicians in anesthesiology, radiology, and orthopedic practices reported unprecedented decreases in payors' offered rates and less interest in contracting since [California's surprise medical billing law] was passed into law." Erin Lindsey Duffy, "Influence of Out-of-Network Payment Standards on Insurer-Provider Bargaining, California's Experience" AMERICAN J. OF MANAGED CARE (Aug. 23, 2019) at 1 ("RAND Study"), available online here.

supply in many parts of the country, and such shortages are projected to worsen over the coming decade.[21] These physician workforce challenges will only be exacerbated by barriers to access that are artificially created by health insurers' manipulation of reimbursement and provider networks. This will force many Americans to travel long distances or suffer lengthy delays to receive medically necessary specialty care. Some patients may lose access altogether because there are no essential specialists in their community or their insurer provider networks.

Access to critically necessary specialty services, particularly in emergencies, will suffer under the Final Rule for an additional reason. Physician specialists — particularly neurosurgeons, orthopaedic surgeons and general surgeons — will find it more difficult to serve "on-call" at hospitals due to insurer under-compensation and barriers to provider networks. Such on-call specialists are critical to patient care, ensuring the highest possible quality of service and patient safety for a variety of medical services, including lifesaving emergency services. This will have dire implications for patients needing these services as emergency departments face physician shortages and significant overcrowding.

Emergency departments also serve as the site for primary care for many Americans, who will lose access to basic care when emergency room physicians and other on-call specialists are no longer available. Additionally, because certain specialists, such as anesthesiologists or radiologists, are part and parcel of hospital surgical teams, their unavailability from provider networks can deprive patients of needed, if not lifesaving, procedures.

---

[21] *See* Ass'n of Amer. Medical Colleges (by HIS Markit Ltd.), "The Complexities of Physician Supply and Demand: Projections from 2019 to 2034" (June 2021) at p. vii, available online here.

### C.     The Final Rule will Spur Further Consolidation that Will Undermine Market Competition, Raise Costs, and Limit Patient Access.

Giving insurers unfettered rate-setting ability will only exacerbate the significant financial pressures that have forced many physician practices to sell to larger corporate entities or join the employment ranks of large health care organizations. These alarming trends have been reported in recent PAI-Avalere research.[22]

In a study of physician practice trends between 2019-2021, Avalere researchers found a 19 percent increase in the percentage of physicians who left independent practices to become employed in a health care organization and a 38 percent increase in the number of physician practice acquisitions by hospitals and other corporate entities. The most recent data shows a troubling national picture of corporate consolidation of physician practices: 73.9 percent of physicians in the U.S. are now employed by hospitals and other corporate entities. In other words, only one in four physicians practice independently.

There is a large body of research showing that health care provider consolidation raises prices and increases overall health care spending without clear indications of quality improvements.[23] Consolidation also undermines patient choice and continuity of care. Ultimately, individual health insurance premiums will rise, as will the out-of-pocket costs for health care that patients must bear. The Final Rule will exacerbate these worrisome trends.

## CONCLUSION

For the foregoing reasons and the reasons in plaintiffs' briefing on the merits, the amici respectfully urge the Court to grant the plaintiffs' motion for summary judgment.

---

[22] *See* Avalere Health, "COVID-19's Impact on Acquisitions of Physician Practices and Physician Employment 2019-2021, PHYSICIANS ADVOCACY INST. (April 2022), online here.

[23] *See* Karyn Schwartz et al., "What We Know About Provider Consolidation" Kaiser Family Found. (Sept. 2, 2020), available online here.

DATED:  October 19, 2022.　　　　　　Respectfully submitted,

_____/s/ *Long X. Do*_____

Long X. Do (*pro hac vice*)
long@athenelaw.com
ATHENE LAW, LLP
5432 Geary Blvd. #200
San Francisco, California 94121
Tel: (415) 680-7419
Fax: (844) 619-8022

Eric D. Chan (*pro hac vice*)
eric@athenelaw.com
ATHENE LAW, LLP
10866 Washington Blvd., #142
Culver City, California 90232
Tel: (310) 913-4013
Fax: (844) 619-8022

*Attorneys for Amici Curiae Physicians Advocacy Institute, California Medical Association, Connecticut State Medical Society, Medical Association of Georgia, Kentucky Medical Association, Massachusetts Medical Society, Michigan State Medical Society, Nebraska Medical Association, Medical Society of New Jersey, Medical Society of the State of New York, North Carolina Medical Society, Oregon Medical Association, South Carolina Medical Association, Tennessee Medical Association, Washington State Medical Association, Texas Association of Neurological Surgeons, Texas College of Emergency Physicians, Texas Orthopaedic Association, Texas Radiology Society, Texas Society for Gastroenterology and Endoscopy, American Association of Neurological Surgeons, Congress of Neurological Surgeons, American Academy of Otolaryngology-Head and Neck Surgery, American Association of Orthopaedic Surgeons, American College of Hyperbaric Medicine,  American College of Surgeons, American Osteopathic Association, American Society of Plastic Surgeons, Colorado Society of Anesthesiologists, Illinois Society of Anesthesiologists, and North American Spine Society*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). This document was also served on all counsel via e-mail service, on this 19th day of October 2022.

/s/ *Long X. Do*

Long X. Do (*pro hac vice*)

## APPENDIX

**A.**     **Description of State Medical Associations**

**California Medical Association**: Founded in 1856 "to develop in the highest possible degree, the scientific truths embodied in the profession," the California Medical Association ("CMA") has served as a professional organization representing California physicians for more than 160 years. Throughout its history, CMA has pursued its mission to promote the science and art of medicine, protection of public health and the betterment of the medical profession. CMA contributes significant value to its 50,000 members with comprehensive practice tools, services and support including legislative, legal, regulatory, economic, and social advocacy. CMA works to help reduce administrative burdens in physician practices, support physicians in providing quality care and ensure they thrive amid industry consolidation.

**Connecticut State Medical Society:** Since 1792, the Connecticut State Medical Society ("CSMS") has worked on behalf of physicians and patients in Connecticut. Through the CSMS, physicians stand together regardless of specialty to ensure patients have access to quality care and to make our state the best place to practice medicine and to receive care. CSMS is a respected and powerful voice for the medical profession in Connecticut, representing 4,000 physician members and patients before the Connecticut General Assembly, state and federal agencies, health plans, licensing boards, the judicial branch, and more.

**Medical Association of Georgia:** Founded in 1849, the Medical Association of Georgia ("MAG") is the leading advocate for physicians in the state. MAG's mission is to "enhance patient care and the health of the public by advancing the art and science of medicine and by representing physicians and patients in the policy making process." With more than 8,400 members, including physicians in every specialty and practice setting, MAG's membership has increased by more than 35% since 2010.

**Kentucky Medical Association:** Established in 1851, the Kentucky Medical Association ("KMA") is a professional organization for physicians throughout the Commonwealth. Representing over 6,000 physicians, residents, and medical students, the KMA works on behalf of physicians and the patients they serve to ensure the delivery of quality, affordable health care. Members of KMA share a mission of commitment to the profession and services to the citizen of the Commonwealth that extends across rural and urban areas. From solo practitioners to academicians to large, multi-specialty groups, KMA is the only state association representing every specialty and type of medical practice in Kentucky.

**Massachusetts Medical Society:** The Massachusetts Medical Society ("MMS") is the statewide professional association for physicians and medical students, supporting 25,000 members. MMS is dedicated to educating and advocating for the physicians of Massachusetts and patients locally and nationally. A leadership voice in health care, the MMS contributes physician and patient perspectives to influence health-related legislation at the state and federal levels, works in support of public health, provides expert advice on physician practice management, and addresses issues of physician well-being. Under the auspices of its NEJM

Group, MMS extends its mission globally by advancing medical knowledge from research to patient care through the New England Journal of Medicine and other publications.

**Michigan State Medical Society:** The Michigan State Medical Society ("MSMS") is a professional association which represents the interests of over 15,000 physicians in the State of Michigan. Organized to promote and protect the public health and to preserve the interests of its members, MSMS has frequently been afforded the privilege of acting as *amicus curiae* with respect to legal issues of significance to the medical profession.

**Nebraska Medical Association:** The Nebraska Medical Association ("NMA") was founded in 1868 and represents nearly 3,000 active and retired physicians, residents, and medical students from across the state of Nebraska. NMA's mission is "to serve physician members by advocating for the medical profession, for patients and for the health of all Nebraskans."

**Medical Society of the State of New York:** The Medical Society of the State of New York ("MSSNY") is an organization of approximately 30,000 licensed physicians, medical residents, and medical students in New York State. MSSNY is a nonprofit organization committed to representing the medical profession as a whole and advocating health-related rights, responsibilities, and issues. MSSNY strives to promote and maintain high standards in medical education and in the practice of medicine in an effort to ensure that quality medical care is available to the public.

**Medical Society of New Jersey:** Founded in 1766, the Medical Society of New Jersey ("MSNJ") is the oldest professional society in the United States. The organization and members are dedicated to a healthy New Jersey, working to ensure the sanctity of the physician-patient relationship. In representing all medical disciplines, MSNJ advocates for the rights of patients and physicians alike, for the delivery of the highest quality medical care. This allows response to the patients' individual, varied needs, in an ethical and compassionate environment, in order to create a healthy Garden State and healthy citizens. With 9,500 members, MSNJ's mission is "to promote the betterment of the public health and the science and the art of medicine, to enlighten public opinion in regard to the problems of medicine, and to safeguard the rights of practitioners of medicine."

**North Carolina Medical Society:** North Carolina Medical Society ("NCMS") was founded in 1849 to advance medical science and raise the standards for the profession of medicine. Today, with 8,000 members NCMS continues to champion these goals and ideals while representing the interest of physicians and protecting the quality of patient care.

**Oregon Medical Association:** Founded in 1874, the Oregon Medical Association ("OMA") is Oregon's largest professional society engaging in advocacy, policy, community-building, and networking opportunities for 8,000 of Oregon's physicians, medical students, physician assistants, and physician assistant students. OMA's mission is to speak as the unified voice of medicine in Oregon; advocate for a sustainable, equitable, and accessible health care environment; and energize physicians and physician assistants by building and supporting their community.

Appendix: Description of Medical Specialty Societies and State Medical Associations

**South Carolina Medical Association:** Since 1789, the South Carolina Medical Association ("SCMA") has served as the foremost association of physicians dedicated to pioneering advances in South Carolina's health care. The largest physician organization in the state, SCMA represents more than 6,000 physicians, resident, and medical students and through that representation provides a voice for the medical profession and creates opportunities to improve the health of all South Carolinians. SCMA works to promote the highest quality of medical care through advocacy on the behalf of physicians and patients, continuing medical education, and the promotion of medical and practice management best practices.

**Tennessee Medical Association:** The Tennessee Medical Association ("TMA") advocates for policies, laws and rules that promote health care safety and quality for all Tennesseans and improve the non-clinical aspects of practicing medicine. TMA's mission is to improve the quality of medical practice for physicians and the quality of health care for patients by influencing policies, laws, and rules that affect health care delivery in Tennessee. On behalf of 9,200 members, TMA works to be the most influential advocacy for Tennessee physicians in the relentless pursuit of the best possible health care environment.

**Washington State Medical Association:** The Washington State Medical Association ("WSMA"), established in 1889, is the largest medical professional association in Washington state, representing more than 12,000 physicians, physician assistants, and trainees from all specialties and various practice settings throughout the state. WSMA's mission is to advance strong physician leadership and advocacy to shape the future of medicine and advance quality care for all Washingtonians.

## B.    Description of Medical Specialty Societies

**Texas Association of Neurological Surgeons:** For the last 50+ years, the Texas Association of Neurological Surgeons and its volunteer members have been working tirelessly to advance the practice of neurosurgery throughout the State of Texas. Member education, grassroots lobbying, and patient advocacy are just a few of the cornerstones of the association. The purposes of the Texas Association of Neurological Surgeons is to promote and advance neurological surgery within the State of Texas, advance the pursuit of excellence in neurological surgery and related sciences through continuing education, and uphold the principles, policies, and practices for the attainment of the best in neurosurgical patient care. Additionally, the organization strives to provide a communication interface with other groups and represent neurosurgical opinion to preserve and achieve the principles and purposes of the Association.

**Texas College of Emergency Physicians:** The Texas College of Emergency Physicians is a 501c(6) organization composed of over 2,168 emergency physicians in Texas. Our membership includes emergency physicians who practice in a wide variety of settings, including: large and small groups, academic centers, urban and rural, board certified and non-board certified, residents, and medical students. Despite the varied backgrounds, they work together for the common goal of furthering the specialty of emergency medicine in Texas. The Texas College of Emergency Physicians exists to promote quality emergency care for all patients and to represent the professional interests of our members.

Appendix: Description of Medical Specialty Societies and State Medical Associations

A3

**Texas Orthopaedic Association:** The Texas Orthopaedic Association was founded in 1936 as a voluntary organization of Texas orthopaedic surgeons. TOA's mission is to ensure outstanding musculoskeletal health for Texans. Approximately 1,400 Texas orthopaedic surgeons are TOA members**.**

**Texas Radiology Society:** The Texas Radiological Society is a professional, medical society dedicated to serving, promoting and advancing the profession of radiology in Texas. TRS membership is comprised of more than 2,900 Diagnostic Radiologists, Radiation Oncologists, Medical Physicists, residents and fellows in training. From our humble beginnings more than 100 years ago to today, the organization has supported Radiologists with cutting edge training, fellowships, scholarships, legislative advocacy, and support.

**Texas Society for Gastroenterology and Endoscopy:** Texas Society for Gastroenterology and Endoscopy is a statewide professional association for physicians. The TSGE was founded in 1976 and it thrives today with over 800 members. TSGE's primary roles are 1) physician medical education, and 2) advocacy on behalf of patients.

**American Association of Neurological Surgeons:** Founded in 1931 as the Harvey Cushing Society, the American Association of Neurological Surgeons ("AANS") is a scientific and educational association with more than 13,000 members worldwide. Fellows of the AANS are board-certified by the American Board of Neurological Surgery, the Royal College of Physicians and Surgeons of Canada, or the Mexican Council of Neurological Surgery, A.C. The mission of the AANS is to promote the highest quality of patient care and advance the specialty of neurological surgery, which is the medical specialty concerned with the prevention, diagnosis, treatment and rehabilitation of disorders that affect the spinal column, spinal cord, brain, nervous system and peripheral nerves.

**Congress of Neurological Surgeons**: Established in 1951, the Congress of Neurological Surgeons ("CNS") exists to enhance health and improve lives through the advancement of neurosurgical education and scientific exchange. With over 10,000 neurosurgical professionals from more than 90 countries, the CNS advances the practice of neurosurgery globally by inspiring and facilitating scientific discovery and its translation to clinical practice. Quality neurosurgical care is essential to the health and well-being of society. As such, the CNS, together with the AANS, support a Washington Office that carries out their missions by promoting sound health policy and advocating before the courts, regulatory bodies, and state and federal legislatures, and other stakeholders.

**American Academy of Otolaryngology-Head and Neck Surgery:** The American Academy of Otolaryngology-Head and Neck Surgery ("AAO-HNS") was founded in 1896 and celebrated its hundred and twenty-fifth anniversary this year. The AAO-HNS serves its 12,000 United States members in many ways to ensure they are able to provide the highest quality care to all patients. Its Core Purpose states: "We engage our members and help them achieve excellence and provide high quality, evidence informed and equitable ear, nose, and throat care through professional and public education, research, and health policy advocacy."

Appendix: Description of Medical Specialty Societies and State Medical Associations

A4

**American Association of Orthopaedic Surgeons:** Representing more than 39,000 members, including Orthopaedic Surgeons and allied health care professionals in the musculoskeletal medicine specialty, the American Association of Orthopaedic Surgeons ("AAOS") promotes and advocates the viewpoint of the orthopaedic community before federal and state legislative, regulatory, and executive agencies. On behalf of its members, AAOS identifies, analyzes, and directs all health policy activities and initiatives to position the AAOS as the trusted leader in advancing musculoskeletal health.

**American College of Hyperbaric Medicine:** The American College of Hyperbaric Medicine was founded in 1983 in support of clinicians practicing hyperbaric medicine who recognized the importance of therapeutic oxygen in clinical applications, especially wound management. The ACHM is a professional society dedicated to appropriate utilization, standards of care, education, training, certification, and recognition of hyperbaric oxygen therapy as a distinct medical specialty.

**American College of Surgeons:** The American College of Surgeons ("ACS") is a scientific and educational organization of surgeons that was founded in 1913 to raise the standards of surgical practice and improve the quality of care for all surgical patients. The ACS is dedicated to the ethical and competent practice of surgery. Its achievements have significantly influenced the course of scientific surgery in America and have established it as an important advocate for all surgical patients. The ACS has more than 84,000 members and is the largest organization of surgeons in the world.

**American Osteopathic Association:** The American Osteopathic Association ("AOA") represents more than 178,000 osteopathic physicians (DOs) and osteopathic medical students; promotes public health; encourages scientific research; serves as the primary board certification body for osteopathic physicians; and is the accrediting agency for osteopathic medical schools. As the primary board certification body for osteopathic physicians and the accrediting agency for all osteopathic medical schools, the AOA works to accentuate the distinctiveness of osteopathic principles and the diversity of the profession. In addition to promoting public health and encouraging scientific research, the AOA advocates at the state and federal levels on issues that affect osteopathic physicians, osteopathic medical students, and patients.

**American Society of Plastic Surgeons:** The American Society of Plastic Surgeons ("ASPS") is the world's largest association of plastic surgeons. Its over 7,000 domestic members represent 93 percent of Board-Certified Plastic Surgeons in the United States. ASPS's mission is to promote the highest quality in professional and ethical standards, advance quality care for plastic surgery patients, and promote public policy that protects patient safety. ASPS's members are highly skilled surgeons who improve both the functional capacity and quality of life for patients, including the reconstruction of defects caused by disease, congenital anomalies, burn injuries, and traumatic injuries; the treatment of hand conditions; and the provision of gender affirming care.

**Colorado Society of Anesthesiologists:** The Colorado Society of Anesthesiologists is a physician organization committed to patient safety, educational advancement, and providing the best possible anesthesia care to our patients. The CSA is a statewide organization of

Appendix: Description of Medical Specialty Societies and State Medical Associations

anesthesiologists which serves as a resource for patients, physicians, and the public by defining and advancing the standard of anesthesia care and supporting the practice of anesthesiology in the state of Colorado.

**Illinois Society of Anesthesiologists:** The Illinois Society of Anesthesiologists is a membership organization of Illinois anesthesiologists focused on furthering patient safety and the practice of our discipline through education, representation, and advocacy for our members. We also provide our member physicians with opportunities to connect as a community through events and networking opportunities.

**North American Spine Society**: The North American Spine Society ("NASS") is a global multidisciplinary medical organization dedicated to fostering the highest quality, ethical, value-based and evidence-based spine care through education, research and advocacy. With over 8,000 members, NASS represents orthopedic surgeons, neurosurgeons, physiatrists, anesthesiologists, nurses, chiropractors, and many more across the United States, and provides a broad array of support for its members through continuing medical educational programs, coding and patient safety resources as well as coverage recommendations, clinical guidelines, addressing issues related to spine research including the funding of grants and traveling fellowships, and legislative advocacy.