**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | |
|---|---|
| TEXAS MEDICAL ASSOCIATION, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 6:22-cv-00372 |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | |
| Defendants. | |

**BRIEF OF AMERICAN SOCIETY OF ANESTHESIOLOGISTS, AMERICAN COLLEGE OF EMERGENCY PHYSICIANS, AND AMERICAN COLLEGE OF RADIOLOGY, AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

Ronald S. Connelly (pro hac vice)
Jeremy Lewin
POWERS PYLES SUTTER & VERVILLE, PC
1501 M Street, N.W.
Seventh Floor
Washington, DC 20005
tel. (202) 466-6550
Ron.Connelly@PowersLaw.com
Jeremy.Lewin@PowersLaw.com

*Counsel to Amici Curiae American Society of Anesthesiologists, American College of Emergency Physicians, and American College of Radiology*

## <u>TABLE OF CONTENTS</u>

INTERESTS OF AMICI CURIAE ................................................................................ 1

INTRODUCTION ....................................................................................................... 1

BACKGROUND ......................................................................................................... 3

    I.      The No Surprises Act ................................................................................ 3

    II.     The 2021 Interim Final Rules .................................................................. 5

    III.    Final Rule Published on August 26, 2022 ............................................... 7

ARGUMENT ............................................................................................................... 8

    I.      The QPA Does Not Reflect the Fair Market Value of Out-of-Network Items and Services ............................................................................................... 8

    II.     The Final Rule Incentivizes Insurers to Lower In-Network Rates, Ultimately Narrowing Provider Networks ............................................................... 10

    III     The Final Rule Will Result in Under-Compensation of Care, Which May Incentivize the Consolidation of Practices, Undermining Market Competition ... 12

    IV.    Market Disruptions and Narrower Provider Networks Stemming from the Final Rule Will Harm Patients in Underserved Areas Struggling with Accessibility ... 13

CONCLUSION ........................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Corn Growers Ass'n v. EPA*, 291 F.3d 1, 6 (D.C. Cir. 2002) ........................................... 2, 11

*Texas Med. Ass'n v. HHS* (*TMA 1*), No. 6:21-cv-425, 2022 WL 542879
  (E.D. Tex. Feb. 23, 2022) .................................................................................................. passim

*Texas Med. Ass'n v. HHS*, No. 6:22-cv-00372 (E.D. Tex. Oct. 12, 2022) .................................... 3

**Statutes**

26 U.S.C. § 9816 ........................................................................................................................... 2

26 U.S.C. § 9816(c) ...................................................................................................................... 2

29 U.S.C. § 1185e ......................................................................................................................... 2

29 U.S.C. § 1185e(c) ..................................................................................................................... 2

42 U.S.C. § 300gg-111(a)(1)(C)(iv)(I), (a)(3)(K)(ii), (c)(1)(A) ................................................... 4

42 U.S.C. § 300gg-111(a)(1)(C)(iv)(II), (b)(1)(D) ....................................................................... 4

42 U.S.C. § 300gg-111(a)(3)(F)(i) ............................................................................................... 3

42 U.S.C. § 300gg-111(b)(2)(A)(ii) ............................................................................................. 3

42 U.S.C. § 300gg-111(c) ......................................................................................................... 2, 4

42 U.S.C. § 300gg-111(c)(1)(B) ................................................................................................... 4

42 U.S.C. § 300gg-111(c)(5) ..................................................................................................... 4, 6

42 U.S.C. § 300gg-111(c)(5)(C)(I)–(II) ........................................................................................ 4

42 U.S.C. § 300gg-111(c)(5)(C)(ii) .............................................................................................. 5

42 U.S.C. § 300gg-111(c)(5)(D) ................................................................................................... 5

42 U.S.C. §§ 300gg-111, 300gg-131 to 132 ............................................................................ 2, 3

Cal. Health & Safety Code § 1371.31 ......................................................................................... 12

No Surprises Act, Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 2757-890 (2020) .............. 1, 2, 3

**Regulations**

45 C.F.R. § 149.140(a)(1) ............................................................................................ 9

45 C.F.R. § 149.140(b)(2)(iv) ..................................................................................... 9

45 C.F.R. § 149.140(c)(1)(i)) ...................................................................................... 6

45 C.F.R. § 156.230 .................................................................................................... 14

**Federal Registers**

86 Fed. Reg. 36,872 (July 13, 2021) .......................................................................... 5

86 Fed. Reg. 36,872, 36,889 (July 13, 2021) ............................................................ 9

86 Fed. Reg. 36,872, 36,965-66 (July 13, 2021) ...................................................... 5

86 Fed. Reg. 36,872, 39,676 (July 13, 2021) ............................................................ 6

86 Fed. Reg. 55,980, 56,104, 56,116, 56,128 (Oct. 7, 2021) .................................... 6

87 Fed. Reg. 52,618 (Aug. 26, 2022) ..................................................................... 1, 7

87 Fed. Reg. 52,618, 52,620-21, 52,631, 52,634 (Aug. 26, 2022) ........................... 7

87 Fed. Reg. 52,618, 52,625-26, 52,633-34 (Aug. 26, 2022) ................................... 7

87 Fed. Reg. 52,618, 52,629 (Aug. 26, 2022) ...................................................... 7, 10

87 Fed. Reg. 52,618, 52,654 (Aug. 26, 2022 .......................................................... 8

**Other Authorities**

Erin L. Duffy, *Influence of Out-of-Network Payment Standards on Insurer-Provider Bargaining: California's Experience*, 25 AM. J. MANAGED CARE e243 (2019) ........................................... 13

Letter from ACEP & Emergency Dep't Prac. Mgmt. Ass'n to Xavier Becerra, Janet Yellen, and Martin Walsh, Dep't Sec'ys 14-15 (Aug. 31, 2021), https://www.regulations.gov/comment/CMS-2021-0117-5695 ........................................... 9, 10

Letter from ACR to Chiquita Brooks-LaSure, Adm'r, CMS 2 (Sept. 7, 2021), https://www.regulations.gov/comment/CMS-2021-0117-7239 ........................................... 9, 10

Letter from Am. Med. Ass'n to Janet Yellen, Sec'y, U.S. Dep't of Treasury, Xavier Becerra, Sec'y, U.S. Dep't of Health & Hum. Servs., and Martin Walsh, Sec'y, U.S. Dep't of Labor, AMA Comments on Interim Final Rule Requirements Related to Surprise Billing: Part II Implementing the No Surprises Act (Dec. 6, 2021), https://downloads.regulations.gov/CMS-2021-0156-5178/attachment_1.pdf ........................................... 12

Letter from ASA to Xavier Becerra, Janet Yellen, and Martin Walsh, Dep't Sec'ys 3 (Sept. 7, 2021), https://www.regulations.gov/comment/CMS-2021-0117-7410 ................................. 9, 10

Letter from Cal. Med. Ass'n to Chiquita Brooks-LaSure, Adm'r, CMS, No Surprises Act: Interim Final Rule: Part I [RIN 0938-AU63; CMS 9909-IF] (Sept. 7, 2021), https://downloads.regulations.gov/CMS-2021-0117-7408/attachment_1.pdf .......................... 13

Letter from Members of Congress to Xavier Becerra, Janet Yellen, and Martin Walsh, Dep't Sec'ys, 2 (Nov. 5, 2021), https://www.acep.org/globalassets/new-pdfs/advocacy/2021.11.05-no-surprises-act-letter.pdf [hereinafter "November Letter"] ............................................... 11, 14

Simon F. Haeder, *Inadequate in the Best of Times: Reevaluating Provider Networks in Light of the Coronavirus Pandemic*, 12 WORLD MED. & HEALTH POL'Y 282, 284 (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7436480/pdf/WMH3-12-282.pdf ............... 14

## INTERESTS OF AMICI CURIAE

The American Society of Anesthesiologists ("ASA"), the American College of Emergency Physicians ("ACEP"), and the American College of Radiology ("ACR") (collectively, "*Amici*") are voluntary, national professional associations that advocate for the interests of their respective members, including on matters concerning adequate and fair reimbursement for items and services provided out-of-network.  ASA is a professional association comprised of approximately 56,000 physician anesthesiologists and others involved in the medical specialty of anesthesiology, critical care, and pain medicine.  ACEP is a professional association comprised of more than 40,000 emergency physicians, residents, and medical students.  ACR is a professional association comprised of approximately 40,000 diagnostic radiologists, radiation oncologists, interventional radiologists, nuclear medicine physicians, and medical physicists.  *Amici* submit this brief on behalf of their members who provide items and services that are impacted by the No Surprises Act ("NSA").

## INTRODUCTION

*Amici* support Plaintiffs' motions for summary judgment, ECF Nos. 41-42, to halt the implementation of specific provisions of the final rules ("Final Rule") jointly published by the United States Department of Health and Human Services ("HHS"), the United States Department of Labor, the United States Department of the Treasury, and the United States Office of Personnel Management (collectively, "Departments") implementing the NSA, Pub. L. No. 116-260, 134 Stat. 1182 (2020).  Requirements Related to Surprise Billing, 87 Fed. Reg. 52,618 (Aug. 26, 2022).  *Amici* submit this brief to explain to the Court how the Final Rule will unlawfully empower insurers to dictate both in-network and out-of-network rates for physician services, which will force many physician practices to consolidate and will harm patient care by

1

narrowing provider networks, particularly in underserved communities.

The NSA addresses two interrelated problems with the private health insurance market: 1) insurers demand unreasonably low payment rates as a condition of physicians participating in their networks, thus forcing many physicians to stay out-of-network to remain economically viable; and 2) patients who unknowingly receive certain care from out-of-network providers are responsible for amounts not paid by their insurance companies, which is known as "surprise billing."  No Surprises Act, Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 2757-890 (2020) (codified at 42 U.S.C. §§ 300gg-111, 300gg-131 to 132; 29 U.S.C. § 1185e; 26 U.S.C. § 9816).[1] *Amici* support Congress's reforms, which, if properly implemented, will ensure fair reimbursement to providers and facilities and reasonable cost sharing by patients.

Unfortunately, the Departments have turned these reforms upside down and transformed an act intended to protect patients and their doctors into a giveaway to private insurers that will harm patients and providers.  The Final Rule unlawfully slants independent dispute resolution ("IDR") decisions toward the qualifying payment amount ("QPA"), which is determined solely by the insurer and does not reflect the fair market value of physician services.  But this Court has already held that nothing in the NSA "states that the QPA is the 'primary' or 'most important' factor" in determining out-of-network rates. *Texas Med. Ass'n v. HHS* (*TMA 1*), No. 6:21-cv-425, 2022 WL 542879, at *8 (E.D. Tex. Feb. 23, 2022) (quoting *Am. Corn Growers Ass'n v. EPA*, 291 F.3d 1, 6 (D.C. Cir. 2002)).  The Final Rule suffers from the same infirmities that led the Court to invalidate the Departments' prior interim final rules.  If the Final Rule goes into

---

[1] The NSA enacted materially identical amendments to the Public Health Service Act ("PHS"), the Employee Retirement Income Security Act of 1974 ("ERISA"), and the Internal Revenue Code ("IRC").  To avoid triplicate citations, this brief cites to the PHS IDR provisions of the NSA at 42 U.S.C. § 300gg-111(c).  The ERISA IDR provisions are at 29 U.S.C. § 1185e(c), and the IRC IDR provisions are at 26 U.S.C. § 9816(c).

effect, it will depress payments for the anesthesiology, radiology, and emergency services of *Amici's* members by empowering insurers to lower in-network rates, which, in turn, will depress out-of-network rates.  The inevitable result will be the consolidation of physician practices, which will lead to fewer services in rural and other underserved communities.  For these reasons, and the reasons stated in Plaintiffs' summary judgment briefs, the Court should invalidate the provisions of the Final Rule that unlawfully force IDR entities to favor the QPA when determining out-of-network payments.

## BACKGROUND

*Amici* refer the Court to Plaintiffs' thorough descriptions of the NSA and the Departments' implementing regulations and provide a brief summary here.  *See generally* Plaintiffs' Motion for Summary Judgment and Memorandum in Support Thereof at 2-14, *Texas Med. Ass'n v. HHS*, No. 6:22-cv-00372 (E.D. Tex. Oct. 12, 2022), ECF No. 41.

## I.    The No Surprises Act

The NSA establishes protections for participants, beneficiaries, and enrollees (collectively, "patients") in group health plans and group and individual health insurance coverage (collectively, "insurers") from surprise billing when patients receive (1) emergency services provided by an out-of-network provider or out-of-network emergency facility, or (2) non-emergency services from an out-of-network provider with respect to a visit at an in-network health care facility.  No Surprises Act, Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 2757-890 (2020) (codified at 42 U.S.C. §§ 300gg-111, 300gg-131 to 132).[2]  The NSA addresses surprise

---

[2] An out-of-network emergency facility is statutorily defined as "an emergency department of a hospital, or an independent freestanding emergency department, that does not have a contractual relationship" with the insurer for providing such item or service under the plan or coverage.  42 U.S.C. § 300gg-111(a)(3)(F)(i).  The NSA defines a "health care facility" as (1) a hospital, (2) a hospital outpatient department, (3) a critical access hospital, (4) an ambulatory surgical center, and (5) any other facility specified by the Departments.  42 U.S.C. § 300gg-111(b)(2)(A)(ii).

billing that occurs when a patient unknowingly receives items or services from an out-of-network provider at an in-network healthcare facility or emergency care provided out-of-network, and the patient is billed for amounts not covered by the patient's insurance.

The NSA also creates a framework for determining fair payment for the provision of certain out-of-network items and services.  42 U.S.C. § 300gg-111(c).  The NSA mandates that insurers reimburse out-of-network providers/facilities an "out-of-network rate," minus the cost-sharing requirement of the patient.[3]  *Id.* § 300gg-111(a)(1)(C)(iv)(II), (b)(1)(D).  If the provider disagrees with the insurer's initial payment determination, the provider can initiate a 30-day open negotiation with the insurer to determine the amount of payment for the out-of-network item or service.  *Id.* § 300gg-111(a)(1)(C)(iv)(I), (a)(3)(K)(ii), (c)(1)(A).

If the parties cannot agree on the amount for the out-of-network item or service, either party may initiate an IDR process.  *Id.* § 300gg-111(c)(1)(B).  The IDR process requires an independent arbitrator—referred to as the IDR entity—to determine appropriate payment amounts for out-of-network health care items and services.  *Id.* § 300gg-111(c)(5).  Congress unambiguously delineates a list of factors that the IDR entity "shall consider" when identifying the appropriate payment amount:  1) the QPA in same geographic region; and 2) "information on any circumstance described in clause (ii), such information as requested [by the IDR entity relating to the party's offer], and any additional information [submitted by a party relating to such offer of either party]."  *Id.* § 300gg-111(c)(5)(C)(I)–(II).  In "clause (ii)," Congress enumerates five additional factors that the IDR entity "shall consider":

---

[3] This brief focuses solely on the implementation of the NSA's framework to determine reimbursement for non-emergency items or services provided by an out-of-network provider at an in-network health care facility and emergency services provided by an out-of-network provider or an out-of-network emergency facility.  *Amici* support the NSA's reforms to the patient cost-sharing requirements, and this brief does not address those reforms.

(I) The level of training, experience, and quality and outcomes measurements of the provider or facility that furnished such item or service ….

(II) The market share held by the nonparticipating provider or facility or that of the plan or issuer in the geographic region in which the item or service was provided.

(III) The acuity of the individual receiving such item or service or the complexity of furnishing such item or service to such individual.

(IV) The teaching status, case mix, and scope of services of the nonparticipating facility that furnished such item or service.

(V) Demonstrations of good faith efforts (or lack of good faith efforts) made by the nonparticipating provider or nonparticipating facility or the plan or issuer to enter into network agreements and, if applicable, contracted rates between the provider or facility, as applicable, and the plan or issuer, as applicable, during the previous 4 plan years.

*Id.* § 300gg-111(c)(5)(C)(ii).

In subparagraph D, Congress also lists specific factors that the IDR entity "shall not consider" (the "Subparagraph D Factors"), including usual and customary charges; the reimbursement rate for such items and services payable by a public payer (e.g.*,* Medicare, Medicaid, the Children's Health Insurance Program, TRICARE, United States Department of Veterans Affairs); or the amount that the out-of-network provider would have billed for the item or service had the NSA not applied.  *Id.* § 300gg-111(c)(5)(D).

## II.    The 2021 Interim Final Rules

On July 13, 2021, the Departments published interim final rules ("July 2021 IFR") implementing certain provisions of the NSA, including the methodology for calculating the QPA.[4]  Requirements Related to Surprise Billing; Part I, 86 Fed. Reg. 36,872 (July 13, 2021).  In general, to calculate the QPA for items or services furnished in 2022, an insurer must increase the "*median* contracted rate" for "the same or similar item or service under such plans or

─────────────

[4] The July 2021 IFR establishes a methodology for calculating the QPA for air ambulance services, which is not covered in this brief.  86 Fed. Reg. at 36,965-66.

coverage, respectively, on January 31, 2019, by the combined percentage increase" as published by the Treasury and the Internal Revenue Service "to reflect the percentage increase in the [Consumer Price Index for All Urban Consumers] CPI–U over 2019, such percentage increase over 2020, and such percentage increase over 2021."  86 Fed. Reg. at 39,676 (codified at 45 C.F.R. § 149.140(c)(1)(i)) (emphasis added).

To ensure a balanced and independent process, Congress purposely avoided giving presumptive weight to any one factor in the IDR process—particularly the QPA, which favors insurers because the QPA is tied to the insurer's median in-network rates.  42 U.S.C. § 300gg-111(c)(5).  Despite this clear directive, the Departments promulgated interim final rules on October 7, 2021, unlawfully tying the hands of an IDR entity by giving presumptive weight to one factor—the QPA—over all other statutory factors unless the party satisfied additional requirements that are not stated in the NSA.  Requirements Related to Surprise Billing; Part II, 86 Fed. Reg. 55,980, 56,104, 56,116, 56,128 (Oct. 7, 2021) [hereinafter "October 2021 IFR"].

On February 23, 2022, this Court vacated the October 2021 IFR's rebuttable presumption in favor of the QPA, holding that the rebuttable presumption conflicted with the unambiguous statute governing the framework for resolving payment disputes for items or services furnished out-of-network and that the Departments promulgated the October 2021 IFR in violation of the Administrative Procedure Act's ("APA's") notice-and-comment requirements.  *TMA 1*, No. 6:21-cv-425, 2022 WL 542879 (E.D. Tex. Feb. 23, 2022).  This Court found that nothing in the NSA "instructs arbitrators to weigh any one factor or circumstance more heavily than the others," and that the Departments effectively "rewr[ote] clear statutory terms" by slanting the IDR process in favor of the QPA.  *Id.* at *8-9.  This Court also determined that the Departments' failure to comply with the APA's notice-and-comment requirements provided an independent

basis to hold unlawful and set aside the October 2021 IRF's rebuttable presumption in favor of

the QPA because the Departments "lacked good cause to bypass notice and comment"

procedures.  *Id.* at \*12-14.

### III.    Final Rule Published on August 26, 2022

After this Court's decision in *TMA 1*, the Departments published the Final Rule

establishing new requirements dictating the IDR entity's determination of out-of-network rates

for items and services subject to the NSA.  Requirements Related to Surprise Billing, 87 Fed.

Reg. 52,618 (Aug. 26, 2022).  The Final Rule once again improperly tilts IDR decisions in favor

of insurers.  The Final Rule biases the IDR process in favor of the QPA by prohibiting the IDR

entity from considering the non-QPA statutory factors if the information (1) is already accounted

for by the QPA or other credible information pertaining to non-QPA statutory factors, (2) does

not relate to either party's offer, (3) is not "worthy of belief and is trustworthy" (i.e., credible)

after a "critical analysis," or (4) concerns information regarding statutorily excluded factors (i.e.,

usual and customary charges, the reimbursement rate for such items and services payable by a

public payer, or the amount that the out-of-network provider would have billed for the item or

service had the NSA not applied).[5]  87 Fed. Reg. at 52,620-21, 52,631, 52,634.

Notably, in the preamble to the Final Rule, the Departments state that "in many cases, the

additional factors for the certified IDR entity to consider other than the QPA will already be

reflected in the QPA."  87 Fed. Reg. at 52,629.  Further, if an IDR entity chooses to give weight

to any information besides the QPA, it must provide a "written decision" containing "an

explanation of why the certified IDR entity concluded that this information was not already

---

[5] The Final Rule also addresses certain disclosure requirements relating to information that
insurers must provide about the QPA under the July 2021 IFR.  87 Fed. Reg. at 52,625-26,
52,633-34.  This brief does not address the disclosure requirements set forth in the Final Rule.

reflected in the QPA." 87 Fed. Reg. at 52,654.  The Final Rule's heighted evidentiary standard required for consideration of the non-QPA Subparagraph C Factors tips the scales of the IDR process in favor of the insurer's QPA.

## ARGUMENT

By significantly restricting the IDR entity's consideration of all statutory factors, the Final Rule will result in a disproportionately high number of IDR decisions that are closer to the QPA.  The QPA, however, is not reflective of the fair market value of items and services furnished by out-of-network providers in the marketplace.  Because the QPA is tied to the insurer's median in-network rates and the Final Rule will result in IDR decisions that favor the QPA, the Departments have created a perverse incentive for insurers to significantly reduce their in-network rates or to refuse to enter into network agreements with providers/facilities.  If more providers/facilities are forced out-of-network due to the Final Rule, patients will lose access to in-network care.  In addition, the Final Rule will undermine the ability of providers and facilities to be reimbursed fairly for their out-of-network services, which will, in turn, threaten their ability to operate in the marketplace.  If this occurs, small, independent practices may have no other choice but to consolidate or to cease operating.  Patients will lose access to care, particularly in underserved areas.

**I.     The QPA Does Not Reflect the Fair Market Value of Out-of-Network Items and Services**

Congress did not give enhanced weight to the QPA in the IDR process.  The QPA does not accurately represent the fair market-based payment rates for out-of-network services.  *See* Declaration of Dr. Nicola; Declaration of Dr. Young; Declaration of Dr. Raley.  Yet the Final Rule unlawfully skews IDR decisions toward the QPA.  By definition, the QPA includes only in-network "contracted rates," excluding single case agreements, letters of agreement, or other

8

similar arrangements between a provider and an insurer to supplement the network of the plan or coverage for a specific patient in unique circumstances.  45 C.F.R. § 149.140(a)(1).  Further, in calculating the median contracted rate, an insurer must exclude risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments.  *Id.* § 149.140(b)(2)(iv).  These exclusions result in QPAs that are lower than the full payment amount for the applicable item or service.  *See* Letter from ACEP & Emergency Dep't Prac. Mgmt. Ass'n to Xavier Becerra, Janet Yellen, and Martin Walsh, Dep't Sec'ys 14-15 (Aug. 31, 2021) [hereinafter "ACEP Comment Letter"];[6] Letter from ASA to Xavier Becerra, Janet Yellen, and Martin Walsh, Dep't Sec'ys 3 (Sept. 7, 2021) [hereinafter "ASA Comment Letter"];[7] Letter from ACR to Chiquita Brooks-LaSure, Adm'r, CMS 2 (Sept. 7, 2021) [hereinafter "ACR Comment Letter"].[8]

Moreover, in calculating the median contracted rate, each contracted rate for an item or service is treated as a single data point regardless of the total number of claims paid at that rate. 86 Fed. Reg. at 36,889.  In other words, if an insurer has a contract with a provider, the rate negotiated with that provider under the contract is treated as a single contracted rate, regardless of the volume of individual claims paid at that rate.  In effect, the calculation of the QPA wholly ignores the frequency of use or applicability of those in-network contracts in the market, which results in a misrepresentation of the true market value of the out-of-network item or service.

For example, if an insurer enters into a network contract with a provider for services that are rarely performed by the provider, the provider is more likely to accept a lower in-network rate because the provider does not depend on the service at issue for a meaningful fraction of its

---

[6] https://www.regulations.gov/comment/CMS-2021-0117-5695.
[7] https://www.regulations.gov/comment/CMS-2021-0117-7410.
[8] https://www.regulations.gov/comment/CMS-2021-0117-7239.

revenue.  Because the median contracted rate fails to take into consideration the volume of the

services billed, contracts for low-volume services artificially reduce the QPA.  *See* ACEP

Comment Letter at 11; ASA Comment Letter at 3; ACR Comment Letter at 2.

The QPA simply does not reflect actual market conditions, nor does it capture the broad

range of cost, complexity, and acuity requirements that inform in-network contracting.  *See*

Declaration of Dr. Nicola; Declaration of Dr. Young; Declaration of Dr. Raley.  For these

reasons, the QPA does not reflect the true market value of items or services provided out-of-

network.  Because the Final Rule will result in out-of-network payments that hew closely to the

QPA, providers will not be fairly reimbursed for their out-of-network services under the Final

Rule.

## II.     The Final Rule Incentivizes Insurers to Lower In-Network Rates, Ultimately Narrowing Provider Networks

Because the Final Rule tips the scales during the IDR process in favor of the QPA, which

is tied to the insurer's median in-network rates, the Final Rule inappropriately creates an

incentive for insurers to slash their in-network rates or to refuse to enter into network agreements

with providers.  Under the Final Rule, the IDR entity has limited authority to consider the non-

QPA Subparagraph C Factors, particularly in light of the Departments' statement in the preamble

to the Final Rule that "in many cases, the additional factors for the certified IDR entity to

consider other than the QPA will already be reflected in the QPA."  87 Fed. Reg. at 52,629.  As a

result, the Final Rule diminishes providers' negotiating position with insurers.

The Final Rule is similar to the vacated October 2021 IFR in that it distorts the

"independent" dispute resolution process and empowers insurers to lower in-network payment

rates artificially.  Under the Final Rule, the Departments effectively replaced the rebuttable

presumption in favor of the QPA with a new set of rules that still skew the IDR entity's decision

in favor of the QPA, notwithstanding that nothing in the NSA "states that the QPA is the 'primary' or 'most important' factor." *TMA 1*, 2022 WL 542879, at *8 (quoting *Am. Corn Growers Ass'n v. EPA*, 291 F.3d 1, 6 (D.C. Cir. 2002)).

Many Congress Members were extremely concerned that the July 2021 IFR would improperly depress payment rates, and those concerns are equally valid now.  By letter dated November 5, 2021, 152 Members of the U.S. House of Representatives criticized the Departments for "making the median in-network rate the default factor considered in the IDR process" under the October 2021 IFR and warned that this "could incentivize insurance companies to set artificially low payment rates."  Letter from Members of Congress to Xavier Becerra, Janet Yellen, and Martin Walsh, Dep't Sec'ys, 2 (Nov. 5, 2021) [hereinafter "November Letter"].[9]  The members of the U.S. House of Representatives stressed that tying out-of-network payments to the QPA could result in "narrow provider networks … jeopardize[ing] patient access to care – the exact opposite of the goal of the [NSA]."  *Id*. at 2.

The concerns expressed by the 152 Members of Congress, unfortunately, materialized. For instance, Blue Cross Blue Shield of North Carolina sent letters to providers demanding a reduction in contracted rates as a direct result of the Departments' October 2021 IFR. Declaration of Dr. Nicola (stating that Blue Cross Blue Shield of North Carolina's "letter cites" the IFR "as justification to 'warrant a significant reduction in (our) contracted rates with Blue Cross NC' and warns of additional rate reductions once the qualifying payment amount is established"); Declaration of Dr. Raley (noting that Blue Cross Blue Shield of North Carolina's letter states that the "IFR provides 'enough clarity to warrant a significant reduction in [Wake Emergency Physicians, P.A.'s] contracted rate with Blue Cross NC'").  The letters from Blue

---

[9] https://www.acep.org/globalassets/new-pdfs/advocacy/2021.11.05-no-surprises-act-letter.pdf.

Cross Blue Shield of North Carolina further state that if providers do not accept the rate

reduction in light of the Departments' October 2021 IFR, their contracts will be "quickly

terminated."  *See* Declaration of Dr. Nicola; Declaration of Dr. Raley.

The impact of the October 2021 IFR will continue under the Final Rule because the Final

Rule still unlawfully skews IDR decisions in favor of the QPA, which empowers insurers to

reduce in-network contracted rates and threatens existing contractual arrangements with

providers/facilities.

### III.   The Final Rule Will Result in Under-Compensation of Care, Which May Incentivize the Consolidation of Practices, Undermining Market Competition

Because providers will not be fairly reimbursed for their out-of-network services, the

Final Rule will impose serious financial pressures on all providers that render items and services

out-of-network.  The financial strain caused by the Final Rule will disproportionately affect

small, independent practices and rural practices that are already reeling financially from the

COVID-19 pandemic.  *See* Letter from Am. Med. Ass'n to Janet Yellen, Sec'y, U.S. Dep't of

Treasury, Xavier Becerra, Sec'y, U.S. Dep't of Health & Hum. Servs., and Martin Walsh, Sec'y,

U.S. Dep't of Labor, AMA Comments on Interim Final Rule Requirements Related to Surprise

Billing: Part II Implementing the No Surprises Act (Dec. 6, 2021).[10]  These practices may have

no choice but to sell their practices to larger corporate entities—a phenomenon that occurred in

California after the State passed its surprise medical billing law.  Cal. Health & Safety Code §

1371.31.

Like the NSA, California's surprise medical billing law requires insurers to make interim

payments to out-of-network providers who could then begin the California IDR process if they

felt the rate was inadequate.  *See* Cal. Health & Safety Code § 1371.31.  However, the interim

---

[10] https://downloads.regulations.gov/CMS-2021-0156-5178/attachment_1.pdf.

rate was chosen as the "reasonable rate" 98% of the time, essentially functioning as a benchmark rate.  Letter from Cal. Med. Ass'n to Chiquita Brooks-LaSure, Adm'r, CMS, No Surprises Act: Interim Final Rule: Part I [RIN 0938-AU63; CMS 9909-IF] (Sept. 7, 2021).[11]  Thus, like the Final Rule, California's IDR process favors rates unilaterally set by insurers.

A RAND corporation study showed that the California law "changed the negotiation dynamics between hospital-based physicians and payers," resulting in leverage shifting "in favor of payers" and incentivizing them to "lower or cancel contracts with rates higher than their average as a means of suppressing [out-of-network] prices."  Erin L. Duffy, *Influence of Out-of-Network Payment Standards on Insurer-Provider Bargaining: California's Experience*, 25 AM. J. MANAGED CARE e243 (2019).[12]  These drastic changes in negotiating power and lower rates accelerated "consolidation and exclusive contracting with facilities" among hospital-based specialists.  *Id.*  The California bill was cited by several healthcare stakeholders as the factor that "clearly put [consolidation efforts] over the edge."  *Id.*

Routine under-compensation of out-of-network care as a result of the Final Rule similarly threatens the viability of many smaller and independent physician practices and incentivizes the consolidation of practices.  This is particularly problematic in underserved areas already struggling with accessibility to care.

## IV.   Market Disruptions and Narrower Provider Networks Stemming from the Final Rule Will Harm Patients in Underserved Areas Struggling with Accessibility

The Final Rule will result in fewer provider networks and the consolidation of practices, which will adversely impact patients' access to care.  Patients who are unable to access care from in-network providers may delay care, seek care from an in-network provider in the wrong

---

[11] CMS-2021-0117-7408_attachment_1.pdf.
[12] https://www.ajmc.com/view/influence-of-outofnetwork-payment-standards-on-insurer-provider-bargaining-californias-experience.

specialty, rely on emergency departments to receive care, or forgo care all together.  Simon F.

Haeder, *Inadequate in the Best of Times: Reevaluating Provider Networks in Light of the*

*Coronavirus Pandemic*, 12 WORLD MED. & HEALTH POL'Y 282, 284 (2020)  (noting how

"[t]hese issues raise concerns, even under relatively normal circumstances" but become

"exacerbated" when considering the effects of the COVID-19 pandemic).[13]

Underserved communities that are already struggling with access to care are

disproportionally impacted by narrowing provider networks.  By letter dated November 5, 2021,

152 Members of the U.S. House of Representatives warned that a rule favoring the QPA could

"have a broad impact on reimbursement for in-network services, which could exacerbate existing

health disparities and patient access issues in rural and urban underserved communities."

November Letter at 2.  Because the Departments' Final Rule still puts its "thumb on the scale for

the QPA" over the other statutory factors laid out by Congress, the Members' concerns regarding

access to care remain valid.  *TMA 1*, 2022 WL 542879, at *8; November Letter at 1-2.

Moreover, the Final Rule's adverse impact on networks is contrary to longstanding

efforts by the Departments to preserve or bolster network adequacy.  *See, e.g.*, 45 C.F.R. §

156.230 (requiring each qualified health plan issuer that uses a provider network to maintain "a

network that is sufficient in number and types of providers, including providers that specialize in

mental health and substance use disorder services, to ensure that all services will be accessible

without unreasonable delay").  If aggressive actions like Blue Cross Blue Shield of North

Carolina's become commonplace, Members' fears of insurers providing lower in-network

payment rates will be realized and the IDR process will be skewed to under compensate

providers consistently.  *See* Declaration of Dr. Nicola (stating that Blue Cross Blue Shield of

---

[13] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7436480/pdf/WMH3-12-282.pdf.

North Carolina's "letter cites the [IFR] as justification to 'warrant a significant reduction in (our) contracted rates with Blue Cross NC' and warns of additional rate reductions once the qualifying payment amount is established"); Declaration of Dr. Raley (noting that Blue Cross Blue Shield of North Carolina's letter states that the IFR "provides 'enough clarity to warrant a significant reduction in [Wake Emergency Physicians, P.A.'s] contracted rate with Blue Cross NC'").

Routine under compensation will threaten the viability of many smaller and independent physician practices that provide care to underserved areas already struggling with accessibility to care.  Ultimately, losing providers in these areas will significantly harm patients and actively work against the Departments' stated efforts.  The Final Rule, therefore, threatens the stability of the nation's already fragile health care system by empowering insurers to cut payments both to in-network and out-of-network providers, leading to decreased access to care.

## CONCLUSION

For the foregoing reasons, *Amici* respectfully request that the Court grant Plaintiffs' Motions for Summary Judgment.

Respectfully submitted,

/s/Ronald S. Connelly
Ronald S. Connelly (pro hac vice)
Jeremy Lewin
Leela Baggett
Fernando Montoya
POWERS PYLES SUTTER &
VERVILLE, PC
1501 M Street, N.W.
Seventh Floor
Washington, DC 20005
tel. (202) 872-6762
fax (202) 785-1756
Ron.Connelly@PowersLaw.com

*Counsel to Amici Curiae American Society of*

*Anesthesiologists, American College of Emergency Physicians, and American College of Radiology*

Dated:  October 19, 2022

## CERTIFICATE OF SERVICE

The undersigned certifies that, on this 19th day of October 2022, the foregoing document was filed electronically in compliance with Local Rule CV-5(a), which provides service on counsel to all parties.

/s/Ronald S. Connelly
Ronald S. Connelly (pro hac vice)
POWERS PYLES SUTTER &
VERVILLE, PC
1501 M Street, N.W.
Seventh Floor
Washington, DC 20005
tel. (202) 872-6762
fax (202) 785-1756
Ron.Connelly@PowersLaw.com

Dated: October 19, 2022