IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| TEXAS MEDICAL ASSOCIATION, et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., <br><br> *Defendants.* | Civ. Action No. 6:22-CV-00372 <br><br> Lead Consolidated Case |

## BRIEF OF *AMICI CURIAE* AMERICAN MEDICAL ASSOCIATION AND AMERICAN HOSPITAL ASSOCIATION

# TABLE OF CONTENTS

STATEMENT OF INTEREST OF *AMICI CURIAE* ................................................... 1

INTRODUCTION ................................................................................... 3

ARGUMENT ......................................................................................... 5

I.    THE FINAL RULE FAILS TO CURE THE DEFECTS THIS COURT IDENTIFIED WITH THE INTERIM RULE ........................... 5

    A.    Although The NSA Instructs Arbitrators To Follow The Statute And "That's It," The Final Rule Unlawfully Adds Various Extra-statutory Requirements And Restrictions ........... 5

    B.    The Final Rule Overweights The QPA And Conflicts With The Intentional Design Of The IDR Process ............................... 8

        1.    *Requiring Arbitrators To Discount Factors Already "Accounted For" By The QPA Impermissibly Elevates The QPA Factor* .................................................. 8

        2.    *Requiring Arbitrators To Explain Only Why They Did Not Find A Factor Accounted For In The QPA Impermissibly Elevates The QPA Factor* ....................... 11

        3.    *Requiring Arbitrators To Consider Only Evidence That Relates To The Specific Item Or Service Impermissibly Elevates The QPA Factor* ....................... 13

        4.    *The Final Rule's Remaining Requirements And Restrictions Further Elevates The QPA Factor* .............. 14

II.    THE FINAL RULE WILL HARM PATIENTS AND PROVIDERS ..................................................................... 15

    A.    The Departments' Elevation Of The QPA Is Having Systemic Effects ........................................................... 15

    B.    Rate Cuts Caused By The Departments' Elevation Of The QPA Imperil Providers And Patient Care ................................. 18

CONCLUSION ..................................................................................... 20

i

# TABLE OF AUTHORITIES

CASES:

*ACLU v. FCC*,
    823 F.2d 1554 (D.C. Cir. 1987)................................................................... 6

*American Corn Growers Ass'n v. EPA*,
    291 F.3d 1 (D.C. Cir. 2002) ...................................................................... 7

*American Hosp. Ass'n v. Becerra*,
    142 S. Ct. 1896 (2022) ............................................................................ 7

*Gulf Fishermens Ass'n v. National Marine Fisheries Serv.*,
    968 F.3d 454 (5th Cir. 2020), *as revised* (Aug. 4, 2020)........................... 6

*Huawei Technologies USA, Inc. v. Federal Commc'ns Comm'n*,
    2 F.4th 421 (5th Cir. 2021)...................................................................... 6

*Landstar Express Am., Inc. v. Federal Maritime Comm'n*,
    569 F.3d 493 (D.C. Cir. 2009) .................................................................. 6

*Lifenet Inc. v. U.S. Dep't of Health & Human Servs.*,
    No. 6:22-cv-00162-JDK, 2022 WL 2959715 (E.D. Tex., July 26,
    2022)................................................................................................... 13

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    140 S. Ct. 2367 (2020) ............................................................................ 6

*Manuel v. City of Joliet*,
    580 U.S. 357 (2017) ................................................................................ 4

*North Haven Bd. of Educ. v. Bell*,
    456 U.S. 512 (1982) ................................................................................ 8

*Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*,
    No. 6:21-cv-425-JDK, 2022 WL 542879 (E.D. Tex. Feb. 23, 2022) ............... *passim*

*United Parcel Serv., Inc. v. Postal Regul. Comm'n*,
    955 F.3d 1038 (D.C. Cir. 2020)................................................................. 9

STATUTES AND REGULATIONS:

16 U.S.C.
    § 5952(5)(A)........................................................................................... 7

42 U.S.C.

    § 300gg-111(c)(5) ......................................................................... 6

    § 300gg-111(c)(5)(B)(ii) ............................................................... 5

    § 300gg-111(c)(5)(C) ................................................................... 5

    § 300gg-111(c)(5)(C)(i)(II) ......................................................... 5

    § 300gg-111(c)(5)(C)(ii)(II) ....................................................... 14

    § 300gg-111(c)(5)(C)(ii)(V) ....................................................... 14

National Parks Omnibus Management Act of 1998, Pub. L. No. 105-391,

    112 Stat. 3497 ............................................................................ 7

45 C.F.R.

    § 149.140(a)(1) ........................................................................... 16

    § 149.140(b)(2)(iv) ..................................................................... 16

    § 149.510(c)(4)(iii)(A) ............................................................... 15

    § 149.510(c)(4)(iii)(B) ............................................................... 15

    § 149.510(c)(4)(iii)(E) ...................................................... 8, 13, 15

    § 149.510(c)(4)(vi)(B) ............................................................... 12

Requirements Related to Surprise Billing, 87 Fed. Reg. 52,618

    (Aug. 26, 2022) .................................................................. *passim*

Requirements Related to Surprise Billing; Part II, 86 Fed. Reg. 55,980

    (Oct. 7, 2021) ............................................................................ 20

OTHER AUTHORITIES:

AHA, *Fact Sheet: Underpayment by Medicare and Medicaid*

    (Feb. 2022) ............................................................................... 18

Avalere Health, *PCP Contracting Practices and Qualified Payment*

    *Amount Calculation Under the No Surprises Act* (Aug. 2, 2022) ....................... 16

Ctrs. for Medicare & Medicaid Servs., *Technical Guidance No. 2021-01,*

    *Calendar Year 2022 Fee Guidance for the Federal Independent*

    *Dispute Resolution Process Under the No Surprises Act*

    (Sept. 30, 2021) ....................................................................... 13

KaufmanHall, *The Current State of Hospital Finances: Fall 2022*

    *Update* (prepared at the request of Am. Hosp. Ass'n) (2022) ............................. 19

Letter from American College of Emergency Physicians to Members of

    the North Carolina Congressional Delegation (Dec. 9, 2021), ...................... 19, 20

Lower Health Care Costs Act, S. 1895, 116th Cong. (2019) ......................................... 7

No Surprises Act, H.R. 3630, 116th Cong. (2019) ................................................... 7, 8

Tepper, Nona, *Coming to a contract negotiation near you: the No Surprises Act*, MODERN HEALTHCARE, Aug. 3, 2022 ...................................... 17, 18

U.S. Departments of Labor, Health and Human Services, & Treasury, *FAQs About Affordable Care Act And Consolidated Appropriations Act, 2021 Implementation Part 55* (Aug. 19, 2022) ...................................... 16, 17

## STATEMENT OF INTEREST OF *AMICI CURIAE*

The **American Hospital Association** represents nearly 5,000 hospitals, healthcare systems, and other healthcare organizations.  Founded in 1898, the AHA educates its members on healthcare issues and advocates on their behalf so that their perspectives are heard and addressed in national health policy development, legislative and regulatory debates, and judicial matters.  Its members are committed to improving the health of the communities that they serve, and to helping ensure that care is available to and affordable for all Americans.

The **American Medical Association** is the largest professional association of physicians, residents, and medical students in the United States.  The AMA was founded in 1847 to promote the art and science of medicine and the betterment of public health, and these remain its core purposes.  AMA members practice in every state and in every medical specialty.

*Amici* regularly file amicus briefs and engage in other advocacy efforts to support the interests of physicians and hospitals nationwide.

*Amici* and their members strongly support Congress's goal of protecting patients from "surprise billing."  For years, they have consistently advocated for a patient-first solution to surprise billing that would shield patients from unexpected medical bills, while enabling providers and insurers to determine fair payment among themselves and ensuring continued access to care.  *Amici* thus supported the compromise set forth in the No Surprises Act, which both protected patients from surprise medical bills and established an independent dispute resolution process with

an intentionally balanced approach that did not skew towards either providers or insurers.

The Departments' Final Rule, however, upsets the balance that Congress struck, and fails to achieve the goal of fair payment. The members of *amici* AMA and AHA therefore agree with Plaintiffs that the rule is unlawful. They submit this brief to emphasize why it is also unworkable as a practical matter, as well as to explain the detrimental impact it will have on the ability of physicians and hospitals to provide their patients with the excellent care they deserve.

## INTRODUCTION

Earlier this year, this Court held unlawful an interim final rule promulgated by the Departments of Health and Human Services, Labor, and the Treasury, along with the Office of Personnel Management (the "Departments"). *Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*, No. 6:21-cv-425-JDK, 2022 WL 542879, at *8 (E.D. Tex. Feb. 23, 2022).  In so doing, it recognized that Congress made a simple and straightforward choice:   "The Act instructs arbitrators to 'consider' the QPA [qualifying payment amount] and the five other factors in deciding which offer to accept. *That's it.*" *Id.* at *9 (emphasis added) (citation omitted).

But the Departments could not take "[t]hat's it" for an answer.  Based on their own apparent policy preferences, the Departments continue to add atextual requirements to Congress's simple framework.  Indeed, six months after this Court definitively interpreted the No Surprises Act, the Departments promulgated a Final Rule with numerous extra-statutory requirements that will interfere with a balanced consideration of Congress's mandated factors and put a thumb on the scale in favor of the QPA.  The Final Rule's new requirements—particularly those related to so-called "double counting"—unlawfully overweight the QPA, just as the Departments' "presumption" did.  This Court should make clear, as *amici* thought its February opinion already had, that *no agency regulation* is needed to supplement the unambiguous statutory factors that Congress set forth in the NSA.

Even if the Departments were somehow permitted to add extra-statutory requirements to the NSA, those included in the Final Rule would not pass muster. The Departments still overemphasize the QPA in ways that favor insurers, with

3

serious collateral effects on *all* negotiations between providers and insurers.  Among other defects, the Final Rule requires arbitrators to discard any information submitted by a provider with respect to the NSA's non-QPA factors if those factors have already been accounted for by the insurer-calculated QPA—no matter if an insurer weighed those factors less than the arbitrator would, and even if a provider has no realistic way to challenge an insurer's representations regarding the QPA's makeup.  The Departments' continued singular treatment of the QPA plainly violates the NSA.

As consistent and longtime supporters of the NSA's patient protections, *amici* want the NSA to succeed.  But the Final Rule jeopardizes that success by threatening serious harm to patients and the provision of healthcare in this country.  With the Departments' backing, insurers know they can obtain payment rates through IDR arbitration near the below-market QPA.  Consequently, they have drastically reduced rates—from 20-50%—for *in-network* providers, threatening to terminate contracts if providers do not acquiesce.  The severe rate cuts enabled by the Departments' insurer-friendly regulations threaten the viability of physician practices and the scope of medical services nationwide.  Ultimately, the victims will be the patients who lose ready access to care.

The Hippocratic Oath reminds providers to "first, do no harm."  The Departments would also do well to keep that rule of thumb in mind.  *Cf. Manuel v. City of Joliet*, 580 U.S. 357, (2017) (Alito, J., dissenting) ("A well-known medical maxim—'first, do no harm'—is a good rule of thumb for courts as well.").  Because the

NSA already tells arbitrators exactly what to do and "that's it," the Departments have no license to tinker with Congress's design. And they certainly should not have done so in a way that threatens lasting harm to patient care nationwide.

## ARGUMENT

### I.   THE FINAL RULE FAILS TO CURE THE DEFECTS THIS COURT IDENTIFIED WITH THE INTERIM RULE

#### A.   Although The NSA Instructs Arbitrators To Follow The Statute And "That's It," The Final Rule Unlawfully Adds Various Extra-statutory Requirements And Restrictions

Plaintiffs have already outlined the full scope of how the Departments' Final Rule continues to prioritize the QPA over the other statutorily mandated factors, and *amici* agree with those arguments. *Amici* wish to emphasize two additional points.

*First*, this Court could hardly have been clearer that the NSA is not a standing invitation for the Departments to tamper with the arbitration procedures Congress set forth. In finding the Departments' earlier presumption unlawful, this Court admonished the Departments that the NSA "instructs arbitrators to 'consider'" all six statutorily mandated factors, and in no way prescribes a particular "procedure" or a "procedural order" for the arbitrator to follow. *Texas Med. Ass'n*, 2022 WL 542879, at *8-*9 (citing 42 U.S.C. § 300gg-111(c)(5)(C)); *see also* 42 U.S.C. § 300gg-111(c)(5)(B)(ii), (C)(i)(II) (additionally requiring arbitrators to consider "any information relating to [an] offer submitted by either party," without specifying a particular procedure to follow).

The Departments did not listen. Although the Final Rule disclaims any intent to set a "presumption" in favor of the QPA, 87 Fed. Reg. 52,618, 52,627 (Aug. 26,

2022), it nonetheless imposes requirements that, as Plaintiffs describe, will drive arbitrators towards the QPA in almost every case, TMA Pls.' Mot. for Summ. J. 18-24.  The Departments' imposition of extra-statutory requirements thus continues to violate the fundamental principle that "federal agencies can[not] rewrite a statute's plain text." *Landstar Express Am., Inc. v. Federal Maritime Comm'n*, 569 F.3d 493, 498 (D.C. Cir. 2009); *accord Huawei Technologies USA, Inc. v. Federal Commc'ns Comm'n*, 2 F.4th 421, 433 (5th Cir. 2021).  It does not matter that the Departments here seek to add rather than omit terms.  "[A]bsent provisions cannot be supplied by the courts"—or by administrative agencies. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020) (internal quotation marks and alteration omitted).  Indeed, "[a] statute's 'lack of text' is sometimes 'more telling' than the text itself." *Texas Med. Ass'n*, 2022 WL 542879, at *8 (quoting *Gulf Fishermens Ass'n v. National Marine Fisheries Serv.*, 968 F.3d 454, 460 (5th Cir. 2020), *as revised* (Aug. 4, 2020)).

That principle applies with particular force here, where Congress's instructions for what the arbitrator should consider when determining the appropriate payment amount were anything but slapdash.  As this Court held, Congress addressed in "meticulous detail," *Texas Med. Ass'n*, 2022 WL 542879, at *8, the mandatory factors that the arbitrator "shall" consider in deciding which offer to select, 42 U.S.C. § 300gg-111(c)(5).  These instructions make clear that "Congress intended its definition" for how arbitrators should select a payment amount to be "a *comprehensive* definition" of the process. *ACLU v. FCC*, 823 F.2d 1554, 1570 (D.C.

6

Cir. 1987) (emphasis added).  There is no basis for the Departments' policy-driven departure from Congress's design, particularly when that departure "would render largely irrelevant" multiple statutory provisions that "precisely detail[] *** requirements for" determining appropriate payment.  *American Hosp. Ass'n v. Becerra*, 142 S. Ct. 1896, 1905 (2022).

*Second*, even were there room for extra-statutory supplementation, it is contrary to the Act to prioritize the QPA over Congress's other mandated factors.  As this Court has already held—presumption or not—"[n]othing in the Act *** instructs arbitrators to weigh any one factor or circumstance more heavily than the others," or "states that the QPA is the 'primary' or 'most important' factor."  *Texas Med. Ass'n*, 2022 WL 542879, at *8; *see American Corn Growers Ass'n v. EPA*, 291 F.3d 1, 6 (D.C. Cir. 2002) (holding that where "no weights were assigned" to statutory factors, "treat[ing] one of the five statutory factors in such a dramatically different fashion distorts" Congress's judgment).  Congress knows how to mandate giving one factor greater or less weight compared to others.  *E.g.*, National Parks Omnibus Management Act of 1998, Pub. L. No. 105-391, 112 Stat. 3497 (specifying "proposed franchise fee" should be weighted less than factors listed in 16 U.S.C. § 5952(5)(A)).  But Congress did not do so in this case—and in fact, it *rejected* proposals that gave priority to the median contracted rate (on which the QPA is based).[1]  This Court

---

[1] *See, e.g.*, Lower Health Care Costs Act, S. 1895, 116th Cong. § 103(a) (2019) ("A group health plan or health insurance issuer offering group or individual health insurance coverage shall pay providers, including facilities and practitioners, furnishing [certain] services[,] *** the median in-network rate for such services."); No

should (again) tell the Departments to leave the policymaking to Congress.  It should hold, once and for all, that *no regulation* is needed to supplement the factors that Congress so clearly laid out in the statute.  Put another way, "that's it" really does mean "that's it."

### B.   The Final Rule Overweights The QPA And Conflicts With The Intentional Design Of The IDR Process

Informed by their real-world experiences under the IDR process in 2022, *amici*'s members have a keen understanding of why the Departments' various new restrictions in the Final Rule will, in practical effect, always preference the QPA—thus placing an unlawful "heightened burden on the remaining statutory factors." *Texas Med. Ass'n*, 2022 WL 542879, at *8.  The fact that certain of these invented requirements are unworkable for providers only underscores that they are inconsistent with Congress's system.

### 1.   Requiring Arbitrators To Discount Factors Already "Accounted For" By The QPA Impermissibly Elevates The QPA Factor

The Final Rule requires arbitrators to ignore any information submitted by a provider with respect to the non-QPA factors if those factors have already been "accounted for by the [QPA]."  45 C.F.R. § 149.510(c)(4)(iii)(E).  But the statute does

---

Surprises Act, H.R. 3630, 116th Cong. § 2(b) (2019) (proposing that insurers pay "the recognized amount," less patient copay or coinsurance); *id.* § 2(a) (defining "recognized amount" as either no more than the state-mandated amount plus patient copay or coinsurance or, for states without mandates, "at least the median contracted rate").  While this Court eschewed reliance on legislative history in its first opinion because the text was unambiguous, this type of legislative history bolsters Plaintiffs' textual argument because Congress clearly chose between two alternative legislative proposals.  That choice may, if necessary, be properly afforded "the weight of contemporary legislative history."  *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982).

not say that.  The Act vests discretion in the arbitrator to determine what weight to give each factor.  *Texas Med. Ass'n*, 2022 WL 542879, at *8.  The Departments cannot therefore require the arbitrator to "accord [a non-QPA factor] appropriate weight" only "[t]o the extent [the] factor is not already reflected in the QPA."  87 Fed. Reg. at 52,629.  Where Congress mandates consideration of a factor, the decision maker must give it individualized and independent consideration, regardless whether the factor "has arguably [already been] considered" elsewhere.  *United Parcel Serv., Inc. v. Postal Regul. Comm'n*, 955 F.3d 1038, 1042 (D.C. Cir. 2020).

The Departments' requirement also is entirely unworkable for providers in ways that conflict with the NSA's framework.  Although the Departments suggest that providers can argue to the arbitrator that a mandated factor is "not accounted for in the QPA," 87 Fed. Reg. at 52,629, they have given providers a hopeless task.  Insurers "hold ultimate power—and are charged by regulation—to calculate the QPA."  *Texas Med. Ass'n*, 2022 WL 542879, at *2.  They are not required to give providers *any* information about whether or how the QPA accounts for the other mandated factors.  To providers, the makeup of the QPA is a black box.

Providers thus have no way to assess—much less contest—whether the QPA accounts for a given factor when providers and insurers simultaneously submit their offers to the IDR arbitrator.  For instance, a physician may submit considerable evidence that her specialized training supports an offer higher than the QPA.  But if an insurer claims the QPA already "accounts" for that training, the arbitrator—who must treat the QPA as credible so long as it is calculated and communicated according

9

to regulatory requirements, 87 Fed. Reg. at 52,627—will have no basis on which to disregard the insurer's representation.

Still worse, an arbitrator is powerless to consider evidence regarding a non-QPA factor if the insurer-calculated QPA already accounts for it, *even if the arbitrator disagrees with the weight the insurer gave it*. For example, although a given QPA may "account" for physician training in a general sense, a physician might still wish to provide—and the arbitrator might wish to consider—evidence related to why specialized training still justifies a higher rate in the context of a *specific item or service*. But the Departments have insisted that "each factor should be weighted *only once* in the evaluation of each party's payment offer." 87 Fed. Reg. at 52,629 (emphasis added). Only if "a factor is not already reflected in the QPA" is an arbitrator permitted to "accord that factor appropriate weight based on information related to it provided by the parties." *Id.* The result is that even if a provider—despite having no real visibility into the QPA—could explain why a particular QPA does not adequately account for her training, the arbitrator must ignore her evidence so long as the QPA accounts for that training *in some way*.

The power that the Final Rule confers on the QPA is made stark by the Departments' example of "an emergency department visit for the evaluation and management of a patient," where the provider submits "an offer that is higher than the QPA," as well as "information showing that the acuity of the patient's condition and the complexity of the qualified IDR service required the taking of a comprehensive history, a comprehensive examination, and medical decision making

10

of high complexity." 87 Fed. Reg. at 52,629.  The insurer in turn submits an offer that is identical to the QPA, as well as effectively unrebuttable information showing that the QPA "accounts for the acuity of the patient's condition" and the complexity of the service.  *Id.*  According to the Departments, if "the information on the acuity of the patient and complexity of the service is already accounted for in the calculation of the QPA," the certified arbitrator simply "*should not give weight* to the additional information provided by the" provider.  *Id.* at 52,629-52,630 (emphasis added).  The end result is clear:  forced by the Departments to conduct an artificially truncated analysis of the other mandated factors, the arbitrator will end up choosing the offer closest to the QPA.

In short, not only have the Departments made it virtually impossible for providers to rebut claims of double counting, they have snatched the decision of *how* to weigh the various statutorily mandated factors from the hands of the arbitrator—*i.e.*, the independent entity Congress selected—and placed it squarely into the hands of self-interested insurers.  These defects necessarily compel "arbitrators to weigh \*\*\* one factor or \*\*\* circumstance more heavily than the others" in direct contravention of the NSA's text and design—and this Court's interpretation of it.  *Texas Med. Ass'n*, 2022 WL 542879, at \*8.

> 2.  *Requiring Arbitrators To Explain Only Why They Did Not Find A Factor Accounted For In The QPA Impermissibly Elevates The QPA Factor*

Not satisfied with inventing a virtually insurmountable obstacle to showing that a factor is not already "accounted" for in the QPA, the Departments ensured that those intrepid enough to overcome it will rarely get relief.  That is because the

Departments impose a particular writing requirement on *only* those arbitrators who might wish to consider non-QPA factors—even though Congress imposed no such one-sided requirement.

Specifically, the Rule requires arbitrators, each time they rely on a non-QPA factor, to explain in a written decision why that factor was not already reflected in the QPA. 45 C.F.R. § 149.510(c)(4)(vi)(B) ("If the certified IDR entity relies on" a non-QPA factor "in selecting an offer, the written decision must include an explanation of why the certified IDR entity concluded that this information was not already reflected in the [QPA]."). But the Rule nowhere requires arbitrators to explain the reverse: why a non-QPA factor *is* reflected in the QPA. In so doing, the Rule heightens the import of the QPA by making it more burdensome for arbitrators to deviate from it.

Thus, even assuming the rare case exists where a provider is actually able to sidestep the Departments' prohibition on considering evidence related to non-QPA factors purportedly accounted for in the QPA, arbitrators will be deterred from actual reliance on such factors by the Departments' added requirement that the arbitrator explain *why* the QPA does not account for the factor. In the experience of *amici*'s members, most IDR decisions are no more than a single paragraph or two. For example, a federal plaintiff quoted a recent IDR arbitrator decision as offering just a handful of sentences as the entire justification for its selection of the insurer's offer:

> As noted above, the [IDR Entity] must consider related and credible information submitted by the parties to determine the appropriate [out-of-network] rate. As set forth in regulation, additional credible information related to certain circumstances was submitted by both parties. ***However, the information submitted did not support the allowance of payment at a higher [out-of-network] rate.***

Compl. 16-17, *Med-Trans Corp. v. Capital Health Plan, Inc.*, No. 3:22-cv-1077-HES-JBT (M.D. Fl. Oct. 4, 2022), ECF No. 1.  Significantly, that decision was rendered in August 2022—*i.e.*, after this Court had invalidated the interim final rule for all providers.  *See Texas Med. Ass'n*, 2022 WL 542879, at *8; *Lifenet Inc. v. U.S. Dep't of Health & Human Servs.*, No. 6:22-cv-00162-JDK, 2022 WL 2959715 at *10 (E.D. Tex., July 26, 2022).

IDR entities are not paid by the word.  They instead receive a modest flat-rate payment of $200-$500 for adjudicating a single claim (or $268-$670 for reviewing batched claims).  Ctrs. for Medicare & Medicaid Servs., *Technical Guidance No. 2021-01, Calendar Year 2022 Fee Guidance for the Federal Independent Dispute Resolution Process Under the No Surprises Act* at 4 (Sept. 30, 2021).  Faced with the impracticable, one-sided requirement to justify reliance *only* on non-QPA factors (not to mention the Departments' clear skepticism regarding the independent relevance of those factors), human nature suggests that arbitrators are likely to hew to the path of least resistance, relying on the QPA alone to select an offer—all according to the Departments' plan.

      3.    *Requiring Arbitrators To Consider Only Evidence That Relates To The Specific Item Or Service Impermissibly Elevates The QPA Factor*

The Final Rule is defective in a third way:  it prohibits an arbitrator from even *considering* a non-QPA factor if the information submitted in its support does not "tend[] to show that the offer best represents the value of the item or service under dispute." 87 Fed. Reg. at 52,628 (defining what it means for information to "relat[e] to" a party's offer); *see* 45 C.F.R. § 149.510(c)(4)(iii)(E) (information cannot be

considered unless it "relate[s] to either party's offer for the payment amount for the qualified IDR item or service").  Once again, Congress imposed no such restriction.

A closer examination of how this requirement works in practice exposes the Departments' agenda.  Of the six factors that an arbitrator may consider, it is (at best) unclear whether at least two of them—(1) the respective market shares of the provider and insurer, and (2) the parties' previous good faith efforts to contract, *see* 42 U.S.C. § 300gg-111(c)(5)(C)(ii)(II), (V)—could *ever* relate to a particular "item or service under dispute."  That is because, unlike training, experience, patient acuity, and similar factors, information about market shares and prior negotiations do not pertain to a specific "item or service," but rather reflect structural factors that bear on the relationship between providers and insurers in a particular market.  Congress sensibly chose to include these factors to encourage more in-network contracting, and to account for the leverage either an insurer or provider carries when negotiating contract rates.

But that is apparently beside the point for the Departments.  By preventing arbitrators from considering information unless it relates to a particular "item or service," the Departments have effectively nullified two of the six factors Congress mandated that they "shall" consider.

4.   *The Final Rule's Remaining Requirements And Restrictions Further Elevates The QPA Factor*

As should be evident by now, the Final Rule puts a thumb on the scale in favor of the QPA in various ways.  But viewed as a whole, that "thumb" is more like a fist. That is because the Final Rule also imposes additional requirements, beyond those

14

already described, that *systematically preference* the QPA at every turn.   For example, it requires arbitrators to consider the QPA first in every arbitration, before considering any other factors; it requires arbitrators to scrutinize the credibility of every factor Congress required them to consider *except for the QPA*; and it prohibits arbitrators from second-guessing QPA calculations.   *See* 45 C.F.R. § 149.510(c)(4)(iii)(A)-(B), (E); TMA Pls.' Mot. for Summ. J. 18-22.

In other words, when all of the Departments' extra-statutory requirements are viewed as a whole—the three just noted, in addition to the prohibition on considering non-QPA factors already "accounted for," the one-sided writing burden, and the "relat[e] to" restriction—their import becomes crystal clear:  the Departments have elevated the QPA above the other factors, in violation of the NSA's plain text.

## II.      THE FINAL RULE WILL HARM PATIENTS AND PROVIDERS

### A.      The Departments' Elevation Of The QPA Is Having Systemic Effects

The Final Rule's subversion of the non-QPA factors, and its systematic elevation of the QPA, will routinely skew IDR arbitrations in favor of the QPA—and thus insurers—to the detriment of providers and their patients.   Indeed, the Departments' unceasing preference for the QPA has already had reliably negative consequences on providers' ability to achieve fair payment rates from insurers, leading to not just dramatic underpayments for out-of-network care, but also drastic cuts for *in-network* contracted rates that will harm patients by reducing readily available care.

The reason insurers have been able to so abruptly modify such payment structures is that, although the QPA is purportedly based on median contracted rates,

the Departments' regulations have led insurers to calculate QPAs that fall well below market rates.  For instance, the Departments' regulations instruct insurers to exclude from the QPA single-case agreements, as well as bonus and incentive payments—even though such payments typically are part and parcel of providers' negotiated contracts.  *See* 45 C.F.R. § 149.140(a)(1) (excluding single-case agreements from calculation of the QPA); *id.* § 149.140(b)(2)(iv) (excluding bonus and other incentive-based payments or payment adjustments from calculation of QPA).

Even worse, insurers have read the Departments' regulations to permit in some cases calculation of QPAs using "ghost rates"—rates for services a provider never actually provides and has no incentive to negotiate—which exert downward pressure on the QPA.  A recent survey found that of 75 primary care professionals surveyed, 68% included in their network contracts services they provide fewer than two times a year, while 57% included in their network contracts services they *never* provide.  Avalere Health, *PCP Contracting Practices and Qualified Payment Amount Calculation Under the No Surprises Act* at 4 (Aug. 2, 2022).  In fact, the Departments were forced to acknowledge recently that some insurers have been calculating QPAs using *$0* contractual rates for never-provided services.  U.S. Departments of Labor, Health and Human Services, & Treasury, *FAQs About Affordable Care Act And Consolidated Appropriations Act, 2021 Implementation Part 55* at 16 (Aug. 19, 2022).[2]  But the Departments have not amended their regulations to fix the problem.

_____

[2] https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/faqs/aca-part-55.pdf.

Although (in subregulatory guidance) the Departments recently instructed insurers not to include $0 amounts when determining their median contracted rates, they said nothing about excluding rates that, while not quite $0, are significantly below market because they are based on never- or rarely provided services whose rates providers have no incentive to negotiate.  *See id.* 17 n.29.  And besides, subregulatory guidance is not the law.

Because they exclude typical payments to providers and include below-market rates, insurers' QPAs do not reflect actual market rates.  Insurers now know they can rely on IDR arbitration to obtain a below-market payment amount for out-of-network items and services.  That, in turn, has changed their approach to *in-network* contracting.  Specifically, if an in-network provider refuses to accept a near-QPA rate during contract negotiations, an insurer can simply terminate the in-network contract and obtain the desired rate through IDR arbitration.  Either way, the QPA becomes the *de facto* end point for payment rates, contrary to Congress's design.

Unsurprisingly, in the wake of the Departments' campaign to elevate the QPA, *amici*'s members have seen abrupt demands from insurers for across-the-board rate reductions as high as 50%, and take-it-or-leave-it rate schedules that coalesce around the QPA.  Nona Tepper, *Coming to a contract negotiation near you: the No Surprises Act*, MODERN HEALTHCARE, Aug. 3, 2022. [3]  For instance, anesthesiologists, radiologists, and emergency physicians all received letters from Blue Cross Blue

---

[3]  https://www.modernhealthcare.com/insurance/no-surprises-act-influencing-insurers-rate-setting-plans.

17

Shield of North Carolina demanding that, in light of the interim final rule, they agree to payment reductions of up to 30%—or forfeit their contracts. *Id.* And UnitedHealthcare has similarly requested a 40% rate cut from emergency physicians. *Id.* Because the Final Rule does not fix this problem—if anything, it entrenches it—*amici*'s members expect insurers to continue to drive doctors and hospitals out of network, reducing patient choice and access to care.

### B. Rate Cuts Caused By The Departments' Elevation Of The QPA Imperil Providers And Patient Care

Even providers who opt to remain in-network are seeing dramatic rate reductions—not just below the market average, but significantly below *Medicare rates* (some insurers have demanded rates as low as 60% of Medicare rates). For many providers, insurers' dramatic rate cuts are unsustainable. As the AHA has documented, Medicare rates—which are generally set by law—already typically underpay hospitals for the cost of care. AHA, *Fact Sheet: Underpayment by Medicare and Medicaid* (Feb. 2022).[4] In 2020, hospitals on average "received payment of only 84 cents for every dollar spent *** caring for Medicare patients," with "67 percent of hospitals" receiving Medicare payments that were less than the cost of care. *Id.* Historically, hospitals have been able to at least partially offset such underpayments through more compensatory rates from privately insured patients. But with private insurers now seeking rates at or below Medicare levels, hospitals will be hard pressed to cover the cost of care for *any* of their patients.

---

[4] https://www.aha.org/fact-sheets/2020-01-07-fact-sheet-underpayment-medicare-and-medicaid.

These cuts ultimately threaten the scope of provider services (especially those that historically lose money, such as burn units and behavioral health services), and the viability of provider practices (in particular, small- and mid-sized physician groups that have operated under stable contracts for years). *See, e.g.*, Letter from American College of Emergency Physicians to Members of the North Carolina Congressional Delegation (Dec. 9, 2021) ("ACEP Letter").[5]  Insurers' non-negotiable reductions will inevitably lead some physician groups to close, sell, or relocate their practices.  Even those practices that continue may not be able to expand to meet patient demand or hospital staffing requirements.  After weathering a once-in-a-century global pandemic, health systems are already struggling with rising costs caused by inflation and labor shortages.  Margins for all U.S. hospitals are "down 37% relative to pre-pandemic levels" and "[m]ore than half of hospitals are projected to have negative margins through 2022."  KaufmanHall, *The Current State of Hospital Finances: Fall 2022 Update* at 1 (prepared at the request of Am. Hosp. Ass'n) (2022).[6] These abrupt, uniform rate reductions come at a perilous time.

It is patients who will suffer the worst consequences.  Rural and other underserved patient populations will bear the brunt of this sea change, losing their access to readily available and personalized care.  Consider the example of just one North Carolina group of emergency physicians, a group that operates on thin margins

---

[5] https://www.acep.org/globalassets/new-pdfs/advocacy/acep--nccep-insurer-cuts-letter-to-nc-delegation---12092021.pdf.

[6] https://www.kaufmanhall.com/sites/default/files/2022-09/KH-Hospital_Finances_Report-Fall2022.pdf.

with no outside corporate or investor funding.  *See* ACEP Letter.  The group serves 11 emergency departments, including one designated as having a provider shortage and others located in rural areas of the state.  In 2020, the group's physicians served 425,000 patients, 44% of whom were uninsured or on Medicaid.  *Id.*  At the end of 2021, just as the NSA's regulations were set to go into effect, Blue Cross Blue Shield of North Carolina threatened termination of the group's contract if it did not accept an *immediate* 20% cut to its contracted rates.  *Id.*  Blue Cross made clear that, going forward, it would require the group to accept contracted rates closer to the QPA.  *Id.* It is far from clear what will happen to patients when groups like this can no longer afford to serve them.

The Departments previously recognized that significant reductions in provider rates could "threaten the viability of these providers [and] facilities," which "in turn, could lead to participants, beneficiaries and enrollees not receiving needed medical care, undermining the goals of the No Surprises Act."  Requirements Related to Surprise Billing; Part II, 86 Fed. Reg. 55,980, 56,044 (Oct. 7, 2021).  The Departments should heed their own warning.  Luckily, there is already an easy path for arbitrators to follow that will avoid these harmful consequences for providers and the patients they serve—namely, the one Congress charted in the text of the No Surprises Act. That's it.

## CONCLUSION

The AMA and AHA respectfully urge the Court to grant Plaintiffs' motion and set aside the provisions of the Final Rule that unlawfully prioritize the QPA above the other statutorily mandated factors.

Dated:  October 19, 2022

Respectfully submitted,

   /s/ James E. Tysse
James E. Tysse
  D.C. Bar No. 978722 (*pro hac vice*)
Kelly M. Cleary
  D.C. Bar No. 985642 (*pro hac vice*)
Kristen E. Loveland
  D.C. Bar No. 1684978) (*pro hac vice*)

AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
jtysse@akingump.com
kcleary@akingump.com
kloveland@akingump.com

*Counsel to Amici Curiae American Medical Association and American Hospital Association*

21

## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2022, I served the foregoing document upon all counsel of record by filing a copy of the document with the Clerk through the Court's electronic docketing system.

   /s/ James E. Tysse    
James E. Tysse
