**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| TEXAS MEDICAL ASSOCIATION, DR. ADAM CORLEY, and TYLER REGIONAL HOSPITAL, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.  6:22-cv-00372-JDK |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, DEPARTMENT OF  LABOR, DEPARTMENT OF THE TREASURY, OFFICE OF PERSONNEL MANAGEMENT, and the CURRENT HEADS OF THOSE AGENCIES IN THEIR OFFICIAL CAPACITIES, | ) ) ) ) ) ) ) ) ) | Lead Consolidated Case |
| Defendants. | ) ) | |

**BRIEF *AMICUS CURIAE* OF**
**THE EMERGENCY DEPARTMENT PRACTICE MANAGEMENT ASSOCIATION**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**JACK R. BIERIG**
(Admitted *Pro Hac Vice*)
Illinois State Bar No. 0207039
**ARENTFOX SCHIFF LLP**
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
Phone: (312) 258-5511
Fax: (312) 258-5600
jack.bierig@afslaw.com
***LEAD COUNSEL FOR AMICUS CURIAE***

**CATHERINE BARTLES**
State Bar No. 24104849
**STAFFORD DAVIS**
State Bar No. 24054605
**THE STAFFORD DAVIS FIRM, PC**
815 S Broadway Ave.
Tyler, Texas 75701
(903) 593-7000 (Office)
(903) 705-7369 (Fax)
sdavis@stafforddavisfirm.com
cbartles@stafforddavisfirm.com
***COUNSEL FOR AMICUS CURIAE***

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND INTERESTS OF *AMICUS CURIAE*....................................................... 1

ARGUMENT ........................................................................................................................... 4

    I.    The Final Rule Directly Conflicts with the NSA's Clear and Unambiguous Language. ........................................................................................................ 4

        A.    The NSA Does Not Create a Benchmark Reimbursement Rate, But Instead Provides for a Robust Arbitration Process in Which All Statutory Factors Must Be Considered in Determining the Out-of-Network Rate. .......................................................................................... 4

        B.    The Final Rule Is Contrary to the NSA and This Court's Prior Ruling. ................................................................................................... 6

    II.    The Legislative History Confirms that the Final Rule Is Contrary to the NSA. ................................................................................................................ 8

    III.    The Final Rule Will Have Serious Adverse Consequences for Healthcare in This Nation—and Particularly for the Delivery of Emergency Care to Patients. ........................................................................................................... 13

CONCLUSION ...................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*,
  No. 6:21-cv-425-JDK, 2022 WL 542879,
  587 F. Supp. 3d 528 (E.D. Tex. Feb. 23, 2022) ..................................................... 1, 6

**Statutes**

42 U.S.C. § 300gg-111(a)(1)(C)(iv)(II) ................................................................. 4

42 U.S.C. § 300gg-111(a)(2) ............................................................................... 8

42 U.S.C. § 300gg-111(a)(3)(K) .......................................................................... 5

42 U.S.C. § 300gg-111(b)(1)(D) .......................................................................... 4

42 U.S.C. § 300gg-111(c) .................................................................................... 1

42 U.S.C. § 300gg-111(c)(1)(A) .......................................................................... 5

42 U.S.C. § 300gg-111(c)(1)(B) .......................................................................... 5

42 U.S.C. § 300gg-111(c)(5)(A) .......................................................................... 5

42 U.S.C. § 300gg-111(c)(5)(B) .......................................................................... 5

42 U.S.C. § 300gg-111(c)(5)(C)(i)(I) ................................................................... 5

42 U.S.C. § 300gg-111(c)(5)(C)(i)(II) .................................................................. 5

42 U.S.C. § 300gg-111(c)(5)(C)(ii)(I) .................................................................. 5

42 U.S.C. § 300gg-111(c)(5)(C)(ii)(II) ................................................................. 5

42 U.S.C. § 300gg-111(c)(5)(C)(ii)(III) ................................................................ 5

42 U.S.C. § 300gg-111(c)(5)(C)(ii)(IV) ................................................................ 5

42 U.S.C. § 300gg-111(c)(5)(C)(ii)(V) ................................................................. 5

42 U.S.C. § 300gg-111(c)(5)(D) .......................................................................... 5

No Surprises Act, Pub. L. 116-260, div. BB, tit. I, 134 Stat. 1182, 2757-890 (2020) .................. 1

**Regulations**

45 C.F.R. § 149.140(d) ......................................................................................... 7

45 C.F.R. § 149.510 ............................................................................................. 1

45 C.F.R. § 149.510(a)(2)(v) ................................................................................ 7

45 C.F.R. § 149.510(c)(4)(iii)(E) .......................................................................... 7

86 Fed. Reg. 36,872 (July 13, 2021) ................................................................. 8, 13

86 Fed. Reg. 55,980 (July 13, 2021) .................................................................. 2, 4

87 Fed. Reg. 52,618 (Aug. 26, 2022) .............................................................. 1, 5, 6

**<u>Legislative Materials</u>**

166 Cong. Rec. H7290 (Dec. 21, 2020) ............................................................ 8

H.R. 3630, 116th Cong. § 2 (2019) .................................................................. 9

H.R. 5800, 116th Cong. § 2 (2020) .................................................................. 9

H.R. 5826, 116th Cong. § 7 (2020) .................................................................. 9

S. 1895, 116th Cong. tit. I, §103 (2019) .......................................................... 9

## EXHIBITS

1. *The Evolving Role of Emergency Departments in the United States* (RAND Corp. 2013) (excerpt).
   Full report available at https://www.rand.org/pubs/research_reports/RR280.html.

2. "Nevada Jury:  Health Insurers Owe ER doctors $60M in Damages," Wash. Post. (Dec. 7, 2021).

3. Letter from 152 Members of Congress to Defendant Departments (Nov. 5, 2021), available at https://wenstrup.house.gov/uploadedfiles/2021.11.05_no_surprises_act_letter.pdf.

4. Letter from House Ways and Means Committee Chairman Neal and Ranking Member Brady to Defendant Departments (Oct. 4, 2021), available at https://www.mcdermottplus.com/wp-content/uploads/2021/10/surprise-billing-regs-Neal-Brady-letter.pdf

5. "Neal Opening Statement at Markup of Surprise Medical Billing, Hospice, and Health Care Investment *Transparency* Legislation" (Feb. 12, 2020) (as prepared for delivery), available at   https://waysandmeans.house.gov/media-center/press-releases/neal-opening-statement-markup-surprise-medical-billing-hospice-and

6. Joint Statement of the Committees on Ways and Means, Energy and Commerce, and Education and Labor, "Protecting Patients from Surprise Medical Bills" (Dec. 21, 2020) (pdf version).  Native-format version available at https://gop-waysandmeans.house.gov/protecting-patients-from-surprise-medical-bills/.

7. Letter from Members of Congress with Health Care Expertise to Defendant Departments (Nov. 5, 2021), available at https://burgess.house.gov/uploadedfiles/2021.11.02_doc_caucus_surprise_billing_letter.pdf

8. "Physicians Decry Unintended Consequences of California's Surprise Billing Laws" (Cal. Med. Ass'n Nov. 1, 2019), available at https://www.cmadocs.org/Portals/CMA/files/public/CMA%20Suprise%20Billing%20Survey%20Results%202019.pdf

9. American Society of Anesthesiologists, "BlueCross BlueShield of North Carolina Abuses No Surprises Act Regulations to Manipulate the Market Before Law Takes Effect"(Nov. 22, 2021) (including sample letter), available at https://www.asahq.org/about-asa/newsroom/news-releases/2021/11/bcbs-abuses-no-surprises-act-regulations#/

10. Becker's, "4 Disputes Involving UnitedHealth, Physician Staffing Firms" (July 22, 2020), available at https://www.beckershospitalreview.com/payer-issues/4-disputes-involving-unitedhealth-physician-staffing-firms.html

11. Percentage Growth in Marketplace Average Benchmark Premiums Since 2015, available at https://www.edpma.org/downloads/EDPMA_one-pager_CT-NYMarketplace.pdf

12.    "Congressional Committee Leaders Announce Surprise Billing Agreement," House Committee on Energy and Commerce (12/11/20), available at https://energycommerce.house.gov/newsroom/press-releases/congressional-committee-leaders-announce-surprise-billing-agreement

13.    PCP Contracting Practices and Qualified Payment Amount Calculation Under the No Surprises Act (Avalere Health Aug. 2, 2022), available at https://www.emergencyphysicians.org/globalassets/emphysicians/all-pdfs/2022-8-15-avalere-qpa-whitepaper_final.pdf

14.    QPA Data Collection Project, Synopsis of Survey Findings (EDPMA 2022)

15.    Technical Guidance No. 2021-01, Calendar Year 2022 Fee Guidance For The Federal Independent Dispute Resolution Process Under The No Surprises Act (CMS Sept. 30, 2021)

16.    Federal Independent Dispute Resolution Process Status Update (CMS Aug. 19, 2022).

17.    Cigna Termination Letter

## INTRODUCTION AND INTERESTS OF *AMICUS CURIAE*[1]

The Emergency Department Practice Management Association ("EDPMA") submits this Brief in support of Plaintiffs' Motion for Summary Judgment (Dkt. 41).  The Final Rule is contrary to the language and legislative history of the No Surprises Act, Pub. L. 116-260, div. BB, tit. I, 134 Stat. 1182, 2757-890 (2020) ("NSA").  *See* 42 U.S.C. § 300gg-111(c); 45 C.F.R. § 149.510; 87 Fed. Reg. 52,618 (Aug. 26, 2022).  In February 2022, this Court invalidated the Interim Final Rule ("IFR") because the IFR improperly established a presumption in the Independent Dispute Resolution ("IDR") process that the Qualifying Payment Amount ("QPA") is the appropriate reimbursement rate for out-of-network healthcare services.  *Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*, No. 6:21-cv-425-JDK, 2022 WL 542879, 587 F. Supp. 3d 528 (E.D. Tex. Feb. 23, 2022) ("*TMA I*").  The Final Rule purports to comply with this Court's ruling by not explicitly requiring a "presumption" in favor of the QPA.  But contrary to the express language of the NSA, and the Court's ruling, the Final Rule effectively creates precisely such a presumption. The Final Rule will exacerbate the existing crisis in emergency medicine care in this country and severely undermine the quality and availability of emergency care to patients.

EDPMA is the nation's only professional physician trade association focused on the delivery of high-quality, cost-effective care in the emergency department.  EDPMA's membership includes emergency medicine physician groups of all sizes, as well as billing, coding, and other professional support organizations that assist physicians in our nation's emergency departments. EDPMA's members provide direct patient care and/or support the provision of care for approximately half of the 146 million patients that visit emergency departments each year. For more than 25 years, EDPMA has advocated for the rights of emergency medicine physicians and their patients at the state and federal levels, including with respect to the NSA.

---

[1] All parties consented to the filing of this Brief.

EDPMA strongly supports the NSA's goal of protecting patients from "surprise" healthcare bills—that is, bills for emergency services furnished by out-of-network physicians, or non-emergency services furnished by out-of-network physicians at in-network facilities.  The NSA accomplishes this goal by prohibiting insurers and out-of-network physicians from charging patients more than what they would have paid had those services been furnished in-network.  At the same time, the NSA recognizes the importance of ensuring fair compensation for physicians.

Accordingly, the NSA establishes a process whereby patients are removed from billing disputes, and physicians and payors negotiate among themselves to arrive at a reasonable payment for the unreimbursed amounts.  Should those negotiations fail, the parties may invoke the IDR, a "baseball-style" arbitration process.  The IDR process is, as the name suggests, supposed to be "independent," and not biased in favor of either party.  The IDR entity must consider each of the statutory factors and examine the particular facts of the claim to determine the appropriate out-of-network rate.  The NSA does not constrain the discretion of the IDR entity in weighing the statutory factors.  Nor does it assign primacy to, or create a presumption in favor of, any of those factors.

Like the IFR that this Court invalidated, the Final Rule is directly contrary to the NSA's unambiguous language.  The IFR created a rebuttable presumption granting the QPA an elevated status over all the other statutory criteria that the IDR entity must consider.  The QPA is the insurer's median contracted (*i.e.*, *in*-network) amount for the service.  The QPA is calculated exclusively by the insurer, is not subject to scrutiny by the IDR entity (or meaningful oversight by Defendants), and has been the subject of widespread insurer noncompliance, as Defendants themselves acknowledged.  *See* 86 Fed. Reg. 55,980, 55,996 (July 13, 2021) ("[I]t is not the role of the certified IDR entity to determine whether the QPA has been calculated by the [insurer] correctly."); *infra* p. 8.  In the Final Rule, the QPA is once again given primacy in determining the out-of-network reimbursement rate.  The previous express QPA presumption is replaced by new,

2

extrastatutory requirements that effectively result in that very same QPA presumption.  The Final Rule requires the IDR entity to *first* consider the QPA and *not* to consider *any* of the other statutory factors unless additional criteria are satisfied—new criteria that do not apply to the QPA.  As a result, the arbitrator's discretion to weigh all NSA-mandated factors is severely circumscribed, and the QPA will once again be the *de facto* benchmark reimbursement rate.

The Final Rule's one-sided procedure tilts the IDR process decidedly in favor of insurers and, necessarily, toward out-of-network reimbursement rates that are inadequate and below-market.  All healthcare physicians will be materially and adversely affected by the Final Rule, but emergency physicians particularly so.  Under the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, emergency physicians and facilities are required to treat and stabilize all emergency room patients, regardless of their insurance status or ability to pay.  Indeed, more than two-thirds of uncompensated medical care in this country is provided in emergency rooms.  The situation has long since passed a crisis point.  The burden of uncompensated care is growing, closing many emergency departments and hospitals, and threatening the ability of emergency departments to care for all patients, including the indigent and rural populations, who rely on emergency departments as an important safety net. (Ex. 1 at 2.)[2]

The NSA was enacted in part to address these problems, but the Final Rule will serve only to exacerbate this already bleak picture.  Fair reimbursement of physicians is critical to the viability of our healthcare system, particularly the delivery of emergency medical care.  But implementation of the Final Rule will drive reimbursement down to artificially low, below-market rates—not only for out-of-network services, but ultimately for in-network services as well. The Final Rule will

---

[2]Some health insurers consistently underpay emergency physicians.  One of the largest insurers recently was found liable for $60 million in punitive damages for cutting reimbursements to out-of-network emergency physicians by more than 50% over the course of several years. (Ex. 2.)

3

exacerbate the existing shortage of emergency physicians, to the detriment of patients.

Key congressional architects of the NSA warned the Departments that the IFR "could incentivize insurance companies to set artificially low payment rates, which could narrow networks and jeopardize patient access to care—the exact opposite of the goal of the law.  It could also have a broad impact on reimbursement for in-network services, which could exacerbate existing health disparities and patient access issues in rural and urban underserved communities." (Ex. 3 at 2.)   Indeed, Defendants themselves recognized the perils of physician undercompensation:  "[U]ndercompensation could threaten the viability of these providers [and] facilities . . . . This, in turn, could lead to participants, beneficiaries and enrollees not receiving needed medical care, undermining the goals of the No Surprises Act."  86 Fed. Reg. at 56,044.

What members of Congress feared has already come true.   EDPMA's members have received notices from insurers threatening to terminate their contracts (and in some cases terminating their contracts) unless they agree to substantial discounts to their contracted rates. Those notices specifically cited the primacy accorded to QPAs as the legal justification for their actions.  *See infra* pp. 14-15.  The Final Rule will serve only to reinforce these practices.

## **ARGUMENT**

I.     **The Final Rule Directly Conflicts with the NSA's Clear and Unambiguous Language.**

A.     **The NSA Does Not Create a Benchmark Reimbursement Rate, But Instead Provides for a Robust Arbitration Process in Which All Statutory Factors Must Be Considered in Determining the Out-of-Network Rate.**

Given the NSA's prohibition against balance-billing patients in excess of their in-network cost-sharing, out-of-network physicians must turn to the patient's insurer for payment of unreimbursed amounts.  Under the NSA, insurers are obligated to pay physicians the "out-of-network rate."   42 U.S.C. §§ 300gg-111(a)(1)(C)(iv)(II),(b)(1)(D).  The statutory provision at issue here states that the out-of-network rate is the amount determined through a 30-day open

4

negotiation process culminating, if necessary, in IDR.  *Id.* § 300gg-111(a)(3)(K).

Under the open negotiation process, the insurer must first pay an amount it reasonably believes will be payment in full for the services.  *See* 87 Fed. Reg. at 52,626 n.29.  The parties then engage in a 30-day negotiation process; if that fails, either party may initiate IDR.  Each side submits an offer for a payment amount.  The IDR entity must choose one of the two offers as the "out-of-network rate."  *Id.* §§ 300gg-111(c)(1)(A), (c)(1)(B), (c)(5)(B), (c)(5)(A).

The NSA does not set a benchmark for the out-of-network rate.  Instead, the NSA provides a detailed list of factors that the IDR entity "*shall* consider" in its determination:

1.  The QPA for comparable services furnished in the same geographic area.  *See* 42 U.S.C. § 300gg-111(c)(5)(C)(i)(I).

2.  Five "additional circumstances":
    - The "level of training, experience, and quality and outcomes measurements" of the provider.  *Id.* § 300gg-111(c)(5)(C)(ii)(I).
    - The "market share" of the provider or payor in the relevant geographic area.  *Id.* § 300gg-111(c)(5)(C)(ii)(II).
    - The "acuity of the individual receiving such item or service" or the "complexity of furnishing such item or service to such individual."  *Id.* § 300gg-111(c)(5)(C)(ii)(III).
    - The "teaching status, case mix, and scope of services" of the facility.  *Id.* § 300gg-111(c)(5)(C)(ii)(IV).
    - "Demonstrations of good faith efforts (or lack of good faith efforts) made by the nonparticipating provider or . . . the plan . . . to enter into network agreements and, if applicable, contracted rates between [those entities] during the previous 4 plan years."  *Id.* § 300gg-111(c)(5)(C)(ii)(V).

3.  Any information the IDR requests from the parties.  *Id.* § 300gg-111(c)(5)(C)(i)(II).

4.  Any additional information submitted by the parties.  *Id.*[3]

Thus, Congress identified with precision the factors that IDR entities must consider in determining the reimbursement rate.  Congress left to the discretion of the IDR entity how to balance each of those factors to arrive at the appropriate reimbursement.  The NSA does not

---

[3] The NSA also states what the IDR entity "*shall not* consider":  (i) usual and customary charges; (ii) amounts the provider would have billed absent the NSA's ban against balance-billing; and (iii) reimbursement rates by a public payor, such as Medicare.  42 U.S.C. § 300gg-111(c)(5)(D).

instruct IDR entities how to weigh the statutory factors, give primacy to the QPA, or create a "presumption" that the QPA is the proper reimbursement.  There is no support in the NSA for making QPA the proxy for, or even the predominant factor in calculating, the out-of-network rate.

B.     **The Final Rule Is Contrary to the NSA and This Court's Prior Ruling.**

In *TMA I*, this Court ruled that the IFR was contrary to the NSA because it improperly created an extrastatutory presumption in favor of one factor—the QPA—and constrained the IDR entity's discretion to weigh all statutory factors in determining an appropriate reimbursement rate.

The Court held that Congress "spoke clearly on the issue relevant here" and "unambiguously established the framework for deciding payment disputes."  2022 WL 542879, at *7-8.  The Court held that the NSA "plainly requires arbitrators to consider all the specified information in determining which offer to select." *Id.* at *7. The NSA does not "instruc[t] arbitrators to weigh any one factor or circumstance more heavily than the others" and does not "suggest anywhere that the other factors or information is less important than the QPA." *Id.* at *8. The IFR "impermissibly altered" the NSA by treating the QPA "as the default payment amount" and "impos[ing] on any provider attempting to show otherwise a heightened burden of proof that appears nowhere in the statute." *Id.* at *8-9. The NSA does not accord primacy to the QPA or "restrict arbitrators' discretion and limit how they could consider the other factors"; the NSA "clearly sets forth a list of considerations and does not dictate a procedure or a procedural order for [those] considerations." *Id.* (internal quotations omitted).  Thus, the IFR's "thumb on the scale" in favor of the QPA "rewrites clear statutory terms." *Id.* at *8-9 (internal quotations omitted).

The Final Rule purports to "remove from the regulation the language vacated" in *TMA I. See* 87 Fed. Reg. at 52,625.  But the Final Rule replaces that language with other, extrastatutory requirements that similarly constrain the discretion of the arbitrators and give improper weight to the QPA.  Rather than a robust arbitration process in which the IDR entity is *required* to evaluate

6

*all* the factors that Congress believed were relevant to determining a proper reimbursement rate, the Final Rule, like the IFR, turns the IDR process into a truncated, meaningless exercise—one in which the IDR entity must first consider the QPA, is prohibited from considering the other required statutory factors unless a series of extrastatutory criteria is satisfied, and in which the foregone conclusion is that the QPA will be selected as the reimbursement amount.

The Departments previously concluded that the NSA "contemplates that typically the QPA will be a reasonable out-of-network rate." 86 Fed. Reg. at 55,996. The Final Rule reinforces the primacy of the QPA. For example, the Final Rule requires arbitrators to consider whether the other, non-QPA information is "credible," but the QPA is exempt from this "credibility" requirement because the QPA allegedly "is worthy of belief and is trustworthy." 45 C.F.R. § 149.510(a)(2)(v). Furthermore, the Final Rule prohibits giving any weight to factors that allegedly are already reflected in the QPA—the so-called "double-counting" prohibition. *Id.* § 149.510(c)(4)(iii)(E). Thus, although the NSA requires arbitrators to consider patient acuity and complexity of service, the Final Rule prohibits consideration of these factors unless they are both "credible" *and* not already reflected in the QPA. *Id.* There is no basis for these provisions.

First, had Congress believed that the QPA—the *in*-network rate calculated solely by the payor—would "typically" be the appropriate amount for *out*-of-network reimbursements, it would have said so. The fact that Congress specified many factors—*in addition* to the QPA—that the IDR entity is required to consider demonstrates that Congress did not believe that the QPA would "typically" be an adequate and fair reimbursement rate. Indeed, as demonstrated below, the QPA will in fact be lower than the reasonable market value of the services. *See infra* pp. 13-15.

Furthermore, the QPA is calculated by insurers and not subject to investigation by the arbitrator or any meaningful oversight by the Departments. Insurers are required to disclose only very limited information about how they calculated QPAs. 45 C.F.R. § 149.140(d). And while the

7

Departments are authorized to audit insurers' QPA calculations, 42 U.S.C. § 300gg-111(a)(2), HHS has stated that it plans to conduct no more than nine audits per year.  86 Fed. Reg. at 36,935.

Finally, Defendants themselves have acknowledged widespread insurer noncompliance with the QPA rules, such as including "ghost rates" in the QPA—that is, including in the rates for certain specialty services the rates of other, unrelated specialists who rarely or never bill for the service. Because these physicians never bill for that service, they typically do not negotiate the rate and simply accept the low rate offered by the insurer. (*See* Pls.' Br. at 7; Ex. 13.)

Accordingly, the Final Rule, just like the IFR, is contrary to the plain and unambiguous language of the NSA.  As with the IFR invalidated by this Court, the Final Rule exalts the QPA to the practical exclusion of other statutory factors and constrains the arbitrators' statutorily mandated discretion in weighing all relevant factors in arriving at a fair and reasonable reimbursement rate.

## II.    The Legislative History Confirms that the Final Rule Is Contrary to the NSA.

That the Final Rule is contrary to congressional intent is confirmed by the NSA's legislative history. Congress rejected all attempts to do what the Final Rule does: create a benchmark for reimbursement based on only one factor (the QPA); limit the discretion of the IDR entity in applying the statutorily mandated factors; and skew the IDR process heavily in favor of insurers, granting them a material advantage they could not obtain during the legislative process.

The NSA was the product of more than two years of intense legislative activity to address surprise billing.  *See* 166 Cong. Rec. H7290, H7291 (Dec. 21, 2020).  Health insurers and other payors vigorously lobbied Congress to make median in-network rates the benchmark for reimbursement.  Other proposals added a form of arbitration, but because the median in-network rate would have been the benchmark, the arbitration process would have been merely "a backstop [that], at most, [would] result in a mere adjustment to the benchmark rate." (Ex. 4 at 2.) Congress rejected these proposals.  Instead, it enacted the NSA's IDR process, under which all disputes,

8

regardless of the amount at issue, may be submitted to the IDR entity, which is required to take into account all relevant statutory factors to determine the appropriate out-of-network rate.

For example, on July 9, 2019, House Energy and Commerce Committee Chairman Pallone and Ranking Member Walden introduced H.R. 3630, which would have set the reimbursement rate at the insurer's median contracted rate.  H.R. 3630, 116th Cong. § 2 (2019).  Patient-protection provisions such as the ban on balance billing received unanimous support, but the benchmarks tying physician reimbursement to median in-network rates generated stiff opposition.[4]

Then, in February 2020, leadership in the House Ways and Means Committee and the House Education and Labor Committee released two pieces of proposed legislation, which reflected the two major competing approaches to physician reimbursement:  H.R. 5800 (Education and Labor) and H.R. 5826 (Ways and Means).  H.R. 5800 would have required insurers to make a minimum payment of the median contracted rate; if that rate was at least $750, either party could initiate an IDR process.  H.R. 5800, 116th Cong. § 2 (2020).  H.R. 5826, on the other hand, did not establish any payment standard, but instead provided for an open negotiation process, with a dispute-resolution process if negotiations failed.  H.R. 5826, 116th Cong. § 7 (2020).

In his opening statement, Chairman Neal noted that the sponsors of H.R. 5826 had "worked to craft a process where both the provider's offer and the plan's offer receive equal weight"; the resolution entity "considers, but isn't bound by, the plan's median in-network rate"; and "the provider is not left in a position to disprove the adequacy of such a rate."  Neal noted his concern with "giving too much weight to such a benchmark rate" (Ex. 5):

> [W]e already know insurers are looking for any way they can pay the least amount possible.  They will work to push those rates down, regardless of what it means for community

---

[4] Similarly, in July 2019, Senator Alexander introduced S. 1895 (Senate Health, Education, Labor and Pensions Committee), which would have set a "benchmark for payment" for out-of-network services at "the median in-network rate for such services provided to [health plan] enrollees."  S. 1895, 116th Cong. tit. I, §103 (2019).

providers like physicians, hospitals, and our constituents who they employ. With no federal network adequacy standards, plans can push rates down and drop providers from networks with no consequences, leaving patients holding the bag. . . . Surprise bills would be much less common if insurer networks were more robust.

In enacting the NSA, Congress ultimately adopted the Ways and Means approach to determining reimbursement rates.[5]  Congress considered, but rejected, the approach embodied in the IFR, which effectively sets the median in-network rate/QPA as the presumptive reimbursement amount and constrains the IDR process so that it decidedly favors insurers over physicians.  Indeed, on the day the NSA was passed, the three major House Committees addressing these issues issued a Joint Statement noting that the NSA provides a "free-market solution that takes patients out of the middle and fairly resolves payment disputes between plans and providers." (Ex. 6.)  The NSA "[p]rotects patients from surprise bills"; "[e]nsures physicians and other health workers don't face economic harm and uncertainty"; and "[p]rotects all stakeholders, most importantly patients, while also ensuring a pathway for resolution of payment disputes for health care services that are consistent with private market practices."  *Id.*  **The Joint Statement also identifies what the NSA "does not do":**  "This text includes NO benchmarking or rate-setting."  *Id.*

The Joint Statement goes on to emphasize the individualized nature of the IDR process, including the fact that the IDR entity "must equally consider" the many statutory factors:

- If a health care provider is not satisfied with the payment they receive, they can initiate an open negotiation period and, if no resolution is reached, can pursue a dispute resolution process where an independent arbitrator considers relevant factors and determines a fair payment.
- This independent dispute resolution process fairly decides an appropriate payment for services based on the facts and relevant data of each case. This results in savings by stopping bad actors from driving up costs across the health care system . . . .

---

[5] Key congressional leaders issued a press release confirming that the IDR entity must consider all statutory factors:  "When choosing between the two offers the arbiter is required to consider the median in-network rate, information related to the training and experience of the provider, the market share of the parties, previous contracting history between the parties, complexity of the services provided, and any other information submitted by the parties."  (Ex. 12.)

- There is no dollar amount threshold to enter the open negotiation and independent dispute resolution processes– all claims will be eligible.

- The arbitrator must equally consider many factors, including:

  ◦ Median contracted rates;
  ◦ Education and experience of providers and severity of individual cases;
  ◦ Previously contracted rates going back four years;
  ◦ Good faith efforts to negotiate – bad actors will be held accountable;
  ◦ Market share of both parties – this will help prevent any stakeholder that dominates a region from trying to set rates at an untenable level; and
  ◦ Any other factors brought forward by providers and plans, except for billed charges or government-set rates.

Since promulgation of the IFR, congressional leaders have made clear that the IFR violated the NSA.  For example, the principal architects of the NSA, Ways and Means Chairman Neal and Ranking Member Brady, wrote to the Departments expressing their concern that the IFR did not reflect the law that Congress passed:

> Congress sought to promote fairness in payment disputes between insurers and providers—carefully specifying all the various factors that should be considered during the independent dispute resolution (IDR) process. . . .
>
> . . . <u>Despite the careful balance that Congress designed for the independent dispute resolution process, the [IFR] strays from the No Surprises Act in favor of an approach that Congress did *not* enact in the final law and does so in a very concerning manner.</u>

(Ex. 4 at 2.)  The NSA "directs the arbiter to consider all of the factors without giving preference or priority to any one factor—that is the express result of substantial negotiation and deliberation among those Committees of jurisdiction, and reflects Congress's intent to design an IDR process that does not become a de facto benchmark." But the IFR "craft[ed] a process that essentially tips the scale for the median contracted rate being the default appropriate payment amount" (*id.*):

> Under the interim final rule, the IDR entity is only allowed to deviate from the median amount where the parties present "credible information about additional circumstances [that] clearly demonstrates that the [median in-network rate] is materially different from the appropriate out-of-network rate." Such a standard affronts the provisions enacted into law, and we are concerned that this approach biases the IDR entity toward one factor (a median rate) as opposed to evaluating all factors equally as Congress intended.

A group of congressional members with healthcare expertise also objected to the IFR, stating that it did "not reflect legislation that could have passed Congress or the law as written":

> Over the last several years, the medical professionals in Congress received copious expert input from providers and physician groups.  They repeatedly cited the importance of ensuring a balanced IDR process in determining a payment rate in order to prevent adverse outcomes such as artificially-low payments, the narrowing of provider networks, and reduced patient access.  While the QPA was originally intended to be applied as a baseline consideration among other factors during the arbitration process, the [IFR] places a disproportionate emphasis on the QPA, which necessarily undervalues other factors brought to the arbiter, including quality and outcomes data.

(Ex. 7.) As a result, the QPA "is unlikely to reflect actual market-based payment rates for all circumstances." (*Id.*)  This failure to reimburse at a fair market rate would adversely affect physicians and, consequently, the availability of healthcare, particularly in underserved areas (*id.*):

> By instructing the IDR entity to rely upon the QPA as the primary factor in determining payment rates, the [IFR] will limit providers' ability to utilize other statutorily required and relevant factors when negotiating with the payor.  Under [the IFR], we are concerned that the IDR process will lead to narrower networks and decreased access to medical care for millions of American patients, which would have a disproportionate impact on access to care in rural and underserved areas.  If [the IFR] is finalized as written, providers may no longer be able to afford to serve these communities given the downward pressure on commercial rates coupled with the already delicate payor mix.

Finally, a letter from 152 members of Congress expressed these same concerns, noting that while the NSA "was one of the most important patient protection bills in American history, . . . its success will depend on your departments following the letter of law in its implementation."  (Ex. 3 at 1.) The letter reiterated that "Congress rejected a benchmark rate and determined the best path forward for patients was to authorize an open negotiation period coupled with a balanced IDR process." (*Id.*)  The NSA "expressly directs the certified IDR entity to consider each of [the] listed factors should they be submitted, capturing the unique circumstance of each billing dispute without causing any single piece of information to be the default one considered."  (*Id.*)  The IFR, on the other hand, did not "reflect the way the law was written," or "reflect a policy that could have passed Congress," or "create a balanced process to settle payment disputes."  (*Id.*)  By making the median in-network rate "the default factor considered in the IDR process," the IFR threatened grave consequences for patients, including jeopardizing patient access to care and exacerbating existing

12

health disparities in underserved communities.  (*Id.*) The Final Rule did not cure these deficiencies.

### III.    The Final Rule Will Have Serious Adverse Consequences for Healthcare in This Nation—and Particularly for the Delivery of Emergency Care to Patients.

The Final Rule is not only contrary to the NSA and its legislative history.  If upheld, it will result in a host of adverse consequences for physicians and their patients.

First, there is no basis for the Departments' assumption that the QPA/in-network rate will "typically" be a reasonable out-of-network rate.  By requiring the IDR entity to consider a number of factors *in addition to* the QPA, the NSA makes clear that the QPA alone does not accurately represent prevailing market rates.  The real world of health insurance markets bears this out. Market rates are fairly represented by *actual payments* to physicians for actual services rendered, not by a median of *contracted* rates irrespective of the actual utilization of those contracts in the marketplace.  Contracted rates are affected by any number of factors, including the market share of the plan and physician, the unique economic and clinical environment in the communities, and penalty and bonus structures.[6] Physicians often agree to lower contracted rates in exchange for reimbursement certainty and administrative efficiencies that attend being in a network.  In fact, the Departments' first interim rule provides that when insurers calculate median contracted rates, they must exclude risk sharing, bonuses, or penalties, and other incentive-based and retrospective payments or payment adjustments. 86 Fed. Reg. 36,872, 36,894 (July 13, 2021). That, too, artificially reflects lower rates of actual payment.  Thus, using contracted rates as the QPA, and the QPA as a proxy for out-of-network rates, will result in reimbursement rates that deviate drastically from the actual prevailing market rate.

EDPMA's members have submitted offers (or expect to submit offers) in the IDR process.

---

[6] In some contracts, risk-sharing amounts can total 10-15% of the total payments; the contracted rates are adjusted *downward* to reflect the potential for earning such an incentive.

They anticipate that their offers will almost always be higher than the QPA and the insurers' offers, because the QPA—which is calculated by the insurers—does not accurately reflect the cost of providing emergency medical services.   By placing a thumb on the scale for the QPA, the Final Rule will make it more challenging for EDPMA's members' bids to be chosen, and the amounts they are reimbursed for their out-of-network services will decrease.  Indeed, the QPAs submitted to physicians today are well below pre-NSA amounts.  (Ex.14.)

Second, there is no serious dispute that "benchmarks" result in underpayments to physicians and in turn cause the contraction of provider networks and the narrowing of healthcare choices for patients.[7]  For emergency physicians, the problem is even more acute.   In the experience of EDPMA and its members, the EMTALA requirements lead health plans to be even less inclined to maintain emergency physicians in-network.  Insurers recognize that that their policyholders are able to receive emergency care regardless of their insurance status or ability to pay.   Insurers therefore have no incentive to enter into fair contracted rates with emergency physicians.

Third, the IFR and now the Final Rule have had the effect of narrowing provider networks and thereby reducing the availability of healthcare to patients.  Numerous physician practices have received termination notices from insurers of longstanding network agreements (including agreements that currently protect patients in rural and underserved communities), or threats to terminate existing agreements unless the physicians agree to substantial discounts from their contracted rates.  Some of those termination letters even cited the Rules as justification. (*See* Ex. 9; *see also* Exs. 10, 17.)  The only recourse for physicians who are forced out-of-network is the

---

[7]For example, California enacted a benchmark payment rate, but it ultimately became the default payment rate for out-of-network and even in-network services, resulting in narrowed networks and jeopardizing patient access to care.  (Ex. 8.)

IDR process.  Indeed, since the start of the program in April 2022, IDR requests have exceeded CMS's projections by more than 700% (Exs. 15-16), causing a severe backlog for arbitration claims and creating additional pressures on emergency physicians.

Finally, Defendants' assumption that lower reimbursement rates will translate into lower costs to patients is without any basis.  In promulgating the IFR, the Departments stated that it would "help limit the indirect impact on patients that would occur from higher out-of-network rates if plans and issuers were to pass higher costs on to individuals in the form of increases in premiums."  86 Fed. Reg. at 55,996. There is no evidence that insurers pass their savings from lower reimbursement rates onto their insureds.  In fact, when states provide for fair reimbursement (like New York and Connecticut), the resulting insurance premiums are actually *lower* than the national average.  One study examined premiums in New York, Connecticut, and nationwide.  In 2019, the percentage growth in premiums was 73% nationwide, but only 50% in New York and 35% in Connecticut. (Ex. 11.)  In other words, there is no evidence of a relationship between higher insurance premiums and laws that improve emergency physician reimbursement.  Implementation of the Final Rule will therefore result in a host of negative consequences for physicians and their patients without any of the hoped-for positives in the form of lower insurance premiums.

## **CONCLUSION**

The EDPMA requests that the Court grant Plaintiffs' Motion for Summary Judgment.

DATED:   October 19, 2022

Respectfully submitted,
*/s/Jack R. Bierig*
**JACK R. BIERIG (lead attorney)**
(Admitted *Pro Hac Vice*)
Illinois State Bar No. 0207039
**ARENTFOX SCHIFF LLP**
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
Phone: (312) 258-5511
jack.bierig@afslaw.com

**CATHERINE BARTLES**
State Bar No. 24104849
**STAFFORD DAVIS**
State Bar No. 24054605
**THE STAFFORD DAVIS FIRM, PC**
815 S Broadway Ave.
Tyler, Texas 75701
(903) 593-7000 (Office)
(903) 705-7369 (Fax)
sdavis@stafforddavisfirm.com
cbartles@stafforddavisfirm.com

*Attorneys for Amicus Curiae*
*The Emergency Department Practice*
*Management Association*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 19, 2022, a true and correct copy of the foregoing document was served on all counsel of record through this Court's CM/ECF filing system.

<u>*/s/ Jack R. Bierig*</u>
Jack R. Bierig

17