IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| TEXAS MEDICAL ASSOCIATION, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No.: 6:22-cv-372-JDK |
| | ) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | ) Lead Consolidated Case |
| | ) |
| Defendants. | ) |

**BRIEF OF AMERICA'S HEALTH INSURANCE PLANS AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' SUMMARY JUDGMENT MOTION**

Hyland Hunt (*pro hac vice*)
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Suite 900
Washington, DC 20001
Phone: (202) 868-6915
Fax: (202) 609-8410
hhunt@deutschhunt.com

Counsel for *Amicus Curiae* America's Health Insurance Plans

**TABLE OF CONTENTS**

INTEREST OF *AMICUS CURIAE* ................................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...............................................................2

ARGUMENT ...................................................................................................................................4

I.      The Volume Of IDR Claims Underscores Why Agency Guidance Is Vital And Appropriate. ..........................................................................................................................4

II.     The Final Rule Reasonably Reflects The QPA's Inherent Credibility But Does Not Require IDR Entities To Give It Any Particular Weight. ....................................................6

      A.     The Final Rule Reasonably Precludes IDR Re-Calculation of the QPA. ................6

      B.     The Final Rule Supports Patient Access to Quality Networks. .............................9

III.    The Final Rule Reasonably Requires IDR Entities To Give Weight Only To Credible, Relevant, And Non-Cumulative Information. ....................................................10

CONCLUSION ..............................................................................................................................14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Barnhart v. Walton*, 535 U.S. 212 (2002) .................................................................................... 4

*Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197 (2016) .......................................................... 5

**Statutes**

5 U.S.C. § 556 ............................................................................................................................. 12

42 U.S.C. § 300gg-111 ........................................................................................................ *passim*

**Regulations**

45 C.F.R. § 149.140 ................................................................................................................... 6, 7

45 C.F.R. § 149.510 .............................................................................................................. *passim*

86 Fed. Reg. 36,872 (July 13, 2021) ............................................................................................. 6

87 Fed. Reg. 52,618 (Aug. 26, 2022) ................................................................................... *passim*

**Other Authorities**

Ctrs. For Medicare & Medicaid Servs., *Calendar Year 2023 Fee Guidance for the Federal IDR Process under the No Surprises Act* (Oct. 31, 2022) .................................................. 4, 5, 12, 13

Ctrs. for Medicare & Medicaid Servs., *List of certified IDR entities* (2022) ................................. 5

Gary Claxton et al., *Employer strategies to reduce health costs and improve quality through network configuration*, Peterson-KFF Health System Tracker (Sept. 25, 2019) ...................... 10

Nat'l Conf. of State Legislators, *Insurance Carriers and Access to Healthcare Providers: Network Adequacy* (Feb. 1, 2018) ............................................................................................ 10

U.S. Dept. of Lab., *FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55* (Aug. 19, 2022) .................................................................................... 8

**INTEREST OF *AMICUS CURIAE***

America's Health Insurance Plans, Inc. ("AHIP") is the national trade association representing the health insurance community. AHIP advocates for public policies that expand access to affordable health care coverage to all Americans through a competitive marketplace that fosters choice, quality, and innovation. AHIP's members have extensive experience working with nearly all health care stakeholders to ensure that patients have affordable access to needed medical services and treatments. That experience gives AHIP broad first-hand knowledge and a deep understanding of how the nation's health care and health insurance systems work.

AHIP's members strive to reach agreements with health care providers to offer consumers affordable networks that provide choices in the delivery of quality medical care. When unable to secure network agreements before treatment is rendered, health insurance providers seek to negotiate reasonable out-of-network payments to prevent surprise medical bills and reduce costs for patients. But before the No Surprises Act, providers often leveraged their refusal to participate in networks to send patients excessive surprise bills and extract payments well above typical market rates.

AHIP strongly supports Congress's decision in the Act to fix the market dysfunction that saddled patients with exorbitant medical bills for services they could not refuse. In AHIP's expert judgment—drawing on its members' extensive experience with state systems for resolving out-of-network disputes—the proposed implementation of Congress's vision under the now-vacated provisions of the Interim Final Rule was better. Those provisions anchored out-of-network rates to the "qualifying payment amount" (QPA), and would have yielded more predictable and less costly independent dispute resolution (IDR), and therefore more affordable health care for all.

In the Final Rule, however, the Departments eschewed any rebuttable presumptions or other decisional constraints and established only minimal procedural guardrails to "encourage[] a

1

consistent methodology for evaluation of information" by IDR entities. 87 Fed. Reg. 52,618, 52,627 (Aug. 26, 2022). Because the Departments could and should have adopted a rule that more appropriately structured IDR decision-making around the QPA, the Final Rule—which does far less—fits comfortably within the discretion afforded the Departments under the Act. AHIP writes separately to explain why, drawing on its members' experience as participants in IDR disputes, the Final Rule's new approach furthers the effectiveness of an IDR system already overwhelmed with a high volume of cases. The rule's common sense procedural guardrails help to preserve a higher degree of workability in the IDR process and thereby ensure that patients and consumers are protected from higher health care costs caused by spiraling IDR administrative costs and payment of inflated out-of-network rates to providers.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In a provision all but ignored by Plaintiffs and their *amici*, the Final Rule leaves an IDR entity the full discretion, in all cases, to choose the offer that it "determines best represents the value of the … item or service." 45 C.F.R. § 149.510(c)(4)(ii)(A). In AHIP's view, this approach does not go nearly far enough to structure IDR decision-making, precisely because it does not make the QPA a "*de facto* benchmark" (contrary to Plaintiffs' repeated assertion otherwise, Br. 1, 15, 24, 25). The QPA instead is but one factor, to be weighed alongside any other relevant, non-cumulative credible information. *See* 45 C.F.R. § 149.510(c)(4)(iii). As the government explains, the Final Rule's minimal procedural guardrails are reasonable and consistent with the statute.

Given the size and structure of the IDR system, some regulatory guidance was critical. The sheer number of IDR disputes—which thus far exceeds the Departments' predictions several times over—underscores the need for some sort of methodological consistency. That need is magnified by the many different decision-makers. Without some procedural guidelines—even basic ones, like weighting only credible and relevant information—the possibility of wildly disparate

2

approaches would render the system wholly arbitrary. The Final Rule provides a small measure of procedural consistency, permitting IDR panels to consider everything submitted by the parties (except for statutorily prohibited considerations), while instructing them to give weight only to credible, relevant, and non-cumulative information in reaching a result. Such common-sense procedural guardrails provide no substantive constraints on IDR panels' authority to select the baseball-style arbitration offer that is farthest from the QPA.

The procedural requirement to deem the QPA credible is reasonable and consistent with Congress's vision. Unlike any other information that IDR entities may consider, the QPA calculation is transparent, governed by exhaustive rules, and subject to audit. Those strictures provide the requisite indicia of trustworthiness, including a congressionally approved audit process to remedy any claims of QPA non-compliance. Crediting the QPA is efficient, and faithful to the statutory scheme, because the QPA is a fixed number serving different purposes throughout the Act, including patient cost-sharing and IDR reporting. Even-handedness is not an issue. All information weighed in IDR decision-making is subject to a credibility requirement—for the QPA, that requirement is simply met through system-wide extensive calculation rules and the audit process, not ad hoc individualized challenges.

Plaintiffs' *amici* have no basis to claim that the Final Rule will drive health insurance providers to slash rates and narrow networks. Networks are designed to provide affordable access to quality care and breadth of choice, not just cost. In fact, there are early signs of a beneficial trend, where the Act has furthered good faith network negotiations over reasonable rates. Because the Final Rule in some measure enhances IDR predictability, it should encourage such network-building, which ultimately benefits the patients who receive high-value, quality care.

The Final Rule's procedural guidelines (however modest) have important practical

consequences for predictability and accuracy—albeit not to the same degree as the now-vacated interim final rule. Predictability furthers Congress's goals of encouraging settlement, thereby reducing IDR volume. Reduced IDR volume, in turn, lowers administrative costs, which—along with greater negotiation of reasonable in-network rates—helps keep health care affordable. Crucially, baseline rules cabining weighted factors to credible, relevant, and non-cumulative information also help foster accuracy and consistency in IDR decision-making. Plaintiffs' wholly unbounded alternative, on the other hand—which effectively insists IDR panels should be free to base their decisions on irrelevant, non-credible, and cumulative information—would yield an IDR process that is wildly inconsistent from entity to entity and likely to produce inaccurate results. Nothing in the Act compels such an arbitrary and unworkable IDR process.

## ARGUMENT

I.  **The Volume Of IDR Claims Underscores Why Agency Guidance Is Vital And Appropriate.**

Congress expressly directed the Departments to implement the IDR process through regulatory guidance for good reason. *See* 42 U.S.C. § 300gg-111(c)(2)(A); Gov. Br. 22-25. Because the Act is complex and has engendered a "vast number of claims," it is best read "as delegating to the Agency considerable authority to fill in, through interpretation, matters of detail related to its administration." *Barnhart v. Walton*, 535 U.S. 212, 225 (2002). The structure and sheer size of the IDR undertaking confirms the need for some minimal regulatory guardrails to "encourage[] a consistent methodology for evaluation of information" by IDR entities. 87 Fed. Reg. at 52,627.

The overwhelming volume of IDR proceedings dwarfs the Departments' initial estimates. Ctrs. for Medicaid & Medicare Servs., *Calendar Year 2023 Fee Guidance for the Federal [IDR] Process under the No Surprises Act*, at 5 (Oct. 31, 2022), https://tinyurl.com/2p9ptmka ("IDR Fee

4

Guidance"). In the first five and a half months of the IDR system, 90,000 proceedings were initiated. *Id*. This is over four times the number of IDR proceedings projected for the entire first year. *Id*. Annualizing this early data suggests nearly 200,000 IDR proceedings per year—ten times the projected volume.

Further compounding the potential for significant uncertainty around IDR outcomes is the fact that thousands of IDR proceedings are being juggled by many different IDR decision-makers. Congress required IDR decisions to be made by private entities. 42 U.S.C. § 300gg-111(c)(4). To date, thirteen different entities have been certified. *See* Ctrs. for Medicare & Medicaid Servs., *List of certified [IDR] entities* (2022), https://tinyurl.com/3w3dx9pj. Each entity is home to full rosters of decision-makers with different medical or legal expertise. The involvement of so many disparate decision-makers cries out for guidance to ensure that IDR entities operate consistently on a nationwide basis in carrying out their statutory duties. It would be nonsensical for Congress to delegate to the Departments the authority to require that IDR entities meet whatever "requirements … determined appropriate by the Secretary" for certification, 42 U.S.C. § 300gg-111(c)(4)(A)(vii), but (silently) bar the Departments from issuing *any* guidance regarding IDR procedures. If Congress had intended for private entities to decide how to settle hundreds of millions of dollars in health care reimbursements with zero guidance beyond the general framework set forth in the statute, it would have said so—not expressly directed the Departments to adopt IDR rules.

With so many decision-makers rendering so many decisions, the Departments reasonably issued procedural guidance. To have no rules beyond the bare statutory categories—categories which are effectively unbounded—would be definitionally arbitrary and inconsistent with standard norms of dispute decision-making. *Cf. Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 204

5

(2016) ("[U]tterly freewheeling inquiries often deprive litigants of 'the basic principle of justice that like cases should be decided alike.'") (quoting *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 139 (2005)). If anything, the Final Rule offers far less structure around IDR decision-making than guidance that the Departments could and should issue. Instead, it reflects the barest minimum for a workable system.

II. **The Final Rule Reasonably Reflects The QPA's Inherent Credibility But Does Not Require IDR Entities To Give It Any Particular Weight.**

   A. **The Final Rule Reasonably Precludes IDR Re-Calculation of the QPA.**

As the Government explains, the Final Rule places no thumb on the scale in favor of the QPA. Gov. Br. 26-29.[1] Rather, the Final Rule tracks the statute in requiring IDR entities to, in every case, consider the QPA "as defined" by the Act. 42 U.S.C. § 300gg-111(c)(5)(C)(i)(I). That statutory definition is a cornerstone of the Act, spanning at least 20 paragraphs and subparagraphs of the U.S. Code. *See id.* § 300gg-111(a)(3)(E). The QPA definition, not challenged in this litigation, is further unpacked and implemented by about 30 paragraphs of regulatory text, as explained in ten pages of the Federal Register. *See* 45 C.F.R. § 149.140; 86 Fed. Reg. 36,872, 36,888-98 (July 13, 2021). Congress established an audit process for the QPA, also not challenged here, to be implemented by the governing Departments. 42 U.S.C. § 300gg-111(a)(2). Given this statutory and regulatory backdrop, the Final Rule appropriately recognized that a rule-compliant QPA "will meet the credibility requirement" to be given weight. 87 Fed. Reg. at 52,627. Moreover, because any concerns about QPA calculations can be addressed in the congressionally mandated audit process, it was entirely reasonable for the Departments to preclude IDR entities from re-calculating the QPA on a case-by-case basis. *Id.* at 52,627 & n.31; *see* Gov. Br. 36-39.

---

[1] Consistent with the Government's arguments, the IDR decisions issued to date have not clustered around the QPA. Of the decisions on the merits, early indications are that half or more have resulted in the provider's above-QPA offer being selected.

6

The QPA's credibility derives from its transparency and reliability. Far from being a "black box" (Pls.' Br. 27), health insurance providers must provide the QPA to physicians and other medical providers when making initial payments for out-of-network services. 45 C.F.R. § 149.140(d)(1)(i). They must also certify that the QPA was used as the basis for their beneficiary's cost-sharing amount and that it was calculated in accordance with the rules. *Id.* § 149.140(d)(1)(iii). Given the extensive rules, this certification reveals a great deal about how the QPA was calculated. Moreover, health insurance providers must make several additional disclosures if requested, including identifying any database used and explaining how non-fee-for-service contracted rates were addressed. *Id.* § 149.140(d)(2).

The Final Rule sensibly determined that any QPA transparency issues should be addressed through rulemaking, not through ad hoc decision-making in thousands of IDR proceedings—in accord with an explicit statutory rulemaking directive on QPA disclosures. 42 U.S.C. § 300gg-111(a)(2)(B)(ii). At the same time, the Final Rule also leaves IDR entities free to assign greater weight to other credible information besides the QPA in deciding which offer best represents a service's value in any given proceeding. The Final Rule thus strikes the balance Congress contemplated in preserving the statutory role for the QPA while giving flexibility for case-specific determinations in IDRs.

As for reliability, Congress established an audit process to ensure that the QPA is correctly calculated. A QPA audit may be conducted through a sampling process or as the result of a complaint—including complaints from physicians. 42 U.S.C. § 300gg-111(a)(2)(A)(ii). If providers are concerned about QPA compliance, the audit process is the congressionally approved remedy. But contrary to Plaintiffs' claim, there is no evidence of "widespread insurer noncompliance" (Br. 7). As the Frequently Asked Questions document cited by Plaintiffs explains,

7

the Departments realized early on that their QPA rules were unclear in some respects, and health insurance providers "(reasonably and in good faith) may have not understood" a particular detail. U.S. Dep't of Labor, *FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55*, at 17 (Aug. 19, 2022), https://tinyurl.com/3zvt3w3j. The Departments have issued such clarifications precisely because they are carefully monitoring how QPAs are being calculated and implemented—as the statute requires. Indeed, the Departments are "continuing to consider comments" related to QPA disclosures, amending regulations to require additional disclosures when needed. 87 Fed. Reg. at 52,625-26.

To permit IDR entities to look behind the QPA calculation and effectively re-calculate it (for the purpose of a single proceeding) in the name of assuring credibility—Plaintiffs' preferred approach—would wreak havoc on the statutory scheme. The QPA calculation is used for several purposes outside of IDR. For example, a patient will often pay a percentage of the QPA as their cost-share for the service (depending on state law and the terms of a patient's health plan). *See* 42 U.S.C. § 300gg-111(a)(1)(C)(iii), (b)(1)(B). Allowing an IDR entity to reopen the calculation of the QPA on a case-by-case basis after the consumer paid a cost-share would introduce just the type of uncertainty for consumers that the No Surprises Act was intended to address.

The Act also requires IDR offers and results to be reported as percentages of the QPA. *Id*. § 300gg-111(c)(7)(A)(v), (B)(iii)-(iv). If IDR entities were empowered to deem the QPA non-credible and dictate a different number, it would not only unnecessarily duplicate the audit function assigned to the Departments (and do so with a far less systematic approach), it would introduce a host of questions for implementing these other provisions that also depend on the QPA, like: which QPA should be used for reporting results? The statutorily defined one, calculated by health insurance providers, used to establish patient cost-sharing, and audited by the Departments? Or the

one generated by an IDR entity? The statute and the Final Rule stop these questions from arising, because they provide for only a single QPA, which IDR entities must consider credible—though they need not assign it any particular weight. *See* 87 Fed. Reg. at 52,627

The even-handed approach of recognizing the credibility afforded by the tight and verifiable constraints on the calculation of QPA, while requiring other information submitted by either party to "meet the same credibility standard that the QPA already meets through other mechanisms" ensures a credibility floor for all information given weight in the IDR process. 87 Fed. Reg. at 52,672. Under Plaintiffs' lopsided approach, in contrast, IDR entities would have to either give weight to additional information that is neither trustworthy nor worthy of belief, or to subject the QPA to extra-statutory and ad hoc verification. Either alternative would undermine the efficiency and accuracy of the IDR process while also destroying the uniformity needed for the QPA to perform multiple functions within the statutory scheme. Nothing in the statute demands that IDR entities assess credibility in such an entirely free-wheeling manner. Nor does the statute require abandonment of any credibility constraint whatsoever (which even Plaintiffs do not advocate (Br. 22)). Setting rules for what counts as credible information, and deeming the QPA credible, is consistent with Congress's detailed rules for calculating and auditing the QPA, and falls well within agency discretion.

**B.     The Final Rule Supports Patient Access to Quality Networks.**

Plaintiffs' *amici*'s sky-is-falling scenario starts from a false premise—that a virtual guarantee of QPA-centered IDR decisions will lead health insurance providers to cut physicians from their networks and refuse to contract for above-QPA rates. *See* Am. Med. Ass'n Amicus Br. 15-20; Am. Soc'y Anesthesiologists Amicus Br. 10-15. There is no QPA presumption, but the argument would fail either way. Even when IDR was tethered to the QPA under the Interim Final Rule, there was no such move to cut rates and narrow networks, because cost is far from the only

9

consideration when designing high-quality networks. Ample evidence shows that health insurance providers regularly consider factors such as quality of care, breadth of choice, legal requirements for network adequacy, and market demand. *See* Gary Claxton et al., *Employer strategies to reduce health costs and improve quality through network configuration*, Peterson-KFF Health System Tracker (Sept. 25, 2019), https://tinyurl.com/ydzxn6ux; Nat'l Conf. of State Legislators, *Insurance Carriers and Access to Healthcare Providers: Network Adequacy* (Feb. 1, 2018), https://tinyurl.com/ym824jvb. When building networks, the goal is to achieve the highest value for patients in terms of both cost *and* quality of care. In addition to helping improve the quality, affordability, and cost predictability of medical care for patients, networks also help ensure that medical providers do not have the ability to send surprise bills to patients. *See* Gov. Br. 3-5.

While it remains too soon to assess broader trends, there are early signs that some providers that had previously opted to remain out of network are now entering into networks. Even a modest increase in IDR predictability under the Final Rule will encourage further network participation, by fostering negotiations around a shared understanding of the range of reasonable values for particular services. In contrast, plaintiffs' proposed rule-free IDR process will permit payment of unsubstantiated out-of-network rates based on irrelevant, double-counted information, making providers more likely to continue the pre-No-Surprises-Act practice of refusing to participate in networks and attempting to extract payment of unreasonable out-of-network charges. *See* Gov. Br. 3-6. By discouraging network participation, Plaintiffs' preferred approach would increase health care costs to patients' detriment, much as surprise billing used to do. *See* Gov. Br. 6-7.

### III. The Final Rule Reasonably Requires IDR Entities To Give Weight Only To Credible, Relevant, And Non-Cumulative Information.

The Final Rule requires that to be given weight, information must be: 1) credible ("worthy of belief and … trustworthy"), 45 C.F.R. § 149.510(a)(2)(v); 2) relevant ("relate to either party's

offer"); and 3) non-cumulative (not "already accounted for by" other information), *id.* § 149.510(c)(4)(iii)(E). This guidance in no way constrains the final IDR outcome. It simply ensures that the decision is not based on information that is untrustworthy, irrelevant, or double-counted. AHIP agrees with the government that such rules are fully consistent with the statutory text. Gov. Br. 30-36. They also benefit consumers by fostering predictability and accuracy.

**A.** Greater predictability of outcomes can help reduce the extraordinarily high volume of IDR proceedings (and their associated costs). Predictable outcomes encourage settlement and reduce the use of IDR, 87 Fed. Reg. at 52,634, because parties can reasonably assess when to settle rather than initiate IDR. Fostering settlement is consistent with the Act's design, which encourages voluntary resolution of disputes through a 30-day open negotiation period before any party may initiate IDR, 42 U.S.C. § 300gg-111(c)(1)(A), and a 90-day cooling-off period after IDR, *id.* § 300gg-111(c)(5)(E)(ii). These extended pre- and post-IDR negotiation periods indicate that Congress intended for most out-of-network disputes to be resolved outside of IDR. Yet those deliberative periods cannot serve their purpose of encouraging settlement if there is no consistency in how IDR entities evaluate information.

Even the minimal increase in predictability fostered by the Final Rule should decrease volume, foster efficiency, and minimize associated IDR administrative costs. Congress was plainly concerned about IDR efficiency and costs. *See* 42 U.S.C. § 300gg-111(c)(3)(A) (requiring batching to "encourag[e] … efficiency (including minimizing costs) of the IDR process"). With good reason. Absent guardrails, the administrative costs generated by IDR are significant. Early estimates based on experience to date indicate that administrative costs related to IDR may be double the costs of resolving out-of-network disputes before the Act.

There are several drivers of spiraling administrative costs. Both parties must pay an

administrative fee, and the losing party must pay IDR fees that currently can be as much as $500 for a single item or service or $670 for a batched claim. *See* IDR Fee Guidance, at 3. Next year, IDR fees will increase to as much as $700 for a single item (a 40% increase), or up to $1,200 for a batched claim with a substantial number of items. *Id.* at 6. In addition, there are substantial IDR-related staffing and technology expenses. Early experience indicates these costs have been substantially higher than anticipated due to the overwhelming volume of IDR disputes. If the IDR process lacked even the modest guidance set forth in the Final Rule, it would spur even greater IDR volume—above the already sky-high numbers—and even greater costs for patients and consumers nationwide. Such a system would frustrate, not further, Congress's goals.

**B.** The Final Rule helps consumers, too, by fostering (at least minimally) an IDR system that is likely to set health care costs closer to their reasonable value. All agree that IDR entities are the fact-finders charged with determining which offer best represents value. The minimal safeguards in the Final Rule foster accurate decisions about value. They are consistent with basic adjudicative norms that require fact-finders to make decisions based on relevant, credible, and non-cumulative information in order to achieve more accurate results. *See* 5 U.S.C. § 556(d) ("[T]he agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence.").

Plaintiffs do not dispute that IDR's objective is to determine which offer best represents the value of a service, yet insist (Br. 23) that the statute requires IDR entities to give weight to information that is not "related to" either party's offer. But if a provider's level of training had no "impact on the care that was provided," 45 C.F.R. § 149.510(c)(4)(iv)(B), then it is not relevant to the value of that care and the Departments reasonably decided that IDR entities should not give it weight. The Departments also reasonably restricted IDR entities from double-counting

information that "is already accounted for by" the QPA "or other credible information." *Id.* § 149.510(c)(4)(iii)(E). Although Plaintiffs focus exclusively on the QPA (Br. 21), the no-double-counting rule applies to any credible information, not just the QPA. The Final Rule mandates no pre-drawn conclusion as to which factors are already accounted for in the QPA; the Departments describe both circumstances where factors like patient acuity are accounted for in the QPA, and circumstances where they are not. *See* 87 Fed. Reg. at 52,628-29.

Such minimal constraints on how IDR entities should evaluate information—baseline procedures for most adjudication systems—are essential to an effective dispute resolution system. Early experience with IDR proceedings conducted before the Final Rule went into effect illustrates how unworkable a system with no constraints would be. For example, though IDR decisions must be issued within 30 days, 42 U.S.C. § 300gg-111(c)(5)(A), less than a third of IDR disputes were resolved within the first half-year that the system was up and running, *see* IDR Fee Guidance, at 5. There are growing indications decisions are taking substantially longer than 30 days, with some IDR proceedings still pending since May. Moreover, the system has been flooded with ineligible disputes, representing as much as 46% of the IDR proceedings filed. *Id*. If the modest, reasonable guidance embodied in the Final Rule were vacated, an already overloaded system would buckle under the weight of more disputes, that take even longer to adjudicate while IDR entities wade through irrelevant, non-credible, and cumulative information, only to reach less accurate results. The statute does not require such an arbitrary free-for-all.

## CONCLUSION

The Court should deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion for summary judgment.

Dated: November 16, 2022                    Respectfully Submitted,

/s/Hyland Hunt
Hyland Hunt (*pro hac vice*)
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Suite 900
Washington, DC 20001
Phone: (202) 868-6915
Fax: (202) 609-8410
hhunt@deutschhunt.com

Counsel for *Amicus Curiae* America's Health Insurance Plans

## CERTIFICATE OF SERVICE

On November 16, 2022, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served counsel for all parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/Hyland Hunt
Hyland Hunt