IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | § | |
|---|---|---|
| TEXAS MEDICAL ASSOCIATION, et al., | § § § | |
| Plaintiffs, | § § | |
| | § | Case No. 6:22-cv-372-JDK |
| v. | § | |
| | § | Lead Consolidated Case |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | § § § | |
| | § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

In these consolidated cases, Plaintiff providers challenge portions of a final rule (the "Final Rule") issued by the Defendant Departments under the No Surprises Act (the "Act"). The Final Rule governs the arbitration process for resolving payment disputes between certain out-of-network providers and group health plans and health insurance issuers.

In two prior cases, the Court addressed the Act and reviewed an interim final rule issued by the Departments governing the arbitration process. The Court first held that the Act unambiguously requires arbitrators to consider several factors when selecting the proper payment amount—and does not instruct arbitrators to weigh any one factor or circumstance more heavily than the others.[1] The Court then concluded

---

[1] *See Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 587 F. Supp. 3d 528 (E.D. Tex. 2022), *appeal dismissed*, 2022 WL 15174345 (5th Cir. Oct. 24, 2022) [hereinafter *TMA*]; *LifeNet, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 2022 WL 2959715 (E.D. Tex. July 26, 2022).

that the interim rule conflicted with the Act because it improperly restricted arbitrators' discretion and directed them to consider one factor—the qualifying payment amount, or "QPA"—as more important than the others.  Indeed, when drafting the interim rule, the Departments had publicly expressed concern that arbitrators would select higher payment amounts favored by providers, resulting in higher healthcare costs.  The interim rule therefore imposed a "rebuttable presumption" that the offer closest to the QPA should be chosen.  This, the Departments explained, would "have a downward impact on health care costs" by lowering payment amounts to providers.[2]  Providers challenged the interim rule, and the Court vacated certain provisions, including the rebuttable presumption in favor of the QPA, after determining that the provisions conflicted with the Act.

The Departments went back to the drawing board.  In August 2022, they issued the Final Rule at issue here, replacing the provisions vacated in the prior cases with new requirements for arbitrators when considering the statutory factors.  Plaintiffs now challenge these requirements and argue that they unlawfully conflict with the Act in the same manner as the vacated provisions in the interim rule—they improperly restrict arbitrators' discretion and unlawfully tilt the arbitration process in favor of the QPA.  The Court agrees.

Accordingly, for the reasons discussed below, the Court concludes that the challenged portions of the Final Rule are unlawful and must be set aside under the Administrative Procedure Act ("APA").  The Court **GRANTS** Plaintiffs' motions for

---

[2]  Requirements Related to Surprise Billing; Part II, 86 Fed. Reg. 55,980, 56,060 (Oct. 7, 2021).

summary judgment (Docket Nos. 41, 42) and **DENIES** the Departments' cross-motions for summary judgment (Docket Nos. 63, 96).

## I.

In the No Surprises Act, Congress established an arbitration process for resolving disputes between out-of-network providers and insurers, detailing the information arbitrators may consider in determining the proper payment amount. Citing the Act, the Departments issued an interim final rule limiting how arbitrators may consider that information—which this Court held unlawful under the APA.  The Departments then issued the Final Rule that is the subject of these consolidated cases.

## A.

Congress enacted the No Surprises Act in December 2020 to address "surprise medical bills."  Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2758–2890 (2020). Generally, the Act limits the amount an insured patient will pay for emergency services furnished by an out-of-network provider and for certain non-emergency services furnished by an out-of-network provider at an in-network facility.  42 U.S.C. §§ 300gg-111, 300gg-131, 300gg-132.[3]

The Act also addresses the payment of these out-of-network providers by group health plans or health insurance issuers (collectively, "insurers").  In particular, the Act requires insurers to reimburse out-of-network providers at a statutorily

---

[3]  The Act amended three statutes: the Public Health Service Act ("PHSA") (administered by the Department of Health and Human Services), the Employee Retirement Income Security Act ("ERISA") (administered by the Department of Labor), and the Internal Revenue Code (administered by the Department of the Treasury).  For ease of reference, this Opinion cites to the PHSA.

calculated "out-of-network rate." § 300gg-111(a)(1)(C)(iv)(II), (b)(1)(D).  In states with an All-Payer Model Agreement or specified state law, the out-of-network rate is the rate provided by the Model Agreement or state law.  § 300gg-111(a)(3)(K).  In states without a Model Agreement or specified state law, the out-of-network rate is either the amount agreed to by the insurer and the out-of-network provider or an amount determined through an independent dispute resolution ("IDR") process.  *Id.*

When an insured receives certain out-of-network medical services, insurers must issue an initial payment or notice of denial of payment to a provider within thirty days after the provider submits a bill for that service.  § 300gg-111(a)(1)(C)(iv), (b)(1)(C).  If the provider disagrees with the insurer's determination, the provider may initiate a thirty-day period of open negotiation with the insurer over the claim. § 300gg-111(c)(1)(A).  If the parties cannot resolve the dispute through negotiation, the parties may then proceed to IDR arbitration.  § 300gg-111(c)(1)(B).

The IDR process—which is the subject of this lawsuit—is a "baseball-style" arbitration.  The provider and insurer each submits a proposed payment amount and explanation to the arbitrator.  § 300gg-111(c)(5)(B).  The arbitrator must then select one of the two proposed payment amounts "taking into account the considerations specified in subparagraph (C)."  § 300gg-111(c)(5)(A).  Subparagraph C states as follows:

(C) Considerations in determination

(i) In general

In determining which offer is the payment to be applied pursuant to this paragraph, the certified IDR entity, with respect to the determination for a qualified IDR item or service shall consider-

(I) the qualifying payment amounts (as defined in subsection (a)(3)(E)) for the applicable year for items or services that are comparable to the qualified IDR item or service and that are furnished in the same geographic region (as defined by the Secretary for purposes of such subsection) as such qualified IDR item or service; and

(II) subject to subparagraph (D), information on any circumstance described in clause (ii), such information as requested in subparagraph (B)(i)(II), and any additional information provided in subparagraph (B)(ii).

(ii) Additional circumstances

For purposes of clause (i)(II), the circumstances described in this clause are, with respect to a qualified IDR item or service of a nonparticipating provider, nonparticipating emergency facility, group health plan, or health insurance issuer of group or individual health insurance coverage the following:

(I) The level of training, experience, and quality and outcomes measurements of the provider or facility that furnished such item or service (such as those endorsed by the consensus-based entity authorized in section 1890 of the Social Security Act [42 U.S.C. 1395aaa]).

(II) The market share held by the nonparticipating provider or facility or that of the plan or issuer in the geographic region in which the item or service was provided.

(III) The acuity of the individual receiving such item or service or the complexity of furnishing such item or service to such individual.

(IV) The teaching status, case mix, and scope of services of the nonparticipating facility that furnished such item or service.

(V) Demonstrations of good faith efforts (or lack of good faith efforts) made by the nonparticipating provider or nonparticipating facility or the plan or issuer to enter into network agreements and, if applicable, contracted rates between the provider or facility, as applicable, and the plan or issuer, as applicable, during the previous 4 plan years.

§ 300gg-111(c)(5)(C).

The Act also prohibits the arbitrator from considering the provider's usual and

customary charges for an item or service, the amount the provider would have billed

5

for the item or service in the absence of the Act, or the reimbursement rates for the item or service under the Medicare, Medicaid, Children's Health Insurance, or Tricare programs.  § 300gg-111(c)(5)(D).  The arbitrator's selection of a payment amount is binding on the parties, and is not subject to judicial review, except under the circumstances described in the Federal Arbitration Act.  § 300gg-111(c)(5)(E).

Important to the challenge here is "the qualifying payment amount" ("QPA"), referenced in § 300gg-111(c)(5)(C)(i)(I).  The QPA is generally "the median of the contracted rates recognized by the plan or issuer . . . under such plans or coverage, respectively, on January 31, 2019, for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item[s] or service is furnished," with annual increases based on the consumer price index.  § 300gg-111(a)(3)(E)(i)(I)-(II).  In other words, the QPA is typically the median rate the insurer would have paid for the service if provided by an in-network provider or facility.  Notably, insurers are charged by regulation to calculate the QPA.  § 300gg-111(a)(3)(E)(i)(I).

The Act also implements a parallel IDR process for determining payments to out-of-network providers of air ambulance services, which largely incorporates by reference the IDR process discussed above.  § 300gg-112(b)(4)(A) (citing § 300gg-111(c)(4)).  The additional circumstances the arbitrator must "tak[e] into account" for air-ambulance providers differ slightly from those listed above in ways not relevant to the present litigation.  *Compare* § 300gg-112(b)(5)(C)(ii), *with* § 300gg-111(c)(5)(C)(ii).

Finally, the Act requires the Secretaries of Health and Human Services, Labor, and the Treasury (collectively, the "Departments") to "establish by regulation one independent dispute resolution process (referred to in this subsection as the 'IDR process') under which . . . a certified IDR entity . . . determines, subject to subparagraph (B) and in accordance with the succeeding provisions of this subsection, the amount of payment under the plan or coverage for such item or service furnished by such provider or facility." § 300gg-111(c)(2)(A); *accord* § 300gg-112(b)(2)(A).

## B.

On September 30, 2021, the Departments issued an interim final rule implementing the IDR process.  Requirements Related to Surprise Billing: Part II, 86 Fed. Reg. 55,980 (Oct. 7, 2021).

Under the interim rule, the arbitrator was required to select the proposed payment amount closest to the QPA unless certain conditions were satisfied.  45 C.F.R. § 149.510(c)(4)(ii).[4]  Specifically, the interim rule required arbitrators to "select the offer closest to the [QPA]" unless "credible" information, including information supporting the "additional factors," "clearly demonstrates that the [QPA] is materially different from the appropriate out-of-network rate." § 149.510(c)(4)(ii)(A). The Departments explained at the time that the interim rule effectively created a "rebuttable presumption" that the amount closest to the QPA was the proper payment amount.  *See* 86 Fed. Reg. 56,056–61.  And because the QPA is "typically lower than

---

[4] As with the Act, identical interim final rules appeared in three separate sections of the C.F.R., specifically Title 45 – Public Health, Title 26 – Internal Revenue, and Title 29 – Labor.  For ease of reference, this Opinion cites to Title 45.

billed charges," the Departments reasoned, the interim rule would ensure arbitrators routinely select the offer favoring the insurers.  *Id*. at 56,056–61.

Multiple providers challenged the interim rule under the APA.  *See TMA*, 587 F. Supp. 3d at 536; *LifeNet, Inc.*, 2022 WL 2959715.  The providers argued that the interim rule required arbitrators to give "outsized weight" to the QPA in conflict with the Act.  *TMA*, 587 F. Supp. 3d at 536; *LifeNet, Inc.*, 2022 WL 2959715, at *3.  The QPA, the providers contended, does not "accurately reflect [the providers'] cost of providing services in most cases."  *TMA*, 587 F. Supp. 3d at 538.  For example, the QPA fails to consider patient acuity, which poses a significant problem for providers who "treat the patients in the sickest lines of service at [] Level I Trauma Center[s]." *See, e.g.*, Declaration of Dr. Dao at 4, *TMA*, No. 6:21-cv-425 (E.D. Tex. Jan. 24, 2022), ECF No. 98, Ex. 2.  The providers thus argued that the interim rule would "systematically reduce out-of-network reimbursement," *TMA*, 587 F. Supp. 3d at 537, and "threaten the viability" of many providers' practices, Declaration of Dr. Cook at 5, *TMA*, No. 6:21-cv-425 (E.D. Tex. Jan. 24, 2022), ECF No. 98, Ex. 1.  Indeed, some providers stated that insurers had terminated their contracts in anticipation of the interim rule because the providers would not agree to "deflated rate[s]" for their services.  Declaration of Dr. Ford at 4, *TMA*, No. 6:21-cv-425 (E.D. Tex. Jan. 24, 2022), ECF No. 98, Ex. 3.  The providers also argued that the interim rule was issued without the required notice and comment under the APA.  *TMA*, 587 F. Supp. 3d at 543; *LifeNet, Inc.*, 2022 WL 2959715, at *9.

The Court largely agreed. *TMA*, 587 F. Supp. 3d at 549; *LifeNet, Inc.*, 2022 WL 2959715, at *10. The Court first held that the interim rule improperly "places its thumb on the scale for the QPA, requiring arbitrators to presume the correctness of the QPA and then imposing a heightened burden on the remaining statutory factors to overcome the presumption." *TMA*, 587 F. Supp. 3d at 542. The interim rule, moreover, characterized the non-QPA factors as "permissible additional factors" that an arbitrator may consider only "when appropriate." *Id.* (quoting 86 Fed. Reg. at 56,080). The interim rule thus conflicted with the Act, which unambiguously requires arbitrators to consider "all the specified information in determining which offer to select" and nowhere instructs them "to weigh any one factor or circumstance more heavily than the others." *Id.* at 541 (citing *Am. Corn Growers Ass'n v. EPA*, 291 F.3d 1, 6 (D.C. Cir. 2002) (holding that where "no weights were assigned" to statutory factors, "treat[ing] one of the five statutory factors in such a dramatically different fashion distorts the judgment Congress directed")); *accord LifeNet, Inc.*, 2022 WL 2959715, at *10. The Act, moreover, does not "impose a 'rebuttable presumption' that the offer closest to the QPA should be chosen—or suggest anywhere that the other factors or information is less important than the QPA." *TMA*, 587 F. Supp. 3d at 541. Because the interim final rule conflicted with the Act, the Court held it unlawful and set it aside under the APA. *Id.* at 543 (citing *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014); and 5 U.S.C. § 706(2)(A)); *LifeNet, Inc.*, 2022 WL 2959715, at *9.

The Court also held that the Departments violated the APA by failing to provide the required notice and comment. *TMA*, 587 F. Supp. 3d at 543–48 (citing 5

U.S.C. § 553(b), (c) (requiring agencies to publish a "notice of proposed rule making" and "give interested persons an opportunity to participate . . . through submission of written data, views, or arguments")); *LifeNet, Inc.*, 2022 WL 2959715, at *9.  This failure "provide[d] a second and independent basis" to set aside the challenged provisions of the interim final rule.  *TMA*, 587 F. Supp. 3d at 548; *LifeNet, Inc.*, 2022 WL 2959715, at *9.

## C.

In August 2022, the Departments issued the Final Rule at issue here. Requirements Related to Surprise Billing, 87 Fed. Reg. 52,618 (Aug. 26, 2022). Although the Departments "remove[d] from the regulations the language vacated" in *TMA* and *LifeNet, Inc.*, *id.* at 52,625, the Final Rule still limits the discretion of arbitrators in determining the payment amount.  This time, the Departments were more circumspect in explaining why they wanted to limit arbitrators' discretion, stating only that the Departments seek greater predictability in payment outcomes. *See* 87 Fed. Reg. at 52,634.

The Final Rule requires arbitrators to consider the QPA first and only "then consider" the non-QPA factors, as set forth in relevant part below:

> (ii) Payment determination and notification.  Not later than 30 business days after the selection of the certified IDR entity, the certified IDR entity must:
>
> (A) Select as the out-of-network rate for the qualified IDR item or service one of the offers submitted under paragraph (c)(4)(i) of this section, weighing only the considerations specified in paragraph (c)(4)(iii) of this section (as applied to the information provided by the parties pursuant to paragraph (c)(4)(i) of this section). The certified IDR entity must select the offer that the certified IDR entity determines best represents the value of the qualified IDR item or service as the out-of-network rate.

. . . .

(iii) Considerations in determination.  In determining which offer to select:

(A) The certified IDR entity must consider the qualifying payment amount(s) for the applicable year for the same or similar item or service.

(B) The certified IDR entity must then consider information submitted by a party that relates to the following circumstances:

(1) The level of training, experience, and quality and outcomes measurements of the provider or facility that furnished the qualified IDR item or service (such as those endorsed by the consensus-based entity authorized in section 1890 of the Social Security Act).

(2) The market share held by the provider or facility or that of the plan or issuer in the geographic region in which the qualified IDR item or service was provided.

(3) The acuity of the participant, beneficiary, or enrollee receiving the qualified IDR item or service, or the complexity of furnishing the qualified IDR item or service to the participant, beneficiary, or enrollee.

(4) The teaching status, case mix, and scope of services of the facility that furnished the qualified IDR item or service, if applicable.

(5) Demonstration of good faith efforts (or lack thereof) made by the provider or facility or the plan or issuer to enter into network agreements with each other, and, if applicable, contracted rates between the provider or facility, as applicable, and the plan or issuer, as applicable, during the previous 4 plan years.

(C) The certified IDR entity must also consider information provided by a party in response to a request by the certified IDR entity under paragraph (c)(4)(i)(A)(2) of this section that relates to the offer for the payment amount for the qualified IDR item or service that is the subject of the payment determination and that does not include information on factors described in paragraph (c)(4)(v) of this section.

(D) The certified IDR entity must also consider additional information submitted by a party that relates to the offer for the payment amount for the qualified IDR item or service that is the subject of the payment determination and that does not include information on factors described in paragraph (c)(4)(v) of this section.

11

45 C.F.R. § 149.510(c)(4).[5]  The Rule, moreover, requires arbitrators to presume the credibility of the QPA while "evaluat[ing]" the credibility of the non-QPA factors. Indeed, the Rule prohibits arbitrators from "giv[ing] weight to" the non-QPA factors unless certain prerequisites are met:

> (E) In weighing the considerations described in paragraphs (c)(4)(iii)(B) through (D) of this section, the certified IDR entity should evaluate whether the information is credible and relates to the offer submitted by either party for the payment amount for the qualified IDR item or service that is the subject of the payment determination. The certified IDR entity should not give weight to information to the extent it is not credible, it does not relate to either party's offer for the payment amount for the qualified IDR item or service, or it is already accounted for by the qualifying payment amount under paragraph (c)(4)(iii)(A) of this section or other credible information under paragraphs (c)(4)(iii)(B) through (D) of this section.

---

[5] The Final Rule for payment disputes involving out-of-network air ambulance providers, 45 C.F.R. § 149.520(b)(1), incorporates "the requirements of § 149.510," "[e]xcept as provided in paragraphs (b)(2) and (3)."  Paragraph (b)(2) lists the following non-QPA factors for arbitrators to consider:

> (2) Considerations for air ambulance services. In determining which offer to select, in addition to considering the applicable qualifying payment amount(s), the certified IDR entity must consider information submitted by a party that relates to the following circumstances:
> (i) The quality and outcomes measurements of the provider that furnished the services.
> (ii) The acuity of the condition of the participant, beneficiary, or enrollee receiving the service, or the complexity of furnishing the service to the participant, beneficiary, or enrollee.
> (iii) The training, experience, and quality of the medical personnel that furnished the air ambulance services.
> (iv) Ambulance vehicle type, including the clinical capability level of the vehicle.
> (v) Population density of the point of pick-up (as defined in 42 CFR 414.605) for the air ambulance (such as urban, suburban, rural, or frontier).
> (vi) Demonstrations of good faith efforts (or lack thereof) made by the nonparticipating provider of air ambulance services or the plan or issuer to enter into network agreements with each other and, if applicable, contracted rates between the provider of air ambulance services and the plan or issuer, as applicable, during the previous 4 plan years.

§ 149.520(b)(2). Paragraph (b)(3) states the prerequisites for "giv[ing] weight to" non-QPA factors. § 149.520(b)(3). These prerequisites are identical to those found in § 149.510(c)(4)(iii)(E), except for minor differences in wording not relevant here.  Owing to the similarity, the Departments cite only to § 149.510.  For ease of reference, this Opinion will do the same.

§ 149.510(c)(4)(iii)(E).    Finally,  the  Final  Rule  imposes  an  additional  writing requirement on arbitrators who give weight to any non-QPA factor:

> (vi) Written decision.
>
> . . . .
>
> (B) . . . . If the certified IDR entity relies on information described under paragraphs (c)(4)(iii)(B) through (D) of this section in selecting an offer, the written decision must include an explanation of why the certified IDR entity concluded that this information was not already reflected in the qualifying payment amount.

§ 149.510(c)(4)(vi).

### D.

Plaintiffs are healthcare and air ambulance service providers.[6]   In two cases consolidated here, they challenge the Final Rule under the APA on two grounds. First, Plaintiffs argue that the Rule "exceed[s] the Departments' statutory authority and conflict[s] with the [Act]" by limiting arbitrators' discretion in considering the statutory factors and by making the QPA "the *de facto* benchmark for out-of-network reimbursement."   Docket No. 41 at 15; *accord* Docket No. 42 at 9 (incorporating "by reference the merits argument set forth in TMA's brief" which "apply in full to air ambulance providers").   Plaintiffs also assert that the Final Rule is arbitrary and

---

[6]  Plaintiffs in the lead consolidated case (Civil No. 6:22-cv-372) are the Texas Medical Association, a trade association representing more than 56,000 Texas physicians and medical students; Dr. Adam Corley, a Tyler, Texas physician; and Tyler Regional Hospital, LLC, a hospital in Tyler, Texas, that provides emergency services as defined in the Act.  Docket No. 1 ¶¶ 12–14.  Both Dr. Corley and the Texas Medical Association previously challenged the interim final rule.  *TMA*, 587 F. Supp. 3d at 536.  Plaintiffs in the consolidated case (Civil No. 6:22-cv-373) are two air ambulance service providers, LifeNet, Inc., and East Texas Air One, LLC.  Docket No. 64 ¶¶ 10–11.  LifeNet previously challenged the interim final rule's provisions for air ambulance service providers.  *LifeNet, Inc.*, 2022 WL 2959715, at *1.

capricious because it "flunks the APA's fundamental requirements of reasoned decisionmaking." Docket No. 41 at 15; *accord* Docket No. 42 at 9.

Accordingly, Plaintiffs request that the Court vacate certain provisions of the Rule—namely, 45 C.F.R. § 149.510(c)(4)(iii)(A)–(B), § 149.510(c)(4)(iii)(E), § 149.510(c)(4)(iv), and § 149.510(c)(4)(vi). Docket No. 1 ¶ 56. Plaintiffs LifeNet and East Texas Air One also seek to vacate § 149.520(b)(3). Docket No. 64 at ¶¶ 54, 99.[7] Plaintiffs further request the Court to remand these provisions to the Departments "with specific instructions" that they promulgate a new rule that complies with the Act. Docket No. 41 at 30; Docket No. 42 at 16.

Defendants are the Departments responsible for promulgating the Final Rule—the Departments of Health and Human Services, Labor, and the Treasury, along with the Office of Personnel Management and the current heads of those agencies in their official capacities. Docket No. 1 ¶¶ 11–18. Together, the Departments contend that the Final Rule is consistent with the Act. Docket No. 63.

Both sides now move for summary judgment under Federal Rule of Civil Procedure 56. Docket Nos. 41, 42, 63, 96. Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

---

[7] After entering the case, East Texas Air One joined LifeNet's summary judgment motion. Docket No. 66.

Both sides agree that the Court can determine Plaintiffs' APA challenge as a matter of law.

## II.

The Departments first argue that Plaintiffs lack standing to challenge the Final Rule because their alleged injuries are speculative.[8]  The Departments also argue that LifeNet lacks standing because Air Methods Corporation, not insurers, pays LifeNet for its services—an argument the Court rejected in *LifeNet, Inc.*, 2022 WL 2959715, at *5–8.

As explained below, the Court concludes that Plaintiffs have demonstrated two cognizable injuries resulting from the Final Rule and that the Departments' additional argument regarding LifeNet is without merit.

## A.

"The irreducible minimum constitutional standing requirement to invoke a federal court's Article III jurisdiction is (1) injury-in-fact (2) fairly traceable to the defendant's actions and (3) likely to be redressed by a favorable decision." *Ensley v. Cody Res., Inc.*, 171 F.3d 315, 319 (5th Cir. 1999) (citing *Raines v. Byrd*, 521 U.S. 811, 818 (1997); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982)).  "For standing purposes," the Court must

---

[8]  The Departments assert these arguments against all Plaintiffs.  Docket No. 63 at 17 ("Plaintiffs have not adequately shown that they have standing . . . .").  While East Texas Air One joined the case as a plaintiff later than the other parties, the Departments present identical standing arguments against East Texas Air One in a separate summary judgment motion.  Docket No. 96 at 6 (arguing, as they did "in their earlier cross-motion[,]" that East Texas Air One "suffer[s] no injury" and "like other Plaintiffs . . . has not demonstrated . . . injury in fact")).  Accordingly, the Court's discussion of standing applies to all Plaintiffs, including East Texas Air One.

"accept as valid the merits of [the plaintiffs'] legal claims." *FEC v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1647 (2022) (citing *Warth v. Seldin*, 422 U.S. 490, 500 (1975)).

Here, Plaintiffs have established at least two injuries fairly traceable to the Final Rule.  *First*, Plaintiffs assert that they have suffered a procedural injury because the Rule "deprive[s] them of the arbitration process established by the Act" and "replace[s] it with a different process that unlawfully 'puts a substantial thumb on the scale in favor of the QPA.'"  Docket No. 82 at 3 (cleaned up) (quoting *TMA*, 587 F. Supp. 3d at 537).  The process established by the Rule, Plaintiffs argue, makes it "more difficult for [a provider's] bid to be chosen, in comparison with a process in which [arbitrators] can freely consider all statutory factors without favoring any particular factor."  Docket No. 41, Ex. A ¶¶ 15–16; *see also id.*, Ex. B ¶ 16 (same); *id.*, Ex. C ¶ 15 (same); *id.*, Ex. D ¶ 10 (same); Docket No. 64, Ex. 2 ¶ 4 (same); *TMA*, 587 F. Supp. 3d at 537; *LifeNet, Inc.*, 2022 WL 2959715, at *7.

This claimed procedural injury is sufficient to confer Article III standing. *TMA*, 587 F. Supp. 3d at 537 (citing *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019) ("A plaintiff can show a cognizable injury if [he] has been deprived of a 'procedural right to protect [his] concrete interests.'") (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573 n.8 (1992). The Departments argue that the Final Rule no longer includes a "presumption in favor of the [QPA]" and that no arbitrator would interpret the Rule in a way that harms providers.  Docket No. 62 at 17–19.  But Plaintiffs have presented evidence that the Rule *will* harm providers, *see infra* at 17–18, and in any event, need not

16

prove that following the proper procedure will necessarily create different outcomes. Plaintiffs must merely show a "reasonable claim of minimal impact" in failing to adhere to proper procedure, which they have done here. *Kinetica Partners, LLC v. U.S. Dep't of the Interior*, 505 F. Supp. 3d 653, 671 (S.D. Tex. 2020), *appeal dismissed*, 2021 WL 3377978 (5th Cir. Mar. 22, 2021) ("A procedural injury can suffice for standing even where the plaintiff does not prove that adherence to the proper procedure would have produced a different outcome because the likelihood and extent of impact are properly addressed in connection with the merits in a harmless error analysis."); *United States v. Johnson*, 632 F.3d 912, 921 n.45 (5th Cir. 2011); *see also TMA*, 587 F. Supp. 3d at 537; *LifeNet, Inc.*, 2022 WL 2959715, at *7.

*Second*, Plaintiffs have established that they will likely suffer financial harm because the Final Rule creates an arbitration process that will cause "the systematic reduction of out-of-network reimbursements." Docket No. 41, Ex. A ¶ 16; *id.*, Ex. B ¶ 16; *id.*, Ex. C ¶ 17 ("[R]equiring IDR entities to privilege the QPA will lower reimbursement rates for my services, such that my compensation will decrease."); Docket No. 42, Ex. G ¶¶ 15–17; Docket No. 64, Ex. 2 ¶ 4. Plaintiffs attest that they will "nearly always" submit offers that are higher and farther from the QPA than the offers submitted by the insurers. Docket No. 82 at 4; Docket No. 42, Ex. C ¶ 11; Docket No. 41, Ex. B ¶ 12; Docket No. 64, Ex. 2 ¶ 4. This is because the QPA does not "accurately reflect [the providers'] cost of providing services in most cases." *TMA*, 587 F. Supp. 3d at 538; Docket No. 41, Ex. A ¶ 13; *id.*, Ex. B ¶¶ 12–13; *id.*,

Ex. C ¶¶ 8–10; *id.*, Ex. D ¶8; Docket No. 64, Ex. 2 ¶ 4.[9]  The Final Rule's QPA-centric approach will therefore injure Plaintiffs by causing arbitrators to select insurers' offers more often than they would under the process established by the Act.  Docket No. 41, Ex. A ¶ 16; *id.*, Ex. B ¶ 16; *id.*, Ex. C ¶ 16; *id.*, Ex. D ¶ 10; Docket No. 42, Ex. G ¶15; Docket No. 64, Ex. 2 ¶ 4.  Such "economic injury is a quintessential injury upon which to base standing."  *El Paso Cnty. v. Trump*, 982 F.3d 332, 338 (5th Cir. 2020 (quoting *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006)).

The Departments argue that the Final Rule "does not actually do what Plaintiffs claim it does" and thus Plaintiffs cannot show they are likely to suffer an injury.  Docket No. 62 at 18.  But this argument "goes to the merits rather than standing."  *Glen v. Am. Airlines, Inc.*, 7 F.4th 331, 335 (5th Cir. 2021).  In determining standing, a court must accept the merits of the plaintiff's claims.  *Ted Cruz for Senate*, 142 S. Ct. at 1647.  And here, Plaintiffs claim that the Rule violates the Act by limiting arbitrators' discretion and privileging the QPA in the payment dispute process.  Plaintiffs then submit detailed affidavits with specific facts establishing that the injuries arising from their claims are not only likely and imminent, but inevitable.  *See, e.g.*, Docket No. 41, Ex. A ¶ 16; *id.*, Ex. B ¶ 16; *id.*, Ex. C ¶ 17; Docket No. 42,

---

[9]  *See also* Brief of American Society of Anesthesiologists, *et al.*, as Amici Curiae in Support of Plaintiffs' Motions for Summary Judgment, Docket No. 53 at 8 (The QPA does "not accurately represent the fair market-based payment rates for out-of-network services."); Brief of American Medical Ass'n and American Hospital Ass'n as Amici Curiae in Support of Plaintiffs' Motions for Summary Judgment, Docket No. 54 at 17 (arguing the QPA does not reflect actual market rates); Brief of Emergency Department Practice Management Ass'n as Amicus Curiae in Support of Plaintiffs' Motion for Summary Judgment, Docket No. 55 at 7 (noting there is no basis for belief that the QPA will "typically" be a reasonable out-of-network rate).

Ex. G ¶¶ 15–17; Docket No. 64, Ex. 2 ¶ 4; *see also TMA*, 587 F. Supp. 3d at 538 (citing *Sabre, Inc. v. Dep't of Transp.*, 429 F.3d 1113, 1118 (D.C. Cir. 2005) (finding "a sufficiently distinct and palpable injury" from agency action that had "immediate, unavoidable implications for [the plaintiff's] business choices"); *Am. Petroleum Inst. v. Johnson*, 541 F. Supp. 2d 165, 176 (D.D.C. 2008) ("[S]tanding is usually self-evident when the plaintiff is a regulated party or an organization representing regulated parties.").

The Departments' reliance on *Missouri v. Yellen*, 39 F.4th 1063 (8th Cir. 2022), is misplaced. In that case, Missouri sued to enjoin an agency from adopting one of two potential interpretations of a rule before the agency published any guidance on how it would interpret the rule. *Id.* at 1069. The Eighth Circuit held that Missouri lacked standing because it was "not challenging the [regulation] as written, but rather a specific potential interpretation of the provision . . . ." *Id.* The Departments argue that Plaintiffs are making the same mistake here—attacking an unlikely interpretation of the Final Rule rather than the Rule itself. Docket No. 63 at 19. But unlike Missouri, Plaintiffs here are challenging the Final Rule as written—a Rule Plaintiffs contend unlawfully restricts arbitrators' discretion and improperly privileges the QPA over other statutory factors.[10]

---

[10] LifeNet and East Texas Air One also argue that they are "objects" of the Final Rule. Thus, there is "little question that the [agency] action or inaction has caused [them] injury." Docket No. 83 at 11; Docket No. 97 at 5 (incorporating LifeNet's standing arguments by reference); *see also Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015); *LifeNet, Inc.*, 2022 WL 295715, at *6. The Court agrees. As the Court previously held, "LifeNet is an object of the [interim] Rule because it is a 'nonparticipating provider' whose air ambulance services are subject to the Rule." *LifeNet, Inc.*, 2022 WL 295715, at *6. Indeed, the Court explained, "LifeNet's services will be analyzed and valued in the IDR process pursuant to the [interim] Rule," and it is LifeNet "whose

**B.**

The Departments also argue that Plaintiff LifeNet cannot show injury because "LifeNet is paid for its services by Air Methods Corporation . . . a fixed amount regardless of the amount Air Methods is reimbursed by an insurer or plan."  Docket No. 62 at 21.

But, for the reasons provided in *LifeNet, Inc.*, 2022 WL 2959715, at *7–8, the Court finds that LifeNet has shown a significant risk of losing its contract with Air Methods—and thus all related profits—because of the Final Rule.  Docket No. 42, Ex. 3 ¶ 13.  The contract permits Air Methods to terminate the agreement if a "financially unviable" situation occurs.  Docket No. 44 § 2.3.  And when the Rule drives down reimbursement rates for air ambulance services, such an "unviable" situation is likely to occur.  Docket No. 42, Ex. 3 ¶ 12; *see also LifeNet, Inc.*, 2022 WL 2959715, at *7.  The Court held in *LifeNet, Inc.*: "An unviable situation, moreover, would almost certainly result in LifeNet's having to renegotiate its contract for a lower payment amount—or losing the contract altogether."  *Id*. at *7.  Although the Departments "recognize that this Court previously rejected their argument that LifeNet lack[s] standing," the Departments offer nothing to call the Court's holding into question.  Docket No. 62 at 20.

*       *       *

Accordingly, for the reasons stated above, Plaintiffs have established Article III standing.

---

training, experience, and quality and outcome measurements are to be considered by the arbitrator." *Id*. at *7.  The same is true under the Final Rule for both LifeNet and East Texas Air One.

## III.

Plaintiffs argue that the challenged provisions of the Final Rule exceed the Departments' statutory authority and conflict with the Act.  Docket No. 41 at 15.  They ask the Court to set aside these provisions under the APA.  The Departments counter that the statute requires them to establish the IDR process by regulation and that they are entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  Docket No. 63 at 22.

The APA requires a reviewing court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The Court reviews an agency's statutory interpretation under the two-step *Chevron* framework.  *See generally Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1014 (5th Cir. 2019) (discussing *Chevron*); *see also City of Arlington v. FCC*, 569 U.S. 290, 306–07 (2013).  The first step determines "whether Congress has directly spoken to the precise question at issue."  *Chevron*, 467 U.S. at 842.  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id.* at 843.  However, if the statute is ambiguous, the Court proceeds to step two: "asking whether the agency's construction is 'permissible.'"  *Sw. Elec. Power Co.*, 920 F.3d at 1014 (quoting *Chevron*, 467 U.S. at 843).

As explained below, the Court concludes that the challenged provisions of the Final Rule conflict with the unambiguous statutory text and must be set aside.

**A.**

In determining whether Congress has unambiguously spoken through a statute, the Court applies all the "traditional tools of construction," including "text, structure, history, and purpose." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (quoting *Chevron*, 467 U.S. at 843 n.9; *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 707 (1991) (Scalia, J., dissenting)); *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 460 (5th Cir. 2020). "[W]here a statute's text is clear, courts should not resort to legislative history" and "should not introduce ambiguity through the use of legislative history." *Adkins v. Silverman*, 899 F.3d 395, 403 (5th Cir. 2018) (citing *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) (plurality opinion)).

As the Court previously held, the Act is unambiguous. *See TMA*, 587 F. Supp. 3d at 541. The Act provides that arbitrators deciding which offer to select "shall consider . . . the qualifying payment amounts . . . and . . . information on any circumstance described in clause (ii)." 42 U.S.C. § 300gg-111(c)(5)(C)(i). Clause (ii) lists five "circumstances" the arbitrator "shall" consider, including (1) "the level of training, experience, and quality and outcomes measurements of the provider or facility"; (2) the "market share held by the nonparticipating provider or facility"; (3) the "acuity of the individual receiving such item or service"; (4) the "teaching status, case mix, and scope of services of the nonparticipating facility"; and (5) "[d]emonstrations of good faith efforts (or lack of good faith efforts)" made by the provider and insurer to enter into a network agreement. § 300gg-111(c)(5)(C)(ii). Arbitrators must also consider any relevant information submitted by either party. § 300gg-111(c)(5)(B). Because "the word 'shall' usually connotes a requirement," the

Act plainly requires arbitrators to consider all the specified information in determining which offer to select. *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016).

Nothing in the Act, moreover, instructs arbitrators to weigh any one factor or circumstance more heavily than the others. *TMA*, 587 F. Supp. 3d at 541. A statute's "lack of text" is sometimes "more telling" than the text itself. *Gulf Fishermens Ass'n*, 968 F.3d at 460. And here, the Act nowhere states that the QPA is the primary or most important factor—or that it must be weighed more heavily than, or considered before, other factors. *See Am. Corn Growers Ass'n v. EPA*, 291 F.3d 1, 6 (D.C. Cir. 2002) (holding that where "no weights were assigned" to statutory factors, "treat[ing] one of the five statutory factors in such a dramatically different fashion distorts the judgment Congress directed"). Nor does the Act limit arbitrators' discretion in considering the statutory factors, impose heightened scrutiny on information related to the non-QPA factors, or create procedural hurdles before considering that information. Rather, the Act instructs arbitrators to select one of the two offers submitted by the parties after "taking into account the considerations specified in subparagraph (C)." 42 U.S.C. § 300gg-11(c)(5)(A)(i).

Because Congress spoke clearly on the issue relevant here, the Departments' interpretation of the statute is owed no *Chevron* deference. *See Chevron*, 467 U.S. at 843; *Gulf Fishermens Ass'n*, 968 F.3d at 459 ("[C]ourts will not defer to agency interpretation of an unambiguous statute.").

**B.**

It is a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp.*, 573 U.S. at 328.  But here, the Departments impermissibly altered the Act's requirements.

Rather than instructing arbitrators to consider all the factors pursuant to the Act, the Final Rule requires arbitrators to consider the QPA first and then restricts how they may consider information relating to the non-QPA factors.  45 C.F.R. § 149.510(c)(4)(iii).  The Rule prohibits arbitrators from "giv[ing] weight" to such information unless several requirements are met:  the information is "credible," "relates to the offer submitted by either party," and is not "already accounted for by the [QPA]."  § 149.510(c)(4)(iii)(E).  If an arbitrator "relies on" any of the non-QPA information, moreover, the arbitrator must explain in writing "why [the arbitrator] concluded that this information was not already reflected in the [QPA]." § 149.510(c)(4)(vi)(B).  While avoiding an explicit presumption in favor of the QPA, the Final Rule nevertheless continues to place a thumb on the scale for the QPA by requiring arbitrators to begin with the QPA and then imposing restrictions on the non-QPA factors that appear nowhere in the statute.  *See TMA*, 587 F. Supp. 3d at 542.

The Final Rule also improperly limits arbitrators' discretion by dictating how they may consider the statutory factors—in direct conflict with the Act.  42 U.S.C. § 300gg-111(c)(2)–(9).  The Act includes detailed rules about who may serve as arbitrators, requiring them to have medical and legal expertise and certifying them

for five-year terms.  § 300gg-111(c)(4).  The Act then directs arbitrators to "select one of the offers submitted" after "taking into account" the statutory factors.  § 300gg-111(c)(5)(A)(i).  The Act thus vests discretion in the arbitrators—not the Departments—to determine the proper payment amount based on their expertise as set forth in the statute.  *See, e.g.*, *New York v. Reilly*, 969 F.2d 1147, 1150 (D.C. Cir. 1992) ("Because Congress did not assign the specific weight the Administrator should accord each of these factors, the Administrator is free to exercise his discretion in this area.").  Yet, the Final Rule attempts to control how arbitrators evaluate the information properly before them and "introduce[es] limitations not found in the statute."  *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2380 (2020) ("Congress could have limited [the agency's] discretion in any number of ways, but it chose not to do so . . . .  By introducing a limitation not found in the statute, respondents ask us to alter, rather than to interpret, the [statute].");  *see also TMA*, 587 F. Supp. 3d at 542.

The Departments argue that the Final Rule merely imposes "reasonable evidentiary and procedural rules" on the IDR process.  Docket No. 62 at 26.  But the Act already tells arbitrators what evidence they "shall consider" and what evidence they "shall not consider."  § 300gg-111(c)(5)(C)–(D).  And the Rule does more than the Departments admit.  The Rule precludes arbitrators from "giv[ing] weight" to some information that the Act requires them to consider—*e.g.*, information relating to the non-QPA factors that happens to be "already accounted for" in the QPA.  § 149.510(c)(4)(iii)(E).  And the Rule attempts to dictate how arbitrators assess other

information—invading the adjudicative role assigned by the statute to the arbitrators, not the Departments. The authorities cited by the Departments, moreover, are inapposite because those cases involved agency-conducted adjudications—not independent arbitrations like those at issue here. *E.g.*, Docket No. 62 at 23 (citing, *e.g.*, *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 868 (D.C. Cir. 2002) (per curiam) ("We give particular deference to an agency's promulgation of evidentiary rules governing *its own adjudications*." (emphasis added))).

The Departments also argue the Final Rule simply fills a "gap" in the statute "concerning how to evaluate the various pieces of information that go into selecting payment amounts." Docket No. 62 at 27. But there is no "gap." The Act specifies in meticulous detail the qualifications for arbitrators and the information for them to consider. *E.g.*, 45 CFR § 149.510(e)(2) (explaining the requirements for certified IDR entities, including arbitration, claims administration, managed care, billing and coding, medical, and legal expertise as well as a current recognized accreditation). And when a statute lists factors for a decisionmaker to consider, the weighing of those factors is left to the decisionmaker's sound discretion. *See, e.g.*, *Ramirez v. ICE*, 471 F. Supp. 3d 88, 176 (D.D.C. 2020) ("[I]f 'Congress did not mandate any particular structure or weight' for an agency's consideration of a variety of factors, then the agency is left with 'discretion to decide how to account for the [factors Congress included in the statute], and how much weight to give each factor.'" (quoting *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011 (D.C. Cir. 1978))). Although the Act authorizes the Departments to promulgate a rule establishing the IDR process, 42

U.S.C. § 300gg-111(c)(2)(A), the Departments may not promulgate a rule that conflicts with the Act or attempts to fill nonexistent statutory "gaps." *See Texas v. United States*, 809 F.3d 134, 186 (5th Cir. 2015) ("Were courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well." (quoting *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995))). *See generally* 45 C.F.R. § 149.510.

Further, the record in this case demonstrates that privileging the QPA remains the Department's intent behind the Final Rule. In implementing the interim final rule, the Departments expressly stated that the "rebuttable presumption for the appropriate payment amount" should be the QPA because that "will protect participants, beneficiaries, and enrollees from excessive costs, either through reduced costs for items and services or through decreased premiums." 86 Fed. Reg. 55,980 at 56,061. The Departments thus drafted the interim rule—in conflict with the statute—to ensure arbitrators would systematically choose the payment amount closest to the QPA. *See TMA*, 587 F. Supp. 3d at 542–43. Indeed, in *TMA*, the Departments argued that vacating the interim rule would result in higher reimbursement payments to providers, "would be highly disruptive" to insurance companies, and would "upend[] . . . efforts to control upward pressure on health care costs." *TMA*, No. 6:21-cv-425 (E.D. Tex. Feb. 2, 2022), ECF No. 104 at 17; *see also* Docket No. 63 at 10–11, 28.

The Departments' goal has not changed: "The goal of the [Final] [R]ule is to keep costs down."  Docket No. 94 at 32:22–23.  Although the Departments have abandoned the "rebuttable presumption" term, they have not relinquished their goal of privileging the QPA, tilting arbitrations in favor of insurers, and thereby lowering payments to providers.

Accordingly, for the reasons stated above, the challenged provisions of the Final Rule conflict with the Act and must be set aside under the APA.[11]

## IV.

Having determined that the Final Rule violates the APA, the Court considers the proper remedy.

Plaintiffs ask the Court to vacate certain portions of the Rule.  Docket No. 1 at 26; Docket No. 64 at 34.  As before, Plaintiffs argue that the Final Rule is seriously deficient and cannot be rehabilitated because it conflicts with the unambiguous terms of the Act.  Docket No. 41 at 29 (citing *TMA*, 587 F. Supp. 3d. at 548).  Plaintiffs also argue that vacatur is especially warranted here, where the Departments "knew about many of the potential problems with the Final Rule" and "ignored or failed to adequately address them."  *Id.* at 29–30 (citing *Texas v. Biden*, 20 F.4th 928, 1000 (5th Cir. 2021), *rev'd and remanded on other grounds*, 142 S. Ct. 2528 (2022) (noting

---

[11] Plaintiffs also argue that the challenged provisions of the Final Rule should be set aside as arbitrary and capricious.  *See* Docket No. 41 at 26; Docket No. 42 at 9.  Because the Court finds that the Final Rule conflicts with the Act and sets it aside under the APA on that basis, the Court need not address Plaintiffs' alternative argument.  *See Flight Training Int'l, Inc. v. Fed. Aviation Admin.*, 58 F.4th 234 (5th Cir. 2023) ("In light of this disposition, we do not reach FTI's alternative argument that the Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."); *Marable v. Dep't of Com.*, 857 F. App'x 836, 837 (5th Cir. 2021) ("Because we conclude that the first basis relied upon by the district court for summary judgment . . . is dispositive, we need not address" other grounds.).

that vacatur is appropriate where an agency is "on notice about the problems with its decision . . . and it still failed to correct them" (cleaned up)).

The Departments request that any relief be limited to the Plaintiffs in this case. Docket No. 63 at 41. According to the Departments, "[n]othing in the APA's directive to 'set aside' unlawful 'agency action' mandates that 'agency action' shall be set aside globally, rather than as applied to the plaintiffs." *Id.* (quoting 5 U.S.C. § 706(2)).

As the Court held in *TMA*, "by default, remand with vacatur is the appropriate remedy" when agency action is successfully challenged under the APA. 587 F. Supp. 3d at 548 (quoting *Texas v. Biden*, 20 F.4th at 1000); *see also Cargill v. Garland*, 56 F.4th 447, 472 (5th Cir. 2023) (en banc) ("[V]acatur of an agency action is the default rule in this Circuit."); *R.J. Reynolds Tobacco Co. v. U.S. FDA*, 2022 WL 17489170, at \*21 (E.D. Tex. Dec. 7, 2022) (noting that the Fifth Circuit has interpreted "set aside" in the APA as "the remedy of vacatur").[12] And "the ordinary result" of setting aside unlawful rules is that "the rules are vacated—not that their application to the individual petitioners is proscribed." *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 944–45 (N.D. Tex. 2019) (quoting *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)); *TMA*, 587 F. Supp. 3d at 549.

---

[12] *See also, e.g.*, *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (holding that § 706's instruction for courts to "set aside" unlawful agency action means to vacate that action as to all parties); *Set Aside*, BLACK'S LAW DICTIONARY (3d ed. 1944) ("To set aside a judgment, decree, award, or any proceedings is to cancel, annul, or revoke them at the instance of a party unjustly or irregularly affected by them."). *But see Arizona v. Biden*, 40 F.4th 375, 395 (6th Cir. 2022) (Sutton, C.J., concurring) (explaining that § 706's "set aside . . . ." does not support disregarding "the long-understood view of equity—that courts issue judgments that bind the parties in each case over whom they have personal jurisdiction").

Further, the same factors the Court considered in *TMA*—the "seriousness of the deficiencies of the action" and "the disruptive consequences of vacatur"—again weigh in favor of vacatur here. *TMA*, 2022 WL 542879, at *14 (citing *Texas v. Biden*, 20 F.4th at 1000). *First*, the Final Rule "conflicts with the unambiguous terms of the Act," meaning that the Departments cannot justify the challenged portions of the Rule on remand. *Id.* (citing *Sw. Elec. Power Co.*, 920 F.3d at 1022 (vacating and remanding part of final rule that was contrary to statute)). *Second*, "vacatur will not be unduly disruptive" as the "remaining provisions of the Rule and the Act itself provide a sufficient framework" for all interested parties to resolve payment disputes. *Id.*

The Departments provide only one reason to reconsider these factors. They argue that vacatur "would be highly disruptive, as it would leave arbitrators with no guidance as to how to proceed with their decision-making." Docket No. 62 at 42. But the "only consequence of vacatur will be that arbitrators will decide cases under the statute as written without having their hands tied by the Departments." *TMA*, 587 F. Supp. 3d at 549. And here, vacatur would preserve the status quo because arbitrators have been—and are presently—deciding payment disputes pursuant to the statute since the Court vacated the interim final rule nearly a year ago.

Accordingly, the proper remedy is vacatur of the challenged provisions and remand to the Departments for "further consideration in light of this opinion."[13] *Franciscan All., Inc.*, 414 F. Supp. 3d at 945.

---

[13] Plaintiffs also ask the Court to "remand to the Departments with specific instructions" on how to

## V.

In sum, the Court holds that (1) Plaintiffs have standing to challenge the Final Rule, (2) the Rule conflicts with the unambiguous terms of the Act, and (3) vacatur and remand of the challenged portions of the Rule is the proper remedy.

Accordingly, the Court **GRANTS** Plaintiffs TMA, Dr. Adam Corley, and Tyler Regional Hospital's motion for summary judgment (Docket No. 41), **GRANTS** Plaintiffs LifeNet and East Texas Air One's motion for summary judgment (Docket No. 42), **DENIES** Defendants' cross-motions for summary judgment (Docket Nos. 63, 96), and **ORDERS** that the following provisions of the Final Rule are **VACATED** and **REMANDED** for further consideration in light of this Opinion:

(1)     The word "then" in 45 C.F.R. § 149.510(c)(4)(iii)(B); the entirety of 45 C.F.R. §§ 149.510(c)(4)(iii)(E) and (c)(4)(iv); and the final sentence of 45 C.F.R. § 149.510(c)(4)(vi)(B);

(2)     The word "then" in 26 C.F.R. § 54.9816-8(c)(4)(iii)(B); the entirety of 26 C.F.R. § 54.9816-8(c)(4)(iii)(E) and (c)(4)(iv); and the final sentence of 26 C.F.R. § 54.9816-8(c)(4)(vi)(B);

(3)     The word "then" in 29 C.F.R. § 2590-716-8(c)(4)(iii)(B); the entirety of 29 C.F.R. § 2590-716-8(c)(4)(iii)(E) and (c)(4)(iv); and the final sentence of 29 C.F.R. § 2590-716-8(c)(4)(vi)(B);

(4)     The entirety of 45 C.F.R. § 149.520(b)(3);

(5)     The entirety of 26 C.F.R. § 54.9817-2(b)(3); and

(6)     The entirety of 29 C.F.R. § 2590-717-2(b)(3).

---

implement any future rule.  Docket No. 41 at 30.  Plaintiffs acknowledge this is appropriate only "in exceptional cases," but argue that the Departments "failed to comply with a previous court order" or otherwise "repeatedly failed to respect the governing law."  *Id.* (citing *Sierra Club. v. EPA*, 346 F.3d 955, 963 (9th Cir. 2003); *Fiber Glass Sys., Inc. v. NLRB*, 807 F.2d 461, 463 (5th Cir. 1987); *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 769–70 (9th Cir. 2007)).  The Court disagrees.  Although mistaken, the Departments attempted to draft a rule in accord with the statute and the Court's prior order.  87 Fed. Reg. at 52,624–25 (detailing this Court's rulings and discussing changes made in response).  This is therefore not an "exceptional case" warranting the requested remand.  *Cf., e.g.*, *Fiber Glass Sys.*, 807 F.2d at 463 (remanding with instructions only after "repeatedly direct[ing]" the agency, on at least seven cited occasions, to comply with circuit precedent).

So **ORDERED** and **SIGNED** this **6th**   day of **February, 2023.**

_____

JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE